No. 24-879

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

YUGA LABS, INC.,

*Plaintiff-Appellee*,

*v.*

RYDER RIPPS, JEREMY CAHEN,

*Defendants-Appellants*,

*and*

DOES 1–10,

*Defendants.*

On Appeal from the United States District Court
for the Central District of California, No. 2:22-cv-04355 (Walter, J.)

## BRIEF FOR APPELLANTS RYDER RIPPS AND JEREMY CAHEN

THOMAS G. SPRANKLING
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
(650) 858-6062

DEREK A. GOSMA
HENRY M. NIKOGOSYAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
350 South Grand Avenue
Suite 2400
Los Angeles, CA 90071
(213) 443-5316

LOUIS W. TOMPROS
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6886

NICHOLAS WERLE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

March 1, 2024

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................iv

INTRODUCTION ................................................................................1

JURISDICTION...................................................................................1

ISSUES ON APPEAL ..........................................................................4

CONSTITUTIONAL AND STATUTORY PROVISIONS
    INVOLVED ....................................................................................5

STATEMENT ......................................................................................6

    A.    Non-Fungible Tokens ("NFTs") ........................................6

    B.    Ripps And Cahen Create The RR/BAYC Project To Criticize
        Yuga And The NFT Craze ..................................................8

    C.    Yuga's Failure To Register Relevant Trademarks Or
        Copyrights ........................................................................14

    D.    Procedural History............................................................15

SUMMARY OF THE ARGUMENT .....................................................17

ARGUMENT ......................................................................................20

I.    THE DISTRICT COURT'S SUMMARY JUDGMENT RULING MADE
    NUMEROUS ERRORS THAT AFFECT BOTH CLAIMS ........................20

    A.    The Use Of The Asserted Marks Was Protected By Nominative
        Fair Use ............................................................................20

    B.    The Use Of The Asserted Marks Was Protected By The First
        Amendment .......................................................................27

    C.    The District Court Made Multiple Errors In Applying The
        *Sleekcraft* / Likelihood of Confusion Analysis .................34

        1.    Typical NFT Consumers Would Not Likely Confuse The
            RR/BAYC Project For A Yuga Production.............................35

        2.    The District Court Ignored Evidence And Resolved
            Genuine Disputes In Yuga's Favor (*Sleekcraft* factors 3,
            5, 7) ..........................................................................37

        3.    The District Court's Errors Regarding The Likelihood of
            Confusion Analysis Also Affected The Cybersquatting
            Claim .......................................................................42

D.     Yuga Has No Ownership Rights Over The Asserted Marks ..............43

II.    THE DISTRICT COURT AT LEAST ERRED IN GRANTING SUMMARY JUDGMENT ON THE LANHAM ACT CLAIM ........................................48

A.     An NFT Is Not A "Good" Under The Lanham Act ............................48

B.     It is Disputed Whether Yuga Lawfully Used The Asserted Marks In Commerce ......................................................................51

III.   THE DISTRICT COURT ERRONEOUSLY REJECTED APPELLANTS' COUNTERCLAIMS ................................................................................53

A.     Yuga Was Not Entitled To Summary Judgment On The DMCA Counterclaim ................................................................................53

B.     Appellants' Copyright Counterclaims Were Erroneously Dismissed With Prejudice ..........................................................56

IV.   EVEN IF THE SUMMARY-JUDGMENT LIABILITY RULING WERE UPHELD, THE REMEDIES AWARDED WERE IMPROPER ......................56

A.     The Permanent Injunction Unconstitutionally Infringes Protected Speech ............................................................................56

B.     The $1.6 Million Award Violated Federal Equitable Principles And The Seventh Amendment ......................................................59

1.     Yuga Was Not Permitted To Seek Monetary Relief Via Equitable Remedies When Legal Remedies Were Available ..........................................................................59

2.     The Seventh Amendment Bars More Than Minimum Statutory Damages For Cybersquatting ...................................60

C.     The $7 Million Attorneys' Fees Award Was Erroneous....................61

CONCLUSION ..............................................................................................64

CERTIFICATE COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884 (9th Cir. 2019) ...........................................................................21, 23, 24

*Barcamerica International USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589 (9th Cir. 2002) ...........................................................44, 45

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141 (1989)....................51

*Boquist v. Courtney*, 32 F.4th 764 (9th Cir. 2022) ......................................................6

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036 (9th Cir. 1999) .....................................................36

*Brother Records v. Jardine*, 318 F.3d 900 (9th Cir. 2003)......................................24

*Brown v. Electronic Arts, Inc.*, 724 F.3d 1235 (9th Cir. 2013) ...............................28

*Cairns v. Franklin Mint Co.*, 292 F.3d 1139 (9th Cir. 2002) .......................2, 21, 24

*Classic Media, Inc. v. Mewborn*, 532 F.3d 978 (9th Cir. 2008) ..............................62

*CreAgri, Inc. v. USANA Health Sciences, Inc.*, 474 F.3d 626 (9th Cir. 2007) ............................................................................................51

*CrossFit, Inc. v. Alvies*, 2014 WL 251760 (N.D. Cal. Jan. 22, 2014).....................54

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003)..................................................................................................49, 40

*Dr. Seuss Enterprises, L.P. v. ComicMix LLC*, 983 F.3d 443 (9th Cir. 2020) ............................................................................................33

*Dr. Seuss Enterprises v. ComicMix LLC*, 300 F. Supp. 3d 1037 (S.D. Cal. 2017) ...............................................................................................24

*Dreamwerks Product Group, Inc. v. SKG Studio*, 142 F.3d 1127 (9th Cir. 1998).............................................................................................34

*DSPT International, Inc. v. Nahum*, 624 F.3d 1213 (9th Cir. 2010) ........................................................................26, 33, 42, 43

*Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135 (9th Cir. 2002) ............38, 39, 43

*Feltner v. Columbia Pictures Television*, 523 U.S. 340 (1998) ..............................60

*Franklin v. Gwinett County Public School*, 503 U.S. 60 (1992) ...........................59

*Freecycle Network, Inc. v. Oey*, 505 F.3d 898 (9th Cir. 2007) ...............................45

*Freeman v. Oakland Unified School District*, 179 F.3d 846 (9th Cir. 1999) ........................................................................56

*Friel v. Dapper Labs, Inc.*, 657 F.Supp.3d 422 (S.D.N.Y. 2023) ..........................52

*GoPets Ltd. v. Hise*, 657 F.3d 1024 (9th Cir. 2011) ................................60, 61

*Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414 (9th Cir. 2014) ..................................56

*Guzman v. Polaris Industries, Inc.*, 49 F.4th 1308 (9th Cir. 2022) ........................59

*Ironhawk Technologies, Inc. v. Dropbox, Inc.*, 2 F.4th 1150 (9th Cir. 2021) ........................................................................34

*Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140 (2023) ........................................................................27, 31, 39

*Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203 (9th Cir. 2023) ................................................................61

*KP Permanent Make-Up v. Lasting Impression I, Inc.*, 408 F.3d 596 (9th Cir. 2005) ..............................................................1, 35

*Lahoti v. VeriCheck*, 586 F.3d 1190 (9th Cir. 2009) ...............................................26

*Lenz v. Universal Music Corp.*, 815 F.3d 1145 (9th Cir. 2016) .................53, 54, 55

*Levine v. United States District Court for Central District of California*, 764 F.2d 590 (9th Cir. 1985) .......................................58

*Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002) .........25, 27, 31, 39

*Mattel, Inc. v. Walking Mountain Products*, 353 F.3d 792 (9th Cir. 2003) ................................................................................39

*Missouri ex rel. Koster v. Harris*, 847 F.3d 646 (9th Cir. 2017) ...........................56

*Multi Time Machine, Inc. v. Amazon.com, Inc.*, 804 F.3d 930 (9th Cir. 2015) ................................................................................35

*Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137 (9th Cir. 2011) ...........................................2, 35, 36, 40, 41, 42

*New Kids on the Block v. News Ammerica Publishing, Inc.*, 971 F.2d 302 (9th Cir. 1992) .......................................20, 23, 24, 25

*Newmont Mining Corp. v. Pickens*, 831 F.2d 1448 (9th Cir. 1987) .........................6

*NRDC, Inc. v. Pritzker*, 828 F.3d 1125 (9th Cir. 2016) .............................................6

*Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971)............................57

*Packingham v. North Carolina*, 582 U.S. 98 (2017) ..................................................1

*Phoenix Entertainment Partners v. Rumsey*, 829 F.3d 817 (7th Cir. 2016) ................................................................................50

*Playboy Enterprises, Inc. v. Netscape Communications Corp.*, 354 F.3d 1020 (9th Cir. 2004) ........................................................40

*Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022 (9th Cir. 2024) ..................................................... 27, 30, 31, 31, 32, 34

*Ranza v. Nike, Inc.*, 793 F.3d 1059 (9th Cir. 2015) ..................................................42

*Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190 (9th Cir. 2012) ................................................................................47

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir.1989)......................................................27

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)..........................................................51

*San Diego Comic Convention v. Dan Farr Productions*, 2019 WL 1599188 (S.D. Cal. Apr. 15, 2019) ................................................63

*San Diego Comic Convention v. Dan Farr Productions*,
807 F.App'x 674 (9th Cir. 2020).....................................................63

*Sengoku Works Ltd. v. RMC International, Ltd.*, 96 F.3d 1217
(9th Cir. 1996) ..............................................................................51

*Slep-Tone Entertainment Corp. v. Wired for Sound Karaoke & DJ
Services, LLC*, 845 F.3d 1246 (9th Cir. 2017)...........................49, 50

*Sooner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) ........................60

*TE-TA-MA Truth Foundation-Family of URI, Inc. v. World Church of
the Creator*, 392 F.3d 248 (7th Cir. 2004) .....................................64

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171
(9th Cir. 2010) ......................................................................*passim*

*Twentieth Century Fox Television v. Empire Distribution, Inc.*,
875 F.3d 1192 (9th Cir. 2017) .................................................20, 30

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*,
718 F.3d 1006 (9th Cir. 2013) ......................................................53

*Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350 (9th Cir.
1969) .............................................................................................23

*Yuga Labs, Inc. v. Ripps*, 2023 WL 7123786 (9th Cir. Oct. 30, 2023) .............15, 28

## STATUTES

15 U.S.C.
§§1051 *et seq.* .............................................................................3
§1117 ...................................................................................60, 61
§1125 ..........................................................................................25

17 U.S.C. §512 ....................................................................................53, 55

28 U.S.C.
§1291 ...........................................................................................3
§1331 ...........................................................................................3
§1338 ...........................................................................................3
§1367 ...........................................................................................3

Fed. R. App. P. 4(a) ................................................................3

## OTHER AUTHORITIES

Busch, Kristen E., *Non-Fungible Tokens (NFTs)*,
  Congressional Research Service (July 20, 2022),
  https://crsreports.congress.gov/product/pdf/R/R47189 ............................. 6, 7

Chen, Adrian, *Ryder Ripps: An Artist of the Internet*, N.Y. Times
  (July 8, 2014), https://www.nytimes.com/2014/07/10/fashion/
  ryder-ripps-an-artist-of-the-internet.html .........................................8

International Astronomical Union, *Buying Stars and Star Names*,
  https://www.iau.org/public/themes/buying_star_names/ (visited
  Mar. x, 2024) ................................................................6

*Licenses*, Bored Ape Yacht Club,
  https://boredapeyachtclub.com/licenses/bayc (visited Mar. 1,
  2024) ................................................................44

*Matter of Impact Theory, LLC*, Release No. 11226 (SEC Aug. 28,
  2023), https://www.sec.gov/files/litigation/admin/2023/33-
  11226.pdf ................................................................52

OpenSea, *Mona Lisa Painting NFT*, http://tinyurl.com/5b4knjpk
  (visited Mar. x, 2024) ................................................................6

Rarible, *Dallas Symphony/MET Orchestra MET Orchestra Musicians
  Musical Experience, VIP Edition*, http://tinyurl.com/ahfshb98
  (visited Mar. x, 2024) ................................................................6

## INTRODUCTION

This case presents questions of first impression regarding non-fungible tokens ("NFTs"), trademark law, and the First Amendment.

The issues' novelty and the underlying, emerging technology requires "extreme caution," given the "vast potential [of the Internet] to alter how we think, express ourselves, and define who we want to be." *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017).[1] The district court, however, appears to have misunderstood critical aspects of NFT technology and granted Appellee Yuga Labs summary judgment of trademark infringement—an approach that ignored numerous genuine disputes of material fact and one that this Court has repeatedly described as "disfavored" "due to the "intensely factual nature of trademark disputes." *KP Permanent Make-Up v. Lasting Impression I., Inc.,* 408 F.3d 596, 602 (9th Cir. 2005). Worse, the district court entered a permanent injunction that appears to prohibit Appellants Ryder Ripps and Jeremy Cahen and their attorneys from mentioning certain words in any context—no matter whether those words express First Amendment-protected criticism of Yuga or simply appear in an appellate brief.[2]

---

[1] Unless specified, all emphasis has been added and all alterations, citations, and internal quotation marks omitted from all cited sources.

[2] As discussed below, Yuga has taken the position that the injunction does not bar the use of certain terms (e.g., "RR/BAYC") in this brief. It, however, refused to agree that the injunction permits Defendants to use "RR/BAYC" or similar terms in any other context.

The district court's other rulings, too, were riddled with error.  Most notably, at Yuga's encouragement, the district court granted summary judgment on the nominative fair use doctrine based on two fundamental misunderstandings of the law—(1) that the doctrine categorically did not apply because "Defendants are not using the… marks to sell Yuga's" products and (2) that Ripps and Cahen had the burden to establish nominative fair use.  1-ER-90.  Both conflict with binding authority.  *See Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1152 (9th Cir. Cir. 2002) (doctrine applies even where "the alleged infringer's ultimate goal was to describe his own product"); *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1182-1183 (9th Cir. 2010) (once defendant invokes doctrine, plaintiff "must bear the burden of establishing that [defendants'] use of the [asserted mark] was *not* nominative fair use").

In addition, the district court applied the wrong legal standard by analyzing the fact-intensive likelihood-of-confusion analysis through the lens of a generic consumer without any knowledge of NFT technology, 1-ER-84, despite this Court having held a decade ago that the correct standard is the typical purchaser of the product at-issue.  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1152 (9th Cir. 2011).  The district court also granted summary judgment on Appellants' counterclaim for improper takedown requests under the Digital

Millenium Copyright Act ("DMCA") even though Yuga undisputedly did not assert a copyright claim.

The district court simply did not give the myriad novel issues in this case the time and attention they deserved. Rather, the court rubber-stamped nearly every motion Yuga filed—often cribbing erroneous legal analysis from Yuga's lengthy proposed orders. And, after ruling in Yuga's favor on two claims, it permitted Yuga to dismiss its remaining claims and remedies that would have allowed Ripps and Cahen to develop a factual record in front of a jury. The district court's decisions do not withstand scrutiny and should be reversed.

## JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. §§1331, 1338, and 1367. Yuga's federal claims are, in part, based on violations of the Lanham Act, as amended, 15 U.S.C. §§1051 *et seq.* The district court had jurisdiction over Yuga's state law claims pursuant to 28 U.S.C. §§1338(b) and 1367. *See* 28 U.S.C. §1291; 1-ER-2. Ripps and Cahen. The district court entered final judgment on February 3, 2024. Appellants timely filed a notice of appeal on February 12, 2024. *See* FRAP 4(a); 7-ER-1312.

## ISSUES ON APPEAL

(1)     Whether a genuine factual dispute precluded summary judgment on both Yuga's "False Designation of Origin" claim (hereinafter "Lanham Act Claim") and "Cybersquatting" claim because:

     a.  Yuga failed to establish Ripps' and Cahen's use of the asserted marks is not protected under the doctrine of nominative fair use;

     b.  Ripps' and Cahen's use of the asserted marks as part of their RR/BAYC Project (i) criticizing Yuga for propagating racist imagery and committing fraud and (ii) satirizing the NFT market is protected under the First Amendment;

     c.  Yuga failed to establish that Ripps' and Cahen's use of the asserted marks raises a substantial likelihood of confusing a typical NFT purchaser; and/or

     d.  Yuga failed to show it did not transfer or otherwise abandon the asserted marks.

(2)     Whether a genuine factual dispute precluded summary judgment on Yuga's Lanham Act claim because:

     a.   Yuga failed to establish that an NFT is a "tangible good" subject to trademark protection; and/or

      b.  Yuga failed to establish it lawfully used the asserted marks in commerce.

(3)    Whether the district court erred in rejecting several counterclaims, including by

      a.  Granting summary judgment on the Digital Millenium *Copyright* Act Claim, where there is at least a genuine dispute that Yuga knowingly and misleadingly relied on a *trademark* to file a *copyright* takedown; or

      b.  Dismissing *with prejudice* two declaratory judgment counterclaims that were resolved on jurisdictional rather than merits ground.

(4)    Whether the remedies ordered by the district court (injunctive relief, equitable relief, and attorney's fees) should be vacated, including because they contravene the First and Seventh Amendments and federal equitable principles.

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

Relevant provisions are in an addendum.

## STATEMENT

### A.     Non-Fungible Tokens ("NFTs")

An NFT is a unique digital record stored on a decentralized network of computers called a "blockchain," a unit of data that cannot be copied.  *See* Busch, *Non-Fungible Tokens (NFTs)* 1, Congressional Research Services (July 20, 2022).[3] As relevant here, an NFT is akin to a database record.  *Id.*   It indicates which cryptocurrency "wallet" holds the NFT and also may include other information such as an internet link linking to a digital item (e.g., an image file).  The image is not what is conveyed when an NFT is purchased—custody of the unique digital record on the blockchain is all that is transferred.  Anyone can create an NFT that links to anything; a person who creates (or "mints") an NFT may or may not have any property rights over the item that the NFT references.  Busch, *Non-Fungible Tokens (NFTs)* 1.  For example, there are NFTs that reference the Mona Lisa[4] and a recording of Mahler's First Symphony.[5]  Therefore, although NFTs *can* be used to verify ownership or provenance of the NFT itself, there is no inherent link between

---

[3] This Court has relied on Congressional Research Service reports to "summarize[]" basic background information.  *See Newmont Min. Corp. v. Pickens*, 831 F.2d 1448, 1453 (9th Cir. 1987); *see also, e.g.*, *Boquist v. Courtney*, 32 F.4th 764, 782 (9th Cir. 2022); *NRDC, Inc. v. Pritzker*, 828 F.3d 1125, 1130 n.5 (9th Cir. 2016).

[4] http://tinyurl.com/5b4knjpk.

[5] http://tinyurl.com/ahfshb98.

the transfer of an NFT between blockchain "wallets" and the conveyance of property rights in the referenced item. Busch, *Non-Fungible Tokens (NFTs)* 1.

In this way, NFTs are analogous to certificates issued by the various commercial services that sell the "right" to "name a star" after someone. A consumer pays money to purportedly "name a star" and in return receives a piece of paper that lists Polaris as "Jim's Star." But Jim neither *owns* the star nor can he require anyone to use his preferred name.[6] He simply owns a piece of paper that links his name to the star. An NFT—like a certificate reading "Jim's Star"—only has intrinsic value to the extent that people believe it does. *See* Busch, *Non-Fungible Tokens* 2 n.12 ("An NFT's value is determined by the willingness of people to pay for it…. The token is inherently valueless.").

Each NFT is verifiably unique; they are created using software code called "smart contracts" that add NFT data to a blockchain. Busch, *Non-Fungible Tokens* 4-5. The blockchain associates each NFT with the "wallet" that holds the NFT and the smart contract that created the NFT. *Id.* That information is "accessible to… anyone using a searchable blockchain explorer." *Id.* One explorer is Etherscan.io— a website that displays entries on the Ethereum blockchain, which records the NFTs at-issue here. *See id.* at 3-5.

---

[6] https://www.iau.org/public/themes/buying_star_names/.

### B. Ripps And Cahen Create The RR/BAYC Project To Criticize Yuga And The NFT Craze

Appellant Ryder Ripps is a well-established visual artist and designer known for works examining popular culture and illustrating how individuals move through our digitized world. The *New York Times* described him as "An Artist of the Internet."[7] *See also, e.g.*, 3-ER-424 (*Forbes* article listing Ripps in the 2016 class of 30 Under 30). Ripps also provided creative direction for well-known companies like Nike and Red Bull and numerous world-famous musicians.[8]

Appellee Yuga Labs is a company with a multi-billion-dollar valuation that created the Bored Ape Yacht Club NFT collection. The Bored Ape NFTs link to cartoon monkeys with various expressions and costumes (the "Bored Ape Images"). The Bored Ape Images have come under public and regulatory scrutiny for, among other things, their depictions of apes with so-called "hip hop" traits and apes wearing kamikaze headbands.

---

[7] Chen, *Ryder Ripps: An Artist of the Internet*, N.Y. Times (July 8, 2014).

[8] *Id.*


BAYC #3721


BAYC #6281

2-ER-274, 4-ER-802.

Ripps and one of his three collaborators, Appellant Jeremy Cahen, are among Yuga's most prominent public critics of the Bored Apes Images' racist and antisemitic imagery. Ripps and Cahen began publicly criticizing Yuga in November 2021, a few months after the Bored Apes NFTs first appeared. 1-ER-74. Ripps and Cahen then conveyed their criticism through a satirical and appropriation art project entitled "Ryder Ripps Bored Ape Yacht Club" ("RR/BAYC Project" or "RR/BAYC"). As explained on the Project's website rrbayc.com, "RR/BAYC uses satire and appropriation to protest and educate people regarding The Bored Ape Yacht Club and the framework of NFTs." 2-ER-283. As part of the RR/BAYC Project, Ripps criticized Yuga through "his Twitter and Instagram profiles, podcasts, cooperation with investigative journalists, and by creating the website www.gordongoner.com," which illustrates how Yuga propagates antisemitic and racist tropes embedded in the Bored Ape Images. 1-ER-46. This case arises from

Ripps' use of certain words and images in connection with acts that convey the RR/BAYC Project's principal critiques.

*First*, the RR/BAYC Project asserts that Yuga embeds its products with racist imagery and references that are popular with neo-Nazis, alt-right groups, and racist subcultures on websites like 4chan.org/pol. 1-ER-74; 2-ER-247. On gordongoner.com and rrbayc.com, Ripps criticized the Bored Ape Images as embodying "simianization" of "Black people and Asian people," which has historically "justif[ied] violence and racism against another group by dehumanizing them, comparing them to apes." 2-ER-247. Ripps also criticized Yuga's "Ape Skull logo," which is among the marks Yuga asserted, for imitating the Totenkopf emblem for the Nazi Schutzstaffel (SS), the primary perpetrators of the Holocaust. 1-ER-74. To convey this criticism, Ripps designed a satirical logo (right), displayed on gordongoner.com alongside the original Nazi Totenkopf (middle) and Yuga's Ape Skull logo (left).

  

2-ER-248.[9]  As Ripps' satirical logo and this presentation emphasize, Yuga's logo copies all salient features of the Nazi Totenkopf—even the ragged edge and the 18 teeth in the symbol's skull.  (Ripps explained on gordongoner.com that the 18 is an alphanumeric code among neo-Nazis for "Adolf Hitler."  *See* 2-ER-249.)

*Second*, "[c]learly defining what we are buying when we purchase an NFT is one of the primary goals of this work."  2-ER-283 (rrbayc.com).  RR/BAYC accordingly employs "provocations and inquiries regarding the nature of NFT, provenance and digital ownership," by "creating new work in the form of NFTs, based on the BAYC images," using "the process of 're-minting,'" through which "the original BAYC images are recontextualized."  2-ER-282-283.  As Ripps explained, the Bored Ape NFT collection is "the most prominent NFT project," and "[t]he current terms of ownership set forth by Yuga Labs to BAYC token holders are unclear and do not meet current copyright standards."  2-ER-283.

As part of the RR/BAYC Project, in approximately May 2022, Ripps collaborated with Cahen to create a satirical RR/BAYC NFT collection as "an extension of and in the spirit of other artists who have worked within the field of **appropriation art**."  8-ER-1512-¶198; 2-ER-283 (rrbayc.com) (emphasis in original).  The RR/BAYC NFT collection consisted of new NFTs minted from a

---

[9] Ripps' satirical logo also appeared on rrbayc.com.  *See* 2-ER-282.

smart contract controlled by Ripps's Ethereum wallet, which lists the contract creator as "ryder-ripps.eth." 8-ER-1520-1521-¶216. Each of the RR/BAYC NFTs link to the same publicly displayed *image* as a Bored Apes NFT; however, the two collections have ***verifiably*** different smart contract addresses, contract creators, metadata, and creation dates on the blockchain. 8-ER-1504-1506-¶¶185-186.

The RR/BAYC NFTs gained notoriety, and the Project team set up the website rrbayc.com through which users could commission his satirical art, in the form of NFTs. 2-ER-282. The rrbayc.com interface required each prospective collector to review an artist statement that RR/BAYC NFTs are "a new mint of BAYC imagery, recontextualizing it for educational purposes, as protest and satirical commentary." 2-ER-280. The artist statement linked to the RR/BAYC smart contract on Etherscan, which collectors were invited to use "to verify provenance." *Id.*



2-ER-280. Ripps also repeatedly posted the artist statement to his Twitter account. *See* 2-ER-258 to 2-ER-270.

The RR/BAYC team made *all* of their primary-market sales of RR/BAYC NFTs either through Twitter or rrbayc.com in exchange for Ethereum at prices between $100 and $200. 8-ER-1506-1506-¶¶187-188. (At the time, Bored Ape NFTs traded for hundreds of thousands of dollars, or in some cases millions of dollars, each. *See* 8-ER-1511-1512-¶196.) These primary-market sales represent more than 90% of the total transaction volume in the RR/BAYC NFT collection.

*See* 8-ER-1506-1507-¶187.  While some collectors of RR/BAYC NFTs (including Cahen) later resold their NFTs on certain third-party NFT marketplaces, including OpenSea and x2y2, Appellants never created pages on any NFT marketplace; these were automatically generated by those third-party marketplaces and displayed information such as the creator ("ryder_ripps"). *See* 8-ER-1519-1520-¶213.  But as the custodian of the smart contract that minted the RR/BAYC NFTs, Ripps could edit those pages and took steps to make clear there was no affiliation with Yuga.  For example, Ripps edited the RR/BAYC page on x2y2 to add the header "RRBAYC.com," the title "RR/BAYC," the RR/BAYC Project's satirical version of the Ape Skull logo, and the message "you can't copy an NFT. conceptual art by Ryder Ripps…" 3-ER-539.

## C.     Yuga's Failure To Register Relevant Trademarks Or Copyrights

Yuga sold out its Bored Ape NFTs on May 1, 2021, after which it has not minted any more Bored Ape NFTs.  8-ER-1484-1485-¶¶148-150.  Yuga's sales were subject to Terms and Conditions, which state that "[w]hen you purchase an NFT, you own the underlying Bored Ape, the Art, completely." 2-ER-277.  Yuga's Terms and Conditions also provide Bored Ape NFT holders with "an unlimited, worldwide license to use, copy, and display the purchased Art for the purpose of creating derivative works based upon the Art ('Commercial Use')," including "use

of the Art to produce and sell merchandise products (T-shirts etc.) displaying copies of the Art." *Id.*

Yuga did not obtain registration of the asserted marks with the United States Patent and Trademark Office ("PTO"). Yuga withdrew its application for the APE mark on October 3, 2022. *See*3-ER-435. It is undisputed that Yuga holds no copyright registration for its "Ape Skull logo" or the other asserted marks. *See* 8-ER-1385-1387-¶5.

### D. Procedural History

Yuga filed its complaint on June 24, 2022, raising eleven federal and state law claims. 4-ER-804. Appellants filed a combined Anti-SLAPP and motion to dismiss, which was denied on December 16, 2022. 7-ER-1322-1324. Appellants timely appealed the district court's ruling that Yuga's claims as alleged did not arise from an act in furtherance of free speech; this stayed Yuga's eight state-law claims. *See* 4-ER-785. This Court affirmed, concluding that "according to the complaint['s]" allegations, the conduct that was the "basis" of the claims was not protected expression. *Yuga Labs, Inc. v. Ripps*, 2023 WL 7123786, at *1 (9th Cir. Oct. 30, 2023). Even though this Court treated the complaint's allegations as true, it acknowledged that "Ripps's broader artistic process may further his rights of free speech" and that "Ripps's free speech activity may be relevant to" Yuga's claims. *Id.* And on remand, Yuga dismissed those state-law claims. 1-ER-2.

- 15 -

While the appeal was pending, Yuga moved for summary judgment on (1) two federal claims (the Lanham Act and cybersquatting claims), (2) Appellants' defenses, and (3) Appellants' DMCA counterclaim. *See* 4-ER-697. On April 21, 2023, the district court granted Yuga's motion for summary judgment with respect to liability and denied Yuga's motion with respect to a determination of damages. 1-ER-73. The district court's ruling relied heavily on Yuga's proposed order and carried over several of Yuga's errors. *See infra* pp. 21, 34, 52.

Then, after the pretrial conference, Yuga dropped its false advertising claim and abandoned "all legal remedies," including its request for nearly $800 million in damages, to avoid a jury trial. 2-ER-118.

The district court held a bench trial on equitable remedies on July 31, 2023. 2-ER-98. On October 25, 2023, it ordered Appellants to disgorge $1.375 million in profits for the Lanham Act claim and to pay the maximum $200,000 in statutory damages for the cybersquatting claim. 1-ER-72. The Court also entered a permanent injunction barring Appellants from directly or indirectly "marketing, promoting or selling products or services… that use the [asserted marks]" and required Appellants to transfer various assets to Yuga (including domain names and social media accounts). 1-ER-65. The district court adopted Yuga's proposed finding that this was an "exceptional" case meriting the award of attorney's fees. 1-ER-67. A special master, who issued a report on January 12, 2024, recommended an award of nearly

$7 million in fees and more than $300,000 in costs—nearly **quadruple** the merits award. 1-ER43, 1-ER-11.

On Saturday, February 3, 2024, again copying much of Yuga's proposed order, the district court entered a final judgment that adopted the special master's recommendation, dismissed eight of Yuga's eleven original claims, and expanded the scope of the permanent injunction. *See* 1-ER-2. The final judgment provides, *inter alia*, that Defendants are prohibited from "[u]sing in any manner any logo, trade name, trademark, or designation confusingly similar to any of the BAYC Marks or any other Yuga source identifier,… trade name component, or otherwise, to… identify any good and/or service not produced, offered or authorized by Yuga, or to… have the effect of falsely representing that the goods or services of any Defendant or of others are sponsored by, authorized by, or in any way associated with Yuga[.]" *See* 1-ER-7-¶1(b).

## SUMMARY OF THE ARGUMENT

**I.** Four cross-cutting errors precluded summary judgment on Yuga's Lanham Act and cybersquatting claims.

**a.** Appellants' use of the asserted marks constituted nominative fair use because it was necessary to use the asserted marks to identify the specific object of their criticism. The district court erroneously held that the defense is unavailable

where the marks were used to describe the Appellants' own products, misallocated the burden of proof, and improperly resolved factual disputes in Yuga's favor.

**b.** The First Amendment also protected Appellants' use of the asserted marks in furtherance of the RR/BAYC Project's criticism of Yuga's propagation of racism and antisemitism and its satire of the NFT craze. The district court erred in applying the *Rogers* test by, *inter alia*, concluding there was no expressive project, only after it resolved disputes in Yuga's favor and misapplied applicable law.

**c.** Granting summary judgment on the *Sleekcraft* likelihood-of-confusion test is disfavored, and the district court erroneously considering the reaction of a generic consumer rather than the *typical buyer* of NFTs, as required. The district court also ignored record evidence and so improperly resolved disputes for Yuga on several *Sleekcraft* factors.

**d.** Finally, if Yuga ever had any ownership rights in the asserted marks, it abandoned them through its Terms of Service and/or by failing to police others' use of the marks.

**II.** At a minimum, the district court erred in granting summary judgment on the Lanham Act claim for two independent reasons.

**a.** The Bored Ape NFTs do not qualify as "goods" under the Lanham Act—even assuming a database entry is a tangible item, the consumer sees only the ape cartoon associated with the NFT, not the NFT itself.

**b.** Genuine disputes persist about whether Yuga *lawfully* used the unregistered, asserted marks in commerce, because Yuga's business constitutes sale of unregistered securities.

**III.** The district court also erred in rejecting Appellants' counterclaims, including by granting summary judgment on Appellants' DMCA counterclaim where Yuga wrongfully invoked the DMCA in takedown requests predicated on trademarks and in dismissing Appellants' copyright counterclaims *with prejudice* on Article III grounds.

**IV.** Remedies should be vacated if the Court reverses on any merits issue, but the remedies award was independently erroneous for four reasons.

**a.** The permanent injunction imposes an unconstitutional prior restraint on speech. It cannot survive strict scrutiny, because it purports to prohibit Appellants from referring to "RR/BAYC" or "Ape" in any way.

**b.** Equitable disgorgement of profits was unavailable because this Court has twice held that a plaintiff may not dismiss a legal remedy to evade the Seventh Amendment and secure an equivalent equitable remedy.

**c.** The $200,000 statutory damages award on the cybersquatting claim contravenes the Seventh Amendment, because Yuga's abandonment of legal remedies waived more than minimum statutory damages ($2,000).

**d.** The district court abused its discretion in determining this is an "exceptional case" and so awarding over $7 million in fees and costs, as its decision was based on, *inter alia*, an erroneous view of the strength of Appellant's claims and improperly faulted Appellants for routine preservation of legal issues.

## ARGUMENT

**I. THE DISTRICT COURT'S SUMMARY JUDGMENT RULING MADE NUMEROUS ERRORS THAT AFFECT BOTH CLAIMS**

### A. The Use Of The Asserted Marks Was Protected By Nominative Fair Use

**1.** The simplest way to resolve this appeal would be to reverse the district court on nominative fair use grounds.[10] Commercial use of trademarks is permitted by nominative fair use where: (1) "the product or service in question [is] not readily identifiable without use of the trademark;" (2) "only so much of the mark or marks [is]… used as is reasonably necessary to identify the product or service;" and (3) "the user… do[es] nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder." *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).

---

[10] The district court's summary judgment decision—which is discussed throughout Parts I-III—is reviewed *de novo*, with all reasonable inferences drawn in the non-moving party's (Appellants') favor. *See Twentieth Century Fox Television v. Empire Distribution, Inc.*, 875 F.3d 1192, 1196 (9th Cir. 2017).

Here, the district court primarily rejected the nominative fair use defense because of two threshold legal errors. *First*, the district court believed that the defense was categorically unavailable because "Defendants are not using the BAYC Marks to sell Yuga's BAYC NFTs, but to sell their own competing RR/BAYC NFTs." 1-ER-90; *see also id.* ("Nominative fair use… governs where the defendant uses a trademark to describe the plaintiff's product, rather than its own."). But this Court has repeatedly held a nominative fair use defense *is* available where "the alleged infringer's ultimate goal was to describe his own product." *Cairns*, 292 F.3d at 1152; *see, also e.g.*, *Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 893-894 (9th Cir. 2019) (defendant used plaintiff's mark to market defendant's "seminar [that] exclusively critiqued [p]laintiff's… service"). Even Yuga conceded this point in its brief to the Ninth Circuit in the prior Anti-SLAPP appeal. *See* Yuga Br. 44, *Yuga Labs, Inc. v. Ripps*, No. 22-56199 (9th Cir. Apr. 20, 2023), ECF 27 (Yuga agreeing that it is "true" that "fair use does not require use of the mark to *sell* the plaintiff's product").[11]

*Second*, the district court wrongly held that Ripps and Cahen had the burden to show that each element of nominative fair use was met. 1-ER-90 ("In addition,

---

[11] Despite Yuga's recantation, Yuga's proposed order included this error: "Because Defendants used the BAYC Marks to sell and promote their products, their use of the BAYC Marks is not nominative fair use." 2-ER-142.

*Defendants* have failed to establish all the elements of the nominative fair use defense.").  But *Toyota*, cited by the district court, holds the opposite:  a defendant need only show "that it used the mark to refer to the trademarked good, as [Appellants] undoubtedly have here."  *Toyota Motor Sales, U.S.A. v. Tabari*, 610 F.3d 1171, 1183 (9th Cir. 2010).  The *plaintiff* "bear[s] the burden of establishing that the [defendant's] use of the [asserted] mark was *not* nominative fair use."  *Id*. at 1182.  This is because "[a] finding of nominative fair use is a finding that the plaintiff has failed to show a likelihood of confusion" and the Lanham Act "always places the burden of proving likelihood of confusion… on the party charging infringement."  *Id.* at 1183.[12]

Had the district court properly applied the three-factor nominative fair use test, it would have ruled in Ripps' and Cahen's favor (wherever it placed the burden). The district court did not address the first factor (whether Yuga's Bored Apes NFTs "w[ere] 'readily identifiable' without use of the mark)," *see* 1-ER-89-91, but this requirement is satisfied if reasonable inferences are drawn in Defendants' favor. Specifically, to accomplish the core objective of the expressive RR/BAYC Project, "Defendants 'needed to communicate' that they critiqued the [BAYC NFT

---

[12] This error, too, appears traceable to Yuga's proposed order.  *See* 2-ER-141-142 ("Defendants provide no evidence at this stage" to establish the applicability of "nominative fair use.").

collection], and so using the mark in the title and [accompanying promotional materials] 'accomplished this goal.'" *Applied Underwriters*, 913 F.3d at 894 (quoting *Toyota*, 610 F.3d at 1180); *see also supra* pp. 9-12 (discussing RR/BAYC Project); 2-ER-282 (rrbayc.com); 2-ER-247 (gordongoner.com).

The summary judgment order also misstated the second element when it suggested that the factor weighed against Defendants because they "frequently used the entirety of the BAYC marks without modification." 1-ER-90. The proper test is whether "only so much of the… marks [was] may be used as is reasonably necessary to identify the product," *New Kids*, 971 F.2d at 308, and this Court has previously applied nominative fair use even when the defendant used the mark in full, *see, e.g.*, *Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350, 352 (9th Cir. 1969). Thus, even assuming that the marks containing the full name ("Bored Ape Yacht Club") and the abbreviation ("BAYC") were used without modification, this was necessary because they "are the normal terms which… signify [Yuga's NFTs]." *Id.* (permitting independent shop to use "Volkswagen" and "VW" marks). Use of the Ape Skull logo was also necessary, for example, because the logo's similarity to the Nazi Totenkopf emblem for the Schutzstaffel is central to one of the RR/BAYC Project's critical messages—that Yuga propagates antisemitism. *See supra* pp. 10-11. In short, if using the entirety of the mark is necessary to identify

the product (as it was here), the second factor is satisfied regardless of "the number of uses" or any modification. *See Applied Underwriters*, 913 F.3d at 895.

But even under the district court's formulation, there was a genuine dispute that the marks were truly used unmodified. Ripps and Cahen presented evidence that they modified Yuga's logos, appended RR to the BAYC mark, and otherwise recontextualized the asserted marks. *See generally* 8-ER-1512-1516-¶¶197-206. Because "[w]hat is reasonably necessary to identify the plaintiff's product differs from case to case," *Cairns*, 292 F.3d at 1154, this is a disputed factual question that should have gone to a jury.[13]

*Finally*, in considering the last factor (whether Ripps' and Cahen's statements "in conjunction with the mark[] suggest[ed] sponsorship or endorsement by the trademark holder"), *New Kids*, 971 F.2d at 308, the summary judgment order improperly placed dispositive weight on whether Ripps' and Cahen's supposed "'prominent[] and bold[]'" use of the marks "'suggests sponsorship,'" 1-ER-90 (quoting *Brother Recs. v. Jardine*, 318 F.3d 900, 908 (9th Cir. 2003)). This ignored the requirement to "look to *context* to determine how much weight to give the words accompanying a mark," *Toyota*, 610 F.3d at 1178, n.5. Ripps and Cahen

---

[13] Yuga has previously suggested that a defendant's use of the mark must be *identical*, but that approach would render this Court's case regarding the second-factor a nullity. *See Dr. Seuss Enterprises v. ComicMix LLC*, 300 F. Supp. 3d 1037, 1087-1088 & n.11 (S.D. Cal. 2017) (discussing, *inter alia*, *Mattel*).

accompanied their use of the asserted marks with numerous public statements expressly *criticizing* Yuga. *See, e.g.*, 2-ER-247 (gordongoner.com); 2-ER-282 (rrbayc.com). It is well-established that "an artistic work [that] targets the original and does not merely borrow another's property to get attention"—such as RR/BAYC's accusation that Yuga propagates ***racism***—is unlikely to connote sponsorship or endorsement. *Mattel, Inc. v. MCA Recs., Inc.*, 296 F.3d 894, 901 (9th Cir. 2002). And at a minimum, this criticism was also conveyed by appending "RR"—initials widely associated in the NFT community with criticism of Yuga, *see, e.g.*, 8-ER-1525-¶225—in the name "RR/BAYC" and in the domain name rrbayc.com. *See Toyota*, 610 F.3d at 1178 ("The importance ascribed to trademark.com in fact suggests that far less confusion will result when a domain making nominative use of a trademark includes characters in addition to those making up the mark.").

This Court has held that even implicit criticism presented as a question (asking which member of a boy band "is your fave? Or are they a turn off?") suffices to protect use of a mark as fair use. *New Kids*, 971 F.2d at 308-309. It cannot be that *express* criticism Yuga has previously complained constitutes "harassment," 4-ER-805-¶3, is insufficient to disclaim endorsement.

**2.** The nominative fair use defense also precludes liability under the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. §1125(d). As

relevant here, ACPA applies when a defendant uses a domain name that is confusingly similar to a protected mark owned by the plaintiff and acted with "bad faith intent to profit from that mark." *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218-1219 (9th Cir. 2010). However, ACPA provides a safe-harbor for defendant who "reasonably believed that use of the domain name was fair use or otherwise lawful" does not act "in bad faith." *Id.* at 1220. If Ripps and Cahen raise a jury question on whether nominative fair use protects "RR/BAYC," the same logic protects rrbayc.com from ACPA liability. *See supra* pp. 20-25.

The district court went astray by relying on an out-of-context quote from *Lahoti v. VeriCheck*, stating that the safe harbor is unavailable to a defendant "who acts even partially in bad faith." 586 F.3d 1190, 1203 (9th Cir. 2009). But *Lahoti's* facts are nothing like this case. The *Lahoti* defendant offered nothing beyond a "self-serving affidavit" stating that—in his subjective opinion—his behavior was reasonable. *Id.* And that behavior had previously been deemed *unreasonable* by a court—"Lahoti has previously advanced, unsuccessfully, the same trademark defenses he argues here" in past litigation. *Id.* at 1202; *see also id.* at 1194-1195 (noting that defendant "had previously registered more than four hundred domain names containing the trademarks of other companies").

**B.** **The Use Of The Asserted Marks Was Protected By The First Amendment**

"'[T]he Lanham Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression.'" *Mattel*, 296 F.3d at 901 (quoting *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir.1989)). Under *Rogers*, a "defendant must first 'make a threshold legal showing that its allegedly infringing use is part of an expressive work protected by the First Amendment.'" *Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022, 1028 (9th Cir. 2024). The defendant must also establish that it did not "use[] a trademark… as a designation of source for the [alleged] infringer's own goods" but used the mark "solely to perform some other expressive function." *Id.* at 1030 (discussing *Jack Daniel's Properties, Inc. v. VIP Prod. LLC*, 599 U.S. 140 (2023)). If so, the burden shifts to the plaintiff to prove that either "the defendant's use of the mark (1) is not artistically relevant to the work or (2) explicitly misleads consumers as to the source or the content of the work." *Id.* at 1028.

**1.** The district court granted summary judgment that there was no protected, expressive work, apparently because it concluded that there was no material dispute that (1) "the only conduct at issue" was sale of "a collection of NFTs" and (2) such sales are not expressive. 1-ER-88. The district court only ruled on the quintessentially factual question of artistic expression, *see Brown v.*

- 27 -

*Electronic Arts, Inc.*, 724 F.3d 1235, 1243 (9th Cir. 2013), by failing to read the record in a light most favorable to Appellants.[14]

The record contains ample evidence that Appellants' sale of the RR/BAYC NFTs was a component of a broader expressive art project and public protest, as explained on their websites and social media accounts. *See supra* p. 8-14. Specifically, rrbayc.com—the website through which the vast majority of the RR/BAYC NFTs were commissioned—explained that the NFTs were an integral part of the RR/BAYC Project's critique of Yuga and the NFT craze. 2-ER-283. Yuga's own expert conceded that Ripps and Cahen "built their promotion of RR/BAYC NFT and Ape Market around their negative commentary about Yuga Labs." 8-ER-1516-1517-¶207. This Court recognized, even on the pleadings, that the "broader artistic" RR/BAYC Project "may further [Ripps'] rights of free speech," *Yuga Labs*, 2023 WL 7123786, at *1, and Appellants should have been permitted to make that case to a jury.

The RR/BAYC NFTs were also expressive in-and-of-themselves. The district court's ruling rests at least partially on technological misunderstandings, as it focused on the "online digital images associated with the BAYC collection." 1-ER-

---

[14] The Court's ruling on the anti-SLAPP appeal did not reach this question, as it considered only the "alleged conduct" in Yuga's "complaint." *See Yuga Labs*, 2023 WL 7123786, at *1.

88.  But neither Yuga nor Appellants ever sold images.  Yuga merely conveyed possession of a digital record linking to images on a public server (images over which Yuga did not advance a copyright claim *see* 4-ER-831-845)—just as a commercial star registry might issue a certificate purporting to rename the North Star "BAYC Star #5" (and a competing registry might issue its own certificate for "Ryder Ripps' BAYC Star #5")).  The district court's analogy to a "counterfeit handbag" (*id.*) was thus inapposite; neither Yuga nor Appellants ***ever*** conveyed ownership of a physical product.

In fact, as explained on rrbayc.com, one of purposes of the RR/BAYC NFTs was to show that NFTs do not convey rights in accompanying images; the picture is not for sale.  *See* 2-ER-280 (rrbayc.com pre-commission artist statement).  That is why the RR/BAYC Project's satirical message could ***only*** be conveyed ***by NFTs*** linking to the same publicly stored and displayed images as the Bored Ape NFTs. The RR/BAYC NFTs also critique the Bored Ape NFT collection.  The undisputed evidence showed Ripps' criticism of the antisemitism and racism in the Bored Ape Images was well-known in the community of NFT collectors.  *See* 4-ER-652 to 4-ER-680 (emails from NFT collectors).  Adding Ripps' initials to the NFTs both referred the purchasers to his criticism and changed the message of the NFTs' sales.

To the extent that the district court's holding that there was no artistic expression rested on the "commercial" nature of the RR/BAYC Project, 1-ER-88—

that Appellants sold their art rather than giving it away—*Twentieth Century Fox Television v. Empire Distribution, Inc.* rejected that approach. 875 F.3d 1192 (9th Cir. 2017).[15]  *Twentieth Century Fox* applied *Rogers* to uses of an allegedly infringing brand associated with the "Empire" television show in a set of "promotional activities, including those that generate revenue, [that we]re auxiliary to the television show and music releases"—*e.g.*, "appearances by cast members in other media,… online advertising,… and the sale or licensing of consumer goods." *Id.* at 1196-1197.  That same logic forecloses the conclusion that the RR/BAYC NFTs Were disconnected from any protected expression. 1-ER-88-89.  *Rogers* protects sales of even those revenue-generating items that are "auxiliary" to an expressive project. *Twentieth Century Fox*, 875 F.3d at 1197.  This is because "[t]he balance of First Amendment interests struck in *Rogers* and *Mattel* could be destabilized if the titles of expressive works were protected but could not be used to promote those works." *Id.* at 1196.  *Rogers* held that both the movie title "Fred and Ginger" *and* the materials used to promote it were protected. *See id.* at 1196-1197.

Finally, the use of the asserted marks also satisfies the *Jack Daniels* requirement that the marks not be used "as a designation of source for [Defendants']

---

[15] *Twentieth Century Fox*—and all Ninth Circuit *Rogers* cases that predate June 2023—have been abrogated by *Jack Daniel's* in "one specific respect[:] *Rogers* does not apply when an expressive mark is used as a mark." *Punchbowl*, 90 F.4th at 1031.  That requirement is discussed below.

own goods." 599 U.S. at 153. *Jack Daniel's* explains that a *Rogers* defense is unavailable "when the defendant may be 'trading on the good will of the trademark owner to market its own goods.'" *Id.* at 156. The evidence shows Appellants did the ***opposite***—their constant criticism and public protest of the Bored Ape Images' racism and the business practices associated with the Bored Ape NFT collection was intended to *undermine* Yuga's good will, not to trade on it. *See supra* pp. 8-14. This case echoes the two examples of protected expression that *Jack Daniels* cited approvingly: *Mattel* and *Rogers*. *See* 599 U.S. at 153 (*Rogers* "had an expressive element implicating First Amendment values."); *see also Mattel*, 296 F.3d at 901 (marks' use in a song "poke[d] fun at Barbie and the values… she represents"). It was therefore disputed whether Defendants "used the mark[s] at issue in a non-source-identifying way." *Jack Daniels*, 599 U.S. at 155-156.

**2.a.** To prevail on artistic relevance, Yuga must prove there is no dispute that the use of the asserted marks "has '*no* artistic relevance to the underlying work whatsoever.'" *Punchbowl*, 90 F.4th at 1028. But Appellants' expressive purpose was to criticize Yuga and its flagship BAYC NFT collection. And it was necessary for Appellants to use the asserted marks to refer to the objects of their criticism (e.g., BAYC) and to illustrate the substance of their critique (e.g., the Ape Skull logo juxtaposed with the lookalike Nazi Totenkopf). *See supra* pp. 20-25.

- 31 -

The district court's bald statement that the RR/BAYC Project is "a pretextual expressive work meant only to disguise a business profiting from another's trademark" is unsupported by the record and, at a minimum, a jury question. 1-ER-89. Not only does Ripps have a long-established track record as an artist, *see supra* p. 8, but Appellants' (noncommercial) use of the asserted marks to criticize Yuga through their RR/BAYC Project predated by months their creation of the RR/BAYC NFT collection. *See supra* pp. 9-14. Ripps gave away the first RR/BAYC NFTs for no charge, in fact *incurring* transaction costs from the Ethereum network. *See* 2-ER-240. While Appellants later commissioned NFTs for a $100-200 fee, at no point did the commissions cost anything comparable to the Bored Ape NFTs' prices at the time (many of which were worth over $200,000). *See* 8-ER-1511-1512-¶¶195-196. This course of conduct is totally inconsistent with concluding that Appellants' criticism of Yuga was pretextual.

**2.b.** Finally, it is genuinely disputed whether Appellants "explicitly misled consumers" as to the source of the RR/BAYC NFTs. *Punchbowl*, 90 F.4th at 1028. The appearance of "BAYC" or other marks in the title or any aspect of the RR/BAYC Project "does not explicitly mislead as to the source of the work;" "if this were enough…, it would render *Rogers* a nullity." *Id.* The question is whether undisputed facts establish "an 'explicit indication,' 'overt claim,' or 'explicit

misstatement' that caused such consumer confusion.'" *Dr. Seuss Enters., L.P. v. Comic Mix LLC*, 983 F.3d 443, 462 (9th Cir. 2020).

Here, Appellants both textually distinguished the RR/BAYC Project from BAYC (the initials "RR"), *see infra* p. 38-39, and took other steps to avoid confusion. They focused RR/BAYC NFT sales to a particular channel (rrbayc.com) that required prospective collectors to acknowledge that they were commissioning "Ryder Ripps artwork" that was "a new mint of BAYC imagery, recontextualize[ed]… for educational purposes, as protest and satirical commentary." 2-ER-280; *see infra* p. 13. This artist statement instructed prospective collectors to "see the RR/BAYC contract… to verify provenance," and linked to Etherscan, which showed that Ryder Ripps, not Yuga, had created the RR/BAYC NFTs. 2-ER-280.

**3.** The same facts establishing Appellants' *Rogers* defense also trigger the ACPA safe harbor, as the "safe harbor protects uses such as parody and comment." *DSPT International*, 624 F.3d at 1220; *see also id* n.18 (citing *Mattel's* discussion of *Rogers* as example of protected conduct). Both rrbayc.com and apemarket.com were components of the RR/BAYC Project's First Amendment-protected criticism

of Yuga, and it was objectively reasonable for Appellants to believe their artistic and critical expression protected them from liability for registering these domains.[16]

### C.  The District Court Made Multiple Errors In Applying The *Sleekcraft* / Likelihood of Confusion Analysis

On the merits of the Lanham Act claim, Yuga bears the burden to prove that "a reasonably prudent consumer in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998). [17] To make this assessment, this Court considers the eight *Sleekcraft* factors: "(1) strength of the mark; (2) proximity [or relatedness] of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines." *Punchbowl*, 90 F.4th at 1027.[18] Each of the *Sleekcraft* factors "presents a highly factual inquiry." *Ironhawk Techs., Inc. v. Dropbox, Inc.* 2 F.4th 1150, 1161 (9th Cir. 2021). Precisely

---

[16] The apemarket.com website "was never launched" and had "nothing on [it]." 2-ER-196:7-10.

[17] *Sleekcraft* applies only if nominative fair use does not. *See Toyota*, 610 F.3d at 1175.

[18] The district court's decision jumbles the established numbers of *Sleekcraft* factors 5-7, apparently due to another error introduced through Yuga's proposed order. *See* 1-ER-82 (listing fifth factor as defendants' intent, the sixth factor as marketing channels, and the seventh as type of goods and degree of care); *see also* 2-ER-131 (proposed order making the same mistake).

"[b]ecause of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc*., 408 F.3d 596, 602 (9th Cir. 2005). This Court has particularly cautioned against applying *Sleekcraft* with "excessive rigidity… in the Internet context," because "emerging technologies require a flexible approach." *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 936 (9th Cir. 2015). Here, the district court only granted summary judgment on likelihood of confusion by considering the wrong perspective and resolving multiple factual disputes in Yuga's favor.[19]

### 1. Typical NFT Consumers Would Not Likely Confuse The RR/BAYC Project For A Yuga Production

In assessing each *Sleekcraft* factor, "[t]he nature of the goods and the type of consumer is highly relevant to determining the likelihood of confusion." *Network Automation*, 638 F.3d at 1152. The relevant standard "is the *typical buyer*" of the product in question "exercising ordinary caution." *Id*. And this Court concluded over a decade ago that in the context of purchases over the Internet, "the default degree of consumer care is becoming more heightened as the novelty of the Internet evaporates and online commerce has become commonplace." *Id.* Moreover, a "higher standard" of confusion is required where (as here), the relevant buyers

---

[19] The district court also held that two of the *Sleekcraft* factors (actual confusion and expansion of product lines) were neutral. *See* 1-ER-84-85.

"ha[ve] expertise in the field," are "sophisticated" in "understand[ing] the mechanics" of the relevant technology, and "when the goods are expensive [because] the buyer can be expected to exercise greater care in his purchases." *Id.* The district court's summary judgment ruling overlooked the "typical buyer" standard and instead assessed the likelihood-of-confusion test from the perspective of a generic consumer. 1-ER-84 (quoting *Brookfield Commc'ns, Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1060 (9th Cir. 1999)).

The district court's error particularly undermined its analysis of the sixth *Sleekcraft* factor (the type of goods and the degree of care likely to be exercised by the purchaser), because the district court "improperly concluded that this factor weighed in [Yuga's] favor based on" its view "that Internet users on the whole exercise a low degree of care"—an approach that *Network Automation* expressly recognized is error. 638 F.3d at 1153. The district court's assumption is particularly unfounded because in the blockchain space, users must routinely exercise a high degree of care—even one erroneous character in a blockchain address could cause a transfer of assets worth millions of dollars to be irreversibly lost. 3-ER-595-598.

The order acknowledges it is possible to "authenticate[] NFTs" and "verify provenance" for NFTs, 1-ER-84,[20] and Yuga's own expert testified that a consumer

---

[20] The district court erroneously listed the type of goods and degree of care factor as the "seventh *Sleekcraft* factor." 1-ER-84-85.

could use Etherscan to distinguish with "a high degree of certainty" Yuga's BAYC NFTs from Defendants' RR/BAYC NFTs, 8-ER-1522-1523-¶221.[21]  But the court swept this evidence aside by focusing on what a general consumer would know, rather than a typical NFT purchaser (a group the evidence shows tends to be technologically sophisticated, *see* 8-ER-1522-1523-¶¶221-222).  It thus improperly resolved a factual dispute over whether typical purchasers of NFTs are capable of distinguishing between NFTs.  1-ER-84-85.

> **2.**   **The District Court Ignored Evidence And Resolved Genuine Disputes In Yuga's Favor (*Sleekcraft* factors 3, 5, 7)**

The district court's opinion (and Yuga's briefing in the anti-SLAPP appeal) repeatedly echo a variation of the same line: i.e., Appellants "used the BAYC Marks in the ***same*** marketplaces to identify and sell NFTs bearing the exact same images underlying the BAYC NFTs and without adding any expressive content."  *E.g.*, 1-ER-89; *see also id.* at 1-ER-89, 1-ER-77, 1-ER-83-84, 1-ER-88;Yuga Br. 1, No. 22-56199, ECF 27.

While these statements reflect the complaint's *allegations*, those accusations were not borne out by the summary judgment record, which reflects at a least a

---

[21] For example, compare 2-ER-274 (Etherscan page showing that a Yuga BAYC NFT came from "Creator: Bored Ape Yacht Club: Deployer") with 2-ER-272 (Etherscan page showing that a RR/BAYC NFT came from "Creator: *ryder-ripps.eth").

genuine dispute over (1) dissimilarities between the asserted marks and the RR/BAYC Project, (2) where the NFTs were sold, and (3) the connection between the expressive message of the RR/BAYC Project and the accused NFTs.

**A.** The district court erred in holding that the third *Sleekcraft* factor (similarity of the marks) favors Yuga. 1-ER-83. Not only did the district court fail to explain its holding, but it ignored the fundamental principle that "[s]imilarity of marks or lack thereof are context-specific concepts." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1147 (9th Cir. 2002); *see* 1-ER-83.

Here, for example, Appellants modified the BAYC mark by affixing Ripps' initials "RR" as a prefix.[22] This Court has explained that while "the difference between the two words [BAYC] and [RR/BAYC] may seem slight… a reasonable juror could find them dissimilar," because "the two capital letters '[R]R' may serve effectively to signal an important distinction from [Yuga's] use of [BAYC]." *Entrepreneur Media*, 279 F.3d at 1146 (reasonable jury could find "EntrepreneurPR" "dissimilar" from "Entrepreneur", just as "Washington *D.C.*" "distinguish[es] the capital city from the state"). Record evidence supports the reasonable inference that typical NFT purchasers are familiar with Ripps as an artist

---

[22] While the "RR" prefix was omitted from the "token tracker" field shown on Etherscan, Yuga's own witness admitted that collectors use other fields to distinguish NFTs during purchase. 2-ER-172:1-8. Regardless, the RR/BAYC Etherscan page lists "*ryder-ripps.eth" as "Creator." 2-ER-272.

and with his prominent criticism of Yuga. *See* 4-ER-652 to 4-ER-680 (emails from NFT collectors); 8-ER-1516-¶206. This raises a genuine dispute whether affixing his initials "is not arbitrary but suggests a particular difference in *meaning*," *Entrepreneur Media*, 279 F.3d at 1146—specifically, criticism of Yuga's BAYC collection.

The summary judgment record also supports the inference that Appellants recontextualized the asserted marks in a piece of expressive protest art that conveyed an unmistakable message highly critical of Yuga. This Court has long recognized that "[c]ritical works are much less likely to have a perceived affiliation with the original work." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 811 (9th Cir. 2003). And as the Supreme Court recently confirmed, "the use of a trademark to convey a "message of ridicule or pointed humor... is not likely to create confusion." *Jack Daniels*, 599 U.S. at 161. That is precisely what happened here— the RR/BAYC Project "does not rely on [Yuga's marks] to poke fun at another subject but targets [Yuga] [it]self." *Mattel*, 296 F.3d at 901. Because the uses of Yuga's marks in the RR/BAYC Project "target[] the original [marks]," that usage is unlikely to connote sponsorship or endorsement. *Id.*

**b.** The district court overstated the record when, in considering the fifth *Sleekcraft* factor (marketing channels used),[23] it held that "both Yuga and Defendants promoted and sold their NFTs through the same online NFT marketplaces—OpenSea and x2y2." 1-ER-84. Appellants' RR/BAYC NFT sales in the primary market *admittedly* took place almost entirely through two sources: rrbayc.com and person-to-person sales following contact through Twitter. 8-ER-1506-1507-¶¶187-188.[24]

Because Yuga did not use the rrbayc.com website, the only undisputedly common sales method is "the shared use of a ubiquitous marketing channel"—Twitter. *Network Automation*, 638 F.3d at 1151; *see* 1-ER-84. But shared use of Twitter "does not shed much light on the likelihood of consumer confusion," as "it would be the rare commercial retailer that did not advertise online." *Network Automation*, 638 F.3d at 1151. "Given the broad use of [Twitter] today, the same could be said for countless companies," so "this factor merits little weight." *Playboy*

---

[23] Copying Yuga, the district court erroneously listed this as the "sixth" factor. 1-ER-84.

[24] Ripps did post RR/BAYCs to a "Foundation.app" page between May 2021 and June 2021, when the RR/BAYC NFTs were taken down pursuant to Yuga's DMCA notice. *See infra* pp. 53-55. There was never a time when both RR/BAYC and BAYC NFTs were simultaneously listed on Foundation. BAYC NFTs were first listed on Foundation on January 26, 2023 (well after the RR/BAYC NFT collection was taken down), following a Foundation policy change that allowed the import of external NFT collections. 8-ER-1509-1511-¶¶192-194.

*Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004); *see also Network Automation*, 638 F.3d at 1151 (reversing district court finding that parties who advertised on the Internet were using the same marketing channel).

**c.** The district court also misstated the evidence in holding that the seventh *Sleekcraft* factor (Ripps's and Cahen's intent) weighed in favor of confusion. Specifically, the court found that "[b]ecause Defendants knowingly and intentionally used Yuga's BAYC marks, and in the *absence of any contrary evidence*, the Court concludes" Appellants did so "to confuse consumers." 1-ER-84.

But the record was replete with "contrary evidence." There was at least a genuine question of disputed fact whether—far from seeking to trade on Yuga's reputation—Appellants' purpose was to *undermine* it by "us[ing] satire and appropriation to protest and educate people regarding The Bored Ape Yacht Club and the framework of NFTs." *See supra* pp. 9-10 (discussing Appellants' public criticism of Yuga). 2-ER-283. It is particularly telling that Appellants required any prospective collector on rrbayc.com to click through a detailed explanation of the RR/BAYC Project before they could commission an RR/BAYC NFT. *See supra* p. 13. Given these facts, the better analogy—and the only possible analogy if all reasonable inferences are drawn in Appellants' favor—is that Appellants intended to engage in "'truthful comparative advertising,'" where "the use of the trademark serves… to truthfully inform [consumers]." *Network Automation*, 638 F.3d at 1153.

As in *Network Automation*, the district court erred by "incorrectly consider[ing] the intent factor in isolation… without first determining [whether Defendants] intended to deceive consumers rather than compare" their NFTs to Yuga's. *Id.*

### 3. The District Court's Errors Regarding The Likelihood of Confusion Analysis Also Affected The Cybersquatting Claim

If this Court reverses on *Sleekcraft*, it should also reverse on the cybersquatting claim's "confusingly similar" prong, which required Yuga to prove the absence of any genuine dispute over whether rrbayc.com and apemarket.com were identical or confusingly similar to a protected mark owned by Yuga. *See DSPT International*, 624 F.3d at 1218. Although the "confusingly similar" question does not implicate all the *Sleekcraft* factors, the underlying analysis is related, *id.* at 1222 n.28, and the district court's *Sleekcraft* errors carried over to its ACPA analysis. For example, the district court concluded that rrbayc.com and apemarket.com gave rise to cybersquatting liability because they included the entirety of Yuga's asserted marks. *See* 1-ER-86.[25] But *Toyota* teaches (albeit in the Lanham Act context) that "the case where the URL consists of nothing but a trademark followed by a suffix

---

[25] The supposed "APE" mark relates only to the cybersquatting claim. Yuga originally relied on the mark to support its Lanham Act claim, but it abandoned that theory, by failing to "move for summary judgment" on it, 1-ER-74 n.2, and then by failing to request a trial on the issue, *see Ranza v. Nike, Inc.*, 793 F.3d 1059, 1076 (9th Cir. 2015) (theory must be "raised below and fairly supported by the record" to qualify as alternative ground for affirmance).

like .com… is a special one," and this "suggests that far less confusion will result when a domain making nominative use of a trademark includes characters in addition to those making up the mark." 610 F.3d at 1178 (citing *Entrepreneur Media*, 279 F.3d at 1146-1147). Nor does the "rr" prefix "suggest[] sponsorship or endorsement by [Yuga]," *id.* at 1179; to the contrary, in the niche community of potential NFT purchasers interested in the Bored Ape NFT collection, the prefix conveys criticism. *See supra* p. 38-39. As in the *Sleekcraft* context, whether an unusual two-letter prefix sufficiently distinguishes a domain name under ACPA is a quintessential jury question. *See DSPT International*, 624 F.3d at 1221-1222.

### D. Yuga Has No Ownership Rights Over The Asserted Marks

Both Yuga's Lanham Act and cybersquatting claims are premised on the assumption that Yuga owns the asserted marks. *See* 4-ER-833; *see also DSPT Int'l*, 624 F.3d at 1218-1219 (cybersquatting liability requires proof a domain name "is identical or confusingly similar to a protected mark *owned* by the plaintiff"). Here, there is at least a genuine question whether Yuga retains ownership for several reasons.

*First*, Yuga fully abandoned its claims to the marks via its Terms of Service, which—in the words of its then-CEO—transferred "[*a*]*ll* IP rights" in the Bored Ape NFTs, with Yuga retaining "none of th[em]." 8-ER-1493-1494-¶163. Yuga has long since sold all of its Bored Ape NFTs, *see supra* p. 14, and the Terms and

- 43 -

Conditions for those NFTs provide that that the purchaser "[o]wn[s] the NFT" and "own[s] the underlying Bored Ape, the Art, completely." (8-ER-1486-¶153; 2-ER-277). There is no carveout for trademark rights or any language that specifically limits the holder's intellectual property rights. *See* 2-ER-277.[26]

Importantly, each of the marks asserted in this case appears in either "the NFT," or "the Art." *See* 4-ER-807-¶11 (listing asserted marks). Yuga's own complaint conceded the marks BAYC, BA YC logo, BA YC BORED APE YACHT CLUB logo, and Ape Skull logo each appear in one or more of the Bored Ape images (i.e., "the Art"). *See* 4-ER-817-818-¶34. And the complaint also conceded that the marks BORED APE YACHT CLUB and BORED APE appear in "the NFT" when a BAYC NFT is viewed through Etherscan. *See* 4-ER-817-¶33 (image at left)). Likewise, Yuga alleged that the Bored Ape images "contain BAYC marks." *See* 4-ER-817-818-¶34.

*Second*, even if Yuga could be said to retain some rights, there is a genuine dispute whether Yuga "involuntar[ily] forfeit[ed]" those rights by "fail[ing] to exercise adequate quality control over" its licensees. *Barcamerica International USA Tr. v. Tyfield Importers, Inc.*, 289 F.3d 589, 596 (9th Cir. 2002). Although there is no precise quantum of "quality control and inspection" needed to avoid

---

[26] Tellingly, Yuga has since changed these terms. *See Licenses*, Bored Ape Yacht Club, https://boredapeyachtclub.com/licenses/bayc (visited Mar. 1, 2024).

forfeiture, *id.*, the uncontroverted evidence shows that Yuga exercised absolutely none. The Bored Ape NFT terms and conditions grant NFT holders "an *unlimited* worldwide license to use, copy, and display the purchased Art," Including for "Commercial Use." 2-ER-277; *see also supra* pp. 43-44 (noting that "the Art" contains most—if not all—of the asserted marks). And NFT holders have taken full advantage of that right. The asserted marks have been displayed on beer cans,[27] cannabis-related products,[28] and apparel.[29] Nothing in the Bored Ape terms and conditions provides Yuga the right to exercise quality control, nor is there any record evidence of "the type of close working relationship" between Yuga and these third parties "required to establish adequate quality control in the absence of a formal agreement." *Barcamerica*, 289 F.3d at 597; *see also* 8-ER-1555:10-21.

*Third*, even if Yuga retained full control over its marks (a conclusion that would be a rude awakening to the NFT holders who relied on Yuga's transfer of rights to sell monkey-themed IPAs and clothes), there is a jury question as to whether it adequately policed *unlicensed*, commercial uses of the asserted marks. A "failure to police [a] mark, resulting in… many sellers using the same term" can render the mark generic, meaning "trademark rights generally cease." *Freecycle Network, Inc.*

---

[27] 2-ER-310 ("Bored Ape IPA" displaying "BAYC" on the can)

[28] 2-ER-329 ("Wake and BAYC"), 2-ER-312 ("BORED APE YACHT CLUB CBD LEMONADE")

[29] 2-ER-327 ("Bored Ape Wear Officially Licensed BAYC Merch").

- 45 -

*v. Oey*, 505 F.3d 898, 905 (9th Cir. 2007). Bored Apes iconography and marks have been used in and on myriad products including coloring books, shoes, satchels of coffee, skateboards, cereal, playing cards, massage candles, wine, vape cartridges, and t-shirts featuring the Ape Skull logo. 2-ER-331, 2-ER-323. Most notably, dozens of NFT collections beyond the RR/BAYC Project use the asserted marks, including "Boredapeyachtclubs," "Bored Yacht Ape Club," and "boredapes yacht club NFTs," and "World Cup Bored Ape Yacht Club"—not to mention thinly veiled copycats such as "Bored Ape Tron Club," the "Grandpa Ape Country Club," "Bored Ape Slave," and the "Bored Ape Solana Club." *See, e.g.*, 2-ER-333 to 2-ER- 412. Yuga adduced no evidence it enforced its supposed rights against these infringers.

*Fourth*, there is a material dispute whether Yuga transferred any rights it may have had in the Ape Skull logo and two marks incorporating it (BA YC logo and the BA YC BORED APE YACHT CLUB logo). On March 16, 2022, Yuga created an NFT associated with a logo containing the Ape Skull logo and gave it to the ApeCoin DAO (a third-party Yuga admittedly does not control), stating "[t]his NFT conveys along with it all rights and privileges of the logo's intellectual property to the ApeCoin DAO." 8-ER-1494-1495-¶¶164-166. Yuga therefore lacks any residual ownership of the Ape Skull mark.

*Finally*, the undisputed evidence establishes that Yuga lacks priority to—and thus any rights in—the "APE" mark. "'[T]he standard test of ownership [in

trademark law] is priority of use.'" *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1203 (9th Cir. 2012). Yet, as one of Yuga's cofounders has publicly admitted, the term "ape" was common slang among cryptocurrency enthusiasts long before the Bored Apes NFTs launched. *See* 8-ER-1496-1497-¶169 (admitting that "many crypto traders thought of themselves as 'apes,'" and "[t]o 'ape' meant to go apesh**t and buy something without any due diligence"). The status of "ape" as a common term is reflected in the names of several preexisting crypto-related projects—including an NFT collection. *See, e.g.*, 3-ER-420 (website of ApeSwap.finance); 3-ER-422 (website of ApeCoin.dev); 3-ER-414 (Pixel of the Apes NFT collection page on OpenSea). Indeed, Yuga abandoned its trademark application for the APE mark in October 2022, 8-ER-1496-¶168, several months after it filed this suit.

The district court passed over these issues with minimal analysis. As to the first and second points above (that Yuga either transferred all intellectual property rights or, if it retained an interest, did not adequately police it), the court baldly stated that the Bored Ape "terms and conditions" provide only a copyright license and not a trademark license. 1-ER-81. The court, however, identified nothing in the agreement that draws this distinction and did not grapple with Yuga's contractual pledge that "[w]hen you purchase an NFT, you own the underlying Bored Ape, the Art, completely."

The district court similarly rejected the failure to police/genericism argument without explanation beyond the fact that "the filing of this action" shows that Yuga "enforces its trademark rights in the BAYC marks." 1-ER-82. But neither Yuga nor the district court identified a single authority where *one* lawsuit has—as a matter of law—saved a mark from genericism. If one lawsuit were enough to establish sufficient policing, a court would **never** be able to rule against a plaintiff on this issue because the plaintiff could always point to the underlying suit.

Although Appellants correctly argued that the APE mark was not a viable trademark in their summary judgment briefing, neither Yuga's briefing nor the ultimate opinion addressed it. At a minimum, then, the cybersquatting claim related to apemarket.com should have gone to a jury.

Finally, the district court rejected the import of the ApeCoin DAO rights transfer because Yuga "gifted []not licensed[]" rights and that the "ape skull" and the relevant image differed somewhat from the Ape Skull logo. 1-ER-81. But the order fails to explain why either distinction should carry legal significance.

## II. THE DISTRICT COURT AT LEAST ERRED IN GRANTING SUMMARY JUDGMENT ON THE LANHAM ACT CLAIM

### A. An NFT Is Not A "Good" Under The Lanham Act

Yuga claims the RR/BAYC NFTs falsely suggested they were sponsored by Yuga, which "uses the trademarks… to identify its well-known Bored Ape NFT collection." 4-ER-817-¶33; *cf.* 1-ER-78-80 (district court ruling). To succeed, Yuga

must prove that there was "consumer confusion about the source of an appropriate *good*, as that concept has been defined by the Supreme Court." *Slep-Tone Ent. Corp. v. Wired for Sound Karaoke*, 845 F.3d 1246, 1249 (9th Cir. 2017) (per curiam). And in *Dastar v. Twentieth Century Fox*, the Supreme Court held that "good" must refer to "*tangible goods* that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Slep-Tone*, 845 F.3d at 1249 (quoting *Dastar Corp. v. Twentieth Century Film Corp.*, 539 U.S. 23, 37 (2003)).

*Dastar* held that a company that sold videotapes containing edited versions of a public-domain television show had no Lanham Act liability for advertising the videotapes as its own product. 539 U.S. at 31. The Supreme Court reasoned that a Lanham Act claim required misrepresenting the origin of the "tangible product sold in the marketplace" (the videotapes) rather than about the origin of "ideas or communications that 'goods' embody or contain." *Id.* at 32. Any other approach would allow a Lanham Act plaintiff to assert a trademark-like protection over intangible, "communicative products"—raising a "conflict with the law of copyright, which addresses… [t]he right to copy, and to copy without attribution." *Id.* at 33.

Following *Dastar*, *Slep-Tone* held that a bar's unauthorized copying of audio-visual files from CDs onto its karaoke system likewise gave rise to no Lanham Act claim. 845 F.3d at 1249. This Court assumed the file that "presumably resides on

- 49 -

the hard drive of the bar's karaoke system" could qualify as a tangible good but noted that the karaoke bar patrons would never see that digital file. *Id.* at 1250. Accordingly, "[i]f there is any confusion, it does not concern the source of the goods, as the Lanham Act requires." *Id.* at 1250. *Slep-Tone* incorporated a Seventh Circuit case's reasoning that *Dastar* "rejected a broader understanding of the 'origin of goods'" that would encompass "communicative products that consumers will value more for the intellectual and creative content they convey than for their physical form." *See Phoenix Entertainment Partners v. Rumsey*, 829 F.3d 817, 828 (7th Cir. 2016) *cited in Slep-Tone*, 845 F.3d at 1250. In sum, a plaintiff cannot use a "false designation of origin claim" to challenge the "allegedly unauthorized use of the *content*" of a product. *Phoenix*, 829 F.3d at 828.

Even assuming a virtual file could constitute a "tangible product," nothing in the record suggests that consumers would be confused by (or even see) the NFT itself (the digital record of ownership that resides on the blockchain ledger). Instead, they see "only the performance of the creative content of the" NFT—i.e., the cartoon ape image associated with the NFT. *See Phoenix*, 829 F.3d at 828. Under the logic of *Dastar*, *Slep-Tone*, and *Phoenix*, NFTs themselves are not "goods" the origin of which can be the subject of consumer confusion actionable under the Lanham Act. Notably, the Patent Office refused to register Yuga's marks for NFTs because NFTs "are not goods in trade and [instead] are similar to a certificate of ownership and

authenticity." 3-ER-433. If recent technology justifies expanding the definition of "goods," that is a question "for Congress to determine," *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 168 (1989).

### B. It is Disputed Whether Yuga Lawfully Used The Asserted Marks In Commerce

Yuga is asserting unregistered trademarks in this action, so it must prove that it acquired trademark rights before the alleged infringement by having "used the mark in commerce first." *Sengoku Works Ltd. v. RMC International Ltd.*, 96 F.3d 1217, 1220 (9th Cir. 1996). And, critically, "only *lawful* use in commerce can give rise to trademark priority." *CreAgri, Inc. v. USANA Health Scis., Inc.*, 474 F.3d 626, 630 (9th Cir. 2007).

While Yuga may have used the asserted marks before the RR/BAYC NFTs were minted, there is a genuine dispute whether Yuga used the marks *legally*. Ripps and Cahen presented evidence showing that Yuga sold the Bored Apes NFTs as unregistered securities. *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946) (defining test for an investment contract requiring registration under federal securities laws). Indeed, it is a matter of public record that (1) the SEC has been investigating whether certain of Yuga's NFTs were unregistered securities, 3-ER-429 (October 2022 report by Bloomberg), and (2) Yuga is a defendant in a class action alleging, *inter alia*, that the BAYC NFTs are unregistered securities, *see* 3-ER-438. Amid the craze in NFT prices, Yuga positioned and marketed the Bored

- 51 -

Apes NFTs as investment contracts by taking actions such as publishing a "roadmap" that promised purchasers that Yuga was "in this for the long haul" and identified benchmarks, such as initiating a "Bored Ape liquidity pool," that would enable NFT holders to treat their NFTs as investments. *See* 2-ER-186. Yuga also provided NFT holders with financial rewards, including providing each NFT holder with about 10,000 tokens of Yuga's ApeCoin cryptocurrency, a payment that was worth approximately $130,000 at the time. *See* 8-ER-1501-¶180; 2-ER-256.

Tellingly, Yuga's summary judgment briefing (1) did not dispute that illegal use cannot establish trademark priority and (2) simply ignored the evidence discussed above. *See* 2-ER-153-156; 4-ER-709-710. The district court, too, simply ignored this argument—possibly because Yuga did not address the "in commerce" issue in its proposed order. *See* 2-ER-130-131. Nor was this an issue that could be summarily dispatched. Other NFT creators have consented to SEC cease-and-desist orders premised on the conclusion that NFTs are investment contracts.[30] And at least one federal court has concluded that an NFT may be a security. *See Friel v. Dapper Labs., Inc.*, 657 F.Supp.3d 422, 450 (S.D.N.Y. 2023) (holding plaintiff adequately alleged that NFT at issue was a "security[] required to be registered with the SEC").

---

[30] Order, *Matter of Impact Theory, LLC*, Release No. 11226 (SEC Aug. 28, 2023) .

At the bare minimum, given Yuga's failure to respond to (much less rebut) these arguments, there is a jury question whether Yuga's use of the marks was "lawful."

## III. THE DISTRICT COURT ERRONEOUSLY REJECTED APPELLANTS' COUNTERCLAIMS

### A. Yuga Was Not Entitled To Summary Judgment On The DMCA Counterclaim

Yuga's complaint only alleges trademark infringement, but its campaign to silence Ripps' critique began with a deceptive invocation of copyright law. Under the Digital Millenium *Copyright* Act, internet service providers can be held liable for copyright infringement in material they are hosting for users, unless they "respond[] expeditiously to remove… the material that is claimed to be infringing." *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1014-1015 (9th Cir. 2013); 17 U.S.C. §512(c)(1)(C). Congress, however, recognized the risk of abuse from someone who would seek "to use the DMCA's safe harbor provisions… as a sword to suppress publication of embarrassing content rather than as a shield to protect its intellectual property." *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1155 (9th Cir. 2016). The DMCA therefore imposes liability on "[a]ny person who knowingly materially misrepresents [in a DMCA takedown notice] that material or activity is infringing," if a service provider relies on that misrepresentation in removing the targeted content and thereby injures the alleged infringer. 17 U.S.C. §512(f).

Here, the undisputed evidence establishes that Yuga approved its "DMCA Agent" to send twenty-five purported DMCA takedown notices to NFT marketplaces and other online service providers targeting the RR/BAYC Project. 3-ER-628; 3-ER-649. As relevant here, three of those takedown notices caused platforms to remove RR/BAYC content. *See* 3-ER-649. Viewing the evidence in Appellants' favor, it is at least disputed whether Yuga is liable under §512(f) for those three DMCA takedown notices because they "intentionally targeted files [Yuga] knew it had no right to remove" under the DMCA. *Lenz*, 815 F.3d at 1155.

Yuga's successful takedown notices falsely asserted that the targeted RR/BAYC material was "infringing content us[ing] *copyrighted material…* produced by Yuga Labs without authorization." *E.g.*, 3-ER-647. Several also expressly referenced §512(f) and falsely suggested that Yuga owned relevant copyrights. *See* 3-ER-628 (message to Foundation with subject line "Yuga Labs, Inc. Notice Under DMCA," opening with the line "[w]e are contacting you as the DMCA Agent" of Yuga, and referring to "copyright owner, Yuga Labs"); *see also* 3-ER-628-629, 3-ER-643 (similar).

These references to the DMCA, copyright, and §512(f) were deeply misleading (or outright false) since Yuga disclaimed any copyright in the images to which its BAYC NFTs link. *CrossFit, Inc. v. Alvies*, 2014 WL 251760, at *2 (N.D. Cal. Jan. 22, 2014) (imposing liability where party "invo[ked]… the DMCA [in

- 54 -

ways that were] improper and misleading since [its] claims [were] based on the assertion of trademark rights, not copyrights"); *see* 2-ER-163-164. Moreover, it is disputed whether Yuga had "a good faith belief" to assert that the allegedly infringing content was "not authorized by the copyright owner, its agent, or the law," 17 U.S.C. §512(c)(3)(A)(v). *See* 8-ER-1384-1388-¶¶4-6. Yuga conceded (as it must) that the three successful takedown notices at issue here were based on trademarks, not copyrights. 2-ER-163-164.

The district court erroneously granted Yuga summary judgment on Defendants' §512(f) counterclaim largely because the three DMCA takedown notices contained passing references to trademarks. 1-ER-92-93. But this Court has never found that §512(f) liability exists only for abusive takedown notices packaged in a specific form. Section 512(f) requires only that someone "knowingly materially misrepresents under this section… that material or activity is infringing" rights held "by any copyright owner." 17 U.S.C. §512(f). Fleeting references to trademarks (and the fact that Foundation later described the DMCA takedown request as a "Trademark Takedown Request," 3-ER-634) say nothing about whether the notices were proper. The DMCA neither protects trademarks nor is a tool to "suppress publication of embarrassing content," *Lenz*, 815 F.3d at 1155.

### B. Appellants' Copyright Counterclaims Were Erroneously Dismissed With Prejudice

Appellants pled two counterclaims seeking declarations that Yuga possesses no copyright in the Bored Ape Images to eliminate the risk that Yuga files a follow-on copyright infringement action. *See* 4-ER-778-779. The district court held that there was no immediate case or controversy because Yuga had never registered a copyright, and it dismissed those counterclaims *with prejudice*. 4-ER-693-694, 696. But this Court has stressed that "[i]n general, dismissal for lack of subject matter jurisdiction is without prejudice," because "the merits have not been considered." *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017). Dismissal *with prejudice* for lack of subject matter jurisdiction therefore constitutes an abuse of discretion and requires modification of the district court's order. *See, e.g.*, *Freeman v. Oakland Unified Sch. Dist.*, 179 F.3d 846, 847 (9th Cir. 1999), *cited in Koster*, 847 F.3d at 656.

### IV. EVEN IF THE SUMMARY-JUDGMENT LIABILITY RULING WERE UPHELD, THE REMEDIES AWARDED WERE IMPROPER

### A. The Permanent Injunction Unconstitutionally Infringes Protected Speech

Apart from the merits, the permanent injunction should be reversed as an unconstitutional prior restraint on Appellants' protected speech. "A prior restraint is an administrative or judicial order that forbids certain communications issued before those communications occur." *Greater Los Angeles Agency on Deafness,*

*Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 430 (9th Cir. 2014). "Any prior restraint on expression comes … with a heavy presumption against its constitutional validity." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971)). Here, the permanent injunction purports to prohibit Appellants from referring to the very existence of the RR/BAYC Project.

Specifically, the injunction bars Appellants from: (1) "[u]sing in any manner any logo, trade name, trademark, or designation confusingly similar to any of the BAYC Marks or any other Yuga source identifier,… trade name component, or otherwise, [2] to… *identify* any good and/or service not produced, offered or authorized by Yuga[.] *See* 1-ER-5-¶1(b). Because the district court has already found that the terms like "RR/BAYC" and "Ape" are confusingly similar to Yuga's products, *see supra* pp. 34-43, any mention of those words—no matter how anodyne—is banned. This overbroad language restricts Defendants' ability to neutrally describe this lawsuit or even to tell their supporters that they are no longer minting RR/BAYC NFTs.

Tellingly, in an email exchange shortly after the final judgment, Yuga's attorney refused to agree that the injunction permits either example just discussed. The only specific example that they agreed was permitted is using the terms like RR/BAYC in an appellate brief. While Appellants' counsel have relied on that representation in this filing, there is no reason why the injunction is naturally read

- 57 -

to include that carve-out, especially given that its restriction applies to "Defendants[]… [and] their… attorneys." 1-ER-5-¶1.

As a prior restraint, the permanent injunction is subject to strict scrutiny and can only be upheld if "(1) the activity restrained poses either a clear and present danger or a serious and imminent threat to a protected competing interest, (2) the order is narrowly drawn, and (3) less restrictive alternatives are not available." *Levine v. U.S. Dist. Ct. for C.D. Cal.*, 764 F.2d 590, 595 (9th Cir. 1985).

The revised injunction cannot survive. In particular, the "identifying" language does not address any clear and present danger to Yuga, particularly on top of the preexisting injunction that already prohibited Ripps and Cahen from "marketing, promoting, or selling products or services including RR/BAYC NFTs and Ape Market, that use the BAYC Marks." 1-ER-65-66. To go further and "[p]rohibit[]… truthful and non-misleading speech does not advance the Lanham Act's purpose of protecting consumers and preventing unfair competition." *Toyota Motor Sales*, 610 F.3d at 1176-1177.

### B.   The $1.6 Million Award Violated Federal Equitable Principles And The Seventh Amendment

#### 1.   Yuga Was Not Permitted To Seek Monetary Relief Via Equitable Remedies When Legal Remedies Were Available[31]

Yuga's complaint sought, *inter alia*, "judgment in the amount Yuga Labs' actual damages." 4-ER-846. Yuga's summary judgment motion argued that Yuga "is entitled to monetary remedies." 4-ER-719; *see also supra* p. 16 (noting that Yuga sought nearly $800 million in damages). But after the district court held that damages were a question for trial, Yuga tactically "withdr[ew] all [requests for] legal remedies" to obtain a bench trial rather than a jury trial. *See* 2-ER-102; *see also* 1-ER-58, D.Ct. Dkt. 350-¶44.

This Court has previously rejected such "gamesmanship," including where a plaintiff "voluntarily dismissed a damages claim to avoid a jury trial." *Guzman v. Polaris Industries, Inc.*, 49 F.4th 1308, 1313 (9th Cir. 2022). The basic principle that "equitable relief *must* be withheld when an equivalent legal claim would have been available" applies even when the plaintiff has no "ulterior motives." *Id*. at 1311-1313. "[T]he proper inquiry [is] whether monetary damages provided an adequate remedy, *and if not*, whether equitable relief would be appropriate." *Franklin v. Gwinett County Pub. Sch.*, 503 U.S. 60, 75-76 (1992). The district court

---

[31] This Court reviews the availability of equitable relief *de novo*. *See Guzman*, 49 F.4th at 1311.

disregarded the "well-established federal policy of safeguarding the constitutional right to a trial by a jury in federal court," *Sooner v. Premier Nutrition Corp.*, 971 F.3d 834, 842 (9th Cir. 2020), so the $1.6 million equitable award cannot stand.

### 2. The Seventh Amendment Bars More Than Minimum Statutory Damages For Cybersquatting

Under ACPA, a Plaintiff may seek either actual damages or statutory damages. *See* 15 U.S.C. §1117(d). The latter can be set anywhere between $1,000 and $100,000 per domain. Yuga elected to pursue statutory damages, and the district court ultimately awarded Yuga the maximum statutory damages available for the two websites at issue: $200,000. 5-ER-874:19-23. This was constitutional error, reviewed *de novo*, *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1029 (9th Cir. 2011). Yuga had waived its jury trial right by abandoning all legal remedies, so it was entitled only to the minimum statutory damages of $1,000 per domain. *But see* 1-ER-62-63 (district court ruling).

"[C]ybersquatting is a form of trademark infringement" and so "therefore likely analogous to a common-law cause of action" for which the Seventh Amendment would require a jury trial. *GoPets*, 657 F.3d at 1034. This follows from the Supreme Court's conclusion that under the Copyright Act, "the Seventh Amendment provides a right to a jury trial on all issues pertinent to an award of statutory damages…, including the amount itself." *Feltner v. Columbia Pictures Television*, 523 U.S. 340, 355 (1998). That logic should have required a jury trial as

soon as Yuga indicated it intended to seek anything greater than the statutory minimum. *See GoPets*, 657 F.3d at 1034 (making this point but declining to decide Seventh Amendment issue because plaintiff sought minimum amount). Because the district court instead held a bench trial, it erred by awarding anything more than the minimum of $2,000.

### C.    The $7 Million Attorneys' Fees Award Was Erroneous

At a minimum, the district court abused its discretion in awarding Yuga—a multi-billion-dollar company—nearly $7 million in attorneys' fees, a staggering sum for two individuals. The Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. §1117(a). The determination of whether a case is "exceptional" depends on the "totality of the circumstances," considering the "substantive strength of the [defendant's] litigating position… or the unreasonable manner in which the case was litigated." *See Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1223 (9th Cir. 2023). But here, the district court's reasoning is at odds with the facts, the law, and the procedural history.

The district court's "exceptional case" reasoning primarily focused on the supposed weakness of Ripps' and Cahen's case. For instance, the district court's finding of "intentional[]" infringement and "bad faith intent to profit" were explicitly justified by its erroneous summary judgment rulings. *See* 1-ER-69 (repeatedly citing

April 21, 2023 order). Any reversal on the merits therefore requires vacatur of the district court's "exceptional case" finding.

Regardless, the court still abused its discretion in finding Appellants litigated this case in an "unreasonable manner" by "continu[ing] to advance… legal theories" (such as that "the RR/BAYC NFT collection was 'art' intended to criticize Yuga" and that Yuga abandoned its marks) at the summary judgment stage and during the bench trial despite an adverse ruling at the pleading stage. 1-ER-70. The district court failed to identify any instance in which Appellants violated applicable court rules or a court order, despite relying on "exceptional case" opinions turning on those issues. *See* 1-ER-67-70. And it is proper to *deny* a Lanham Act fee award where a party litigated "close questions in an unsettled area of law" with a legal theory that "was not so obviously foreclosed by [binding precedent] such that [the position] was groundless or unreasonable." *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 990-991 (9th Cir. 2008).

To the extent the district court's rulings were repetitive, that is because the district court (at Yuga's urging) merely repeated its pleadings-stage reasoning at summary judgment without reconsidering Appellants' contentions on the basis of a different record and under a different standard of review. *See* 1-ER-70; *compare* 4-ER-795-797 (order denying Appellants' rule 12(b)(6) motion) *with* 1-ER-88-90

- 62 -

(order granting Yuga's motion for summary judgment).[32]   The district court acknowledged elsewhere in the same opinion that it retained the authority to reconsider its summary judgment rulings as late as the one-day bench trial on remedies. *See* 1-ER-56 n.8.

Finally, the district court abused its discretion by granting "exceptional case" status because of Appellants' "conduct during the pendency of this litigation." 1-ER-70.  The district court cites no specific examples of the supposedly "obstructive and evasive" answers in deposition and trial testimony. *Id.*  Nor could a few coarse statements on Twitter about Yuga and its counsel justify a fee award.  The district court's only cited authority on this point is totally inapposite:  In *TE-TA-MA Truth Foundation-Family of URI, Inc. v. World Church of the Creator*, the Seventh Circuit affirmed a fee award on extreme facts not present here—after "detail[ing] at some length… a campaign of harassment… which targeted [the opposing party] and its attorneys," including "considerable evidence that the harassment was intended to force the [party] and its attorneys to drop the trademark claim," such as "explicit

---

[32] The unpublished decision upon which the district court relied, *San Diego Comic Convention v. Dan Farr Productions*, 807 F.App'x 674, 676 (9th Cir. 2020), is inapposite.  It concerned a party that repeatedly used multiple pre-trial and post-trial motions to, in effect, "re-argue" adverse summary judgment rulings in violation of specific orders and applicable rules. *San Diego Comic Convention v. Dan Farr Prods.*, 2019 WL 1599188, at *4-5 (S.D. Cal. Apr. 15, 2019).  It did not involve the commonplace reassertion of a position at summary judgment and during trial to preserve it for appeal.

threats of violence" that "g[ave] rise to [the defendant's] eventual prosecution and conviction for attempting to have the presiding district judge murdered." 392 F.3d 248, 264 (7th Cir. 2004).

## CONCLUSION

Throughout this litigation, the district court adopted Yuga's positions wholesale (and in doing so it adopted Yuga's inaccurate statements of law), overlooked record evidence that Yuga ignored, and erroneously resolved factual disputes in Yuga's favor. Appellants respectfully submit that these errors pervade the record and require reversal.

Respectfully submitted,

/s/ *Louis W. Tompros*

THOMAS G. SPRANKLING
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
(650) 858-6062

DEREK GOSMA
HENRY M. NIKOGOSYAN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
350 South Grand Avenue
Suite 2400
Los Angeles, CA 90071
(213) 443-5316

March 1, 2024

LOUIS W. TOMPROS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6886

NICHOLAS WERLE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-879

I am the attorney or self-represented party.

**This brief contains** | 13,998 | **words,** including | 102 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⊙ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Louis W. Tompros | **Date** | 3/1/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

# ADDENDUM

**ADDENDUM**

**TABLE OF CONTENTS**

Page

U.S. Constitution, First Amendment ................................................... A-1

U.S. Constitution, Seventh Amendment.............................................. A-2

15 U.S.C. §1117....................................................................................... A-3

15 U.S.C. §1125....................................................................................... A-4

## U.S. Constitution

**Amendment 1**

Congress shall make no law… abridging the freedom of speech[.]

\* \* \*

## U.S. Constitution

**Amendment 7**

In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any court of the United States, than according to the rules of the common law.

## 15 U.S.C. §1117

### § 1117. Recovery for violation of rights

(a) Profits; damages and costs; attorney fees

When… a violation under section 1125(a) or (d) of this title… shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

\* \* \*

(d) Statutory damages for violation of section 1125(d)(1)

In a case involving a violation of section 1125(d)(1) of this title, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just.

**15 U.S.C. §1125**

**§ 1125. False designations of origin, false descriptions, and dilution forbidden [Statutory Text & Notes of Decisions subdivisions I to III]**

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

\*　　\*　　\*

(d) Cyberpiracy prevention

(1)(A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person—

(i)has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

(ii)registers, traffics in, or uses a domain name that—

(I)in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

(II)in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

(III)is a trademark, word, or name protected by reason of section 706 of title 18 or section 220506 of title 36.

(B)(i)In determining whether a person has a bad faith intent described under subparagraph (A), a court may consider factors such as, but not limited to—

(I)the trademark or other intellectual property rights of the person, if any, in the domain name;

(II)the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III)the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV)the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V)the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI)the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII)the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII)the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX)the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

(ii)Bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable

grounds to believe that the use of the domain name was a fair use or otherwise lawful.

*     *     *

## CERTIFICATE OF SERVICE

I hereby certify that on this first day of March, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system.  Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.


*/s/  Louis W. Tompros*
LOUIS W. TOMPROS