**No. 24-879**

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

YUGA LABS, INC.,

*Plaintiff-Appellee,*

v.

RYDER RIPPS *and* JEREMY CAHEN,

*Defendants-Appellants.*

On appeal from the United States District Court
for the Central District of California, No. 2:22-cv-04355 (Walter, J.)

**RESPONSE BRIEF OF PLAINTIFF-APPELLEE
YUGA LABS, INC.**

TODD R. GREGORIAN
ETHAN M. THOMAS
ANTHONY M. FARES
ZACHARY A. KALINOWSKI
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
415.875.2300

ERIC BALL
KIMBERLY CULP
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
650.988.8500

*Attorneys for Plaintiff-Appellee
Yuga Labs, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellee Yuga Labs, Inc. certifies that it has no parent corporation and no publicly held corporation owns 10% or more of its stock.

May 30, 2024                         FENWICK & WEST LLP


                                     */s/ Todd R. Gregorian*
                                     Todd R. Gregorian

                                     *Attorneys for Plaintiff-Appellee*
                                     *Yuga Labs, Inc.*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ....................................................i

TABLE OF AUTHORITIES ................................................................v

INTRODUCTION .........................................................................1

STATEMENT OF THE ISSUES...............................................................4

CONSTITUTIONAL AND STATUTORY PROVISIONS..............................................6

STATEMENT OF THE CASE................................................................7

I.     Yuga Creates the Bored Ape Yacht Club.............................................7

II.    Defendants Sell Counterfeit NFTs Using BAYC Marks. ..............................9

III.   Defendants Knowingly Confused Consumers and Intended to Profit from the Infringement...................................................................16

IV.    Defendants' Defamation of Yuga Is Not at Issue..................................18

V.    Procedural History .............................................................19

       A.    The district court granted summary judgment on liability.................19

       B.    The district court ruled for Yuga on liability and remedies after a bench trial. .......................................................19

SUMMARY OF ARGUMENT ................................................................22

STANDARD OF REVIEW .................................................................24

ARGUMENT ............................................................................25

I.     The Court Should Affirm Summary Judgment. ......................................25

       A.    The district court may resolve infringement at summary judgment.........25

       B.    Defendants' use of the BAYC marks to identify counterfeit NFTs was a clear infringement. .........................................26

C. The *Sleekcraft* factors show a likelihood of confusion. ...................29

    1. Defendants used the identical BAYC marks (Factor 3). ..........30

    2. Defendants used the same marketing channels (Factor 5)........33

    3. A reasonable consumer was likely to be confused (Factor 6). ...............................................................................................35

    4. Defendants used the BAYC marks intentionally (Factor 7). ............................................................................................37

D. Any error at summary judgment is harmless because the district court reached the same outcome after trial. ........................................37

E. Defendants' use of the marks to identify counterfeit NFTs as genuine was not nominative fair use. ..................................................40

F. Defendants' use of the marks to identify counterfeit NFTs as genuine was not protected First Amendment expression....................42

    1. The First Amendment does not immunize a defendant who uses a mark to identify source...........................................43

    2. Defendants' NFT sales are not expressive conduct entitled to First Amendment protection. ...................................44

G. Yuga owns the marks. ........................................................................47

    1. The Lanham Act protects marks associated with digital goods such as NFTs. .................................................................47

    2. Yuga did not give away or abandon the marks.........................49

    3. Yuga used the BAYC marks lawfully in commerce. ...............52

H. The Court should affirm summary judgment on cybersquatting........53

II. The Court Should Affirm the District Court's Remedies.............................55

A. The district court did not abuse its discretion by entering an injunction against future trademark infringement...............................55

B.   The district court did not abuse its discretion by ordering disgorgement of profits. .................................................58

C.   Defendants had no right to a jury trial on statutory damages for cybersquatting. .................................................59

D.   The district court did not abuse its discretion by finding the case exceptional and awarding fees. ...........................61

III.   The Court Should Affirm the Disposition of the Counterclaims. .................64

A.   The Court should affirm summary judgment on the DMCA counterclaim. .................................................64

B.   The Court should affirm the dismissal of the declaratory judgment counterclaims. .................................................67

CONCLUSION .................................................69

STATEMENT OF RELATED CASES .................................................70

CERTIFICATE OF COMPLIANCE .................................................71

ADDENDUM OF PERTINENT STATUTORY PROVISIONS ..........................72

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*2Die4Kourt v. Hillair Cap. Mgmt. LLC*,
2016 WL 4487895 (C.D. Cal. Aug. 23, 2016), *aff'd*,
692 F. App'x 366 (9th Cir. May 26, 2017)......................................................56

*Acad. of Motion Picture Arts & Sciences v. GoDaddy, Inc.*,
2015 WL 12697732 (C.D. Cal. Apr. 10, 2015)...............................................60

*AMF Inc. v. Sleekcraft Boats*,
599 F.2d 341 (9th Cir. 1979) ...............................................................*passim*

*Applied Underwriters v. Lichtenegger*,
913 F.3d 884 (9th Cir. 2019) ..............................................................41

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*,
457 F.3d 1062 (9th Cir. 2006) ....................................................28, 34

*Beyene v. Coleman Sec. Servs., Inc.*,
854 F.2d 1179 (9th Cir. 1988) ..........................................................36

*Brookfield Commc'ns., Inc. v. W. Coast Ent. Corp.*,
174 F.3d 1036 (9th Cir. 1999) ...........................................................*passim*

*Brother Recs, Inc. v. Jardine*,
318 F.3d 900 (9th Cir. 2003) ..............................................................42

*Century 21 Real Estate Corp. v. Sandlin*,
846 F.2d 1175 (9th Cir. 1988) ..........................................................55

*Chapman v. California*,
386 U.S. 18 (1967)............................................................................38

*City of Dallas v. Stanglin*,
490 U.S. 19 (1989)............................................................................45

*Coachella Music Festival, LLC v. Simms*,
2017 WL 6888716 (C.D. Cal. Oct. 10, 2017), *as clarified*,
2017 WL 6888499 (C.D. Cal. Dec. 13, 2017)..................................34

*Coca-Cola Co. v. Purdy*,
382 F.3d 774 (8th Cir. 2004) ................................................................54

*Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*,
321 F.3d 878 (9th Cir. 2003) ...............................................................58

*CreAgri, Inc. v. USANA Health Scis., Inc.*,
474 F.3d 626 (9th Cir. 2007) ...............................................................52

*CrossFit, Inc. v. Alvies*,
2014 WL 251760 (N.D. Cal. Jan. 22, 2014)..........................................66

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,
539 U.S. 23 (2003).........................................................................48, 49

*Desirous Parties Unlimited Inc. v. Right Connection Inc.*,
2022 WL 4110370 (D. Nev. Sep. 7, 2022), *aff'd*,
2023 WL 4285504 (9th Cir. June 30, 2023)..........................................56

*Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*,
109 F.3d 1394 (9th Cir. 1997) ..............................................................57

*Dreamwerks Prod. Grp., Inc. v. SKG Studio*,
142 F.3d 1127 (9th Cir. 1998) ..............................................................37

*DSPT Int'l v. Nahum*,
624 F.3d 1213 (9th Cir. 2010) ..............................................................53

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
967 F.2d 1280 (9th Cir. 1992) ..............................................24, 34, 57

*E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*,
547 F.3d 1095 (9th Cir. 2008) ..............................................................47

*Eclipse Assocs. Ltd. v. Data Gen. Corp.*,
894 F.2d 1114 (9th Cir. 1990) ..............................................................51

*Entrepreneur Media, Inc. v. Smith*,
279 F.3d 1135 (9th Cir. 2002) ..............................................................32

*Experience Hendrix LLC v. Hendrixlicensing.com Ltd.*,
762 F.3d 829, 839 (9th Cir. 2014) .......................................................40

vi

*Feltner v. Columbia Pictures Television*,
523 U.S. 340 (1998)............................................................61

*Franklin v. Gwinett County Pub. Sch.*,
503 U.S. 60 (1992)............................................................59

*Freecycle Network, Inc. v. Uey*,
505 F.3d 898 (9th Cir. 2007) ..........................................51

*FreecycleSunnyvale v. Freecycle Network*,
626 F.3d 509 (9th Cir. 2010) ..........................................51

*Freeman v. Oakland Unified Sch. Dist.*,
179 F.3d 846 (9th Cir. 1999) ..........................................68

*Friel v. Dapper Labs, Inc.*,
657 F. Supp. 3d 422 (S.D.N.Y. 2023) ...........................52

*Gareis v. 3M Company*,
9 F.4th 812 (8th Cir. 2021) .............................................39

*GoPets Ltd. v. Hise*,
657 F.3d 1024 (9th Cir. 2011) .......................53, 54, 55, 60

*Gordon v. Draper Creative, Inc.*,
909 F.3d 257 (9th Cir. 2018) .........................43, 45, 46

*GoTo.com, Inc. v. Walt Disney Co.*,
202 F.3d 1199 (9th Cir. 2000) .......................31, 35, 37

*Granfinanciera, S. A. v. Nordberg*,
492 U.S. 33 (1989)............................................................60

*Guzman v. Polaris Indus., Inc.*,
49 F.4th 1308 (9th Cir. 2022) .........................................59

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
896 F.2d 1542 (9th Cir. 1990) ........................................67

*Hermes Int'l v. Rothschild*,
590 F. Supp. 3d 647 (S.D.N.Y. 2022) ...........................49

*Hermes Int'l v. Rothschild,*
     654 F. Supp. 3d 268 (S.D.N.Y. 2023) ...........................................7, 8, 47

*i4i Ltd. Partnership v. Microsoft Corp.,*
     598 F.3d 831 (Fed. Cir. 2010), *aff'd,* 564 U.S. 91 (2011)................................59

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust*
     *Litig.,* 958 F.3d 1239 (9th Cir. 2020)..................................................................24

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc.,*
     774 F.3d 935 (9th Cir. 2014) .............................................................................58

*Intenze Prod., Inc. v. TATLAB Corp.,*
     2023 WL 5209729 (C.D. Cal. Aug. 3, 2023), *aff'd,*
     2024 WL 511878 (9th Cir. Feb. 9, 2024) ........................................................56

*Internet Specialties West v. Milon-DiGiorgio Enters.,*
     559 F.3d 985 (9th Cir. 2009) .............................................................................29

*ISE Ent. Corp. v. Longarzo,*
     2018 WL 11346736 (C.D. Cal. Dec. 11, 2018)................................................66

*Jack Daniel's Properties, Inc. v. VIP Prod. LLC,*
     599 U.S. 140 (2023)...........................................................................43, 44, 46

*Jason Scott Collection, Inc. v. Trendily Furniture, LLC,*
     68 F.4th 1203 (9th Cir. 2023) .....................................................................24, 62

*Karl Storz Endoscopy-Am., Inc. v. Surgical Techs., Inc.,*
     285 F.3d 848 (9th Cir. 2001) .............................................................................28

*King Jewelry, Inc. v. Fed. Express Corp.,*
     316 F.3d 961 (9th Cir. 2003) .............................................................................24

*Lahoti v. VeriCheck,*
     586 F.3d 1190 (9th Cir. 2009) ....................................................................54, 55

*Levi Strauss & Co. v. Shilon,*
     121 F.3d 1309 (9th Cir. 1997) ...........................................................................45

*Lindy Pen Co., Inc. v. Bic Pen Corp.,*
     725 F.2d 1240 (9th Cir. 1984) ...........................................................................37

*Lindy Pen Co. v. Bic Pen Corp.*,
796 F.2d 254 (9th Cir. 1986) ........................................................................26, 27

*Maier Brewing Co. v. Fleischmann Distilling Corp.*,
390 F.2d 117 (9th Cir. 1968) ........................................................................58

*Mandala v. Tire Stickers, LLC*,
829 F. App'x 869 (11th Cir. 2020) ..............................................................66

*Missouri ex rel. Koster v. Harris*,
847 F.3d 646 (9th Cir. 2017) ........................................................................68

*Network Automation, Inc. v. Advanced Sys. Concepts*,
638 F.3d 1137 (9th Cir. 2011) ........................................................25, 34, 35, 47

*New Kids on the Block v. News Am. Pub., Inc.*,
971 F.2d 302 (9th Cir. 1992) ................................................................40, 41, 42

*Nordyke v. Santa Clara Cnty.*,
110 F.3d 707 (9th Cir. 1997) ........................................................................45

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
572 U.S. 545 (2014) ........................................................................................61, 62

*Payne v. Barnhart*,
150 F. App'x 612 (9th Cir. 2005) ..............................................................38, 39

*Perfect 10, Inc. v. CCBill LLC*,
488 F.3d 1102 (9th Cir. 2007) ......................................................................66

*Phoenix Ent. Partners v. Ramsey*,
829 F.3d 817 (7th Cir. 2016) ........................................................................49

*Playboy Enters., Inc. v. Baccarat Clothing Co.*,
692 F.2d 1272 (9th Cir. 1982) ......................................................................59

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
354 F.3d 1020 (9th Cir. 2004) ......................................................................34

*Pom Wonderful LLC v. Hubbard*,
775 F.3d 1118 (9th Cir. 2014) ..............................................................33, 34

*Punchbowl, Inc. v. AJ Press, LLC*,
   90 F.4th 1022 (9th Cir. 2024) ...................................................................44

*Risley v. Universal Navigation Inc.*,
   2023 WL 5609200 (S.D.N.Y. Aug. 29, 2023)........................................7

*Rock River Commc'ns v. Universal Music Grp.*,
   2011 WL 1598916 (C.D. Cal. Apr. 27, 2011) ....................................66

*Rogers v. Grimaldi*,
   875 F.2d 994 (2d Cir. 1989) ...............................................4, 43, 46

*Rossi v. Motion Picture Ass'n of Am.*,
   391 F.3d 1000 (9th Cir. 2004) ...................................................65

*Ruiz v. Snohomish Cnty. Pub. Utility Dist. No. 1*,
   824 F.3d 1161 (9th. Cir. 2016) ...................................................68

*S. Cal. Darts Ass'n v. Zaffina*,
   762 F.3d 921 (9th Cir. 2014) ...................................................52

*SanDisk Corp. v. Kingston Tech. Co.*,
   695 F.3d 1348 (Fed. Cir. 2012) ...............................................51

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946).................................................................52

*Shields v. Zuccarini*,
   254 F.3d 476 (3d Cir. 2001) ...................................................60

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
   904 F.2d 1301 (9th Cir. 1990) ...................................................61

*Skydive Arizona, Inc. v. Quattrocchi*,
   673 F.3d 1105 (9th Cir. 2012) ...................................................59

*Slep-Tone Corp. v. Wired for Sound Karaoke & DJ Servs., LLC*,
   845 F.3d 1246 (9th Cir. 2017) ...................................................49

*Spectrum Ass'n Mgmt. of Texas, LLC v. Lifetime HOA Mgmt., LLC*,
   2020 WL 3490384 (W.D. Tex. June 26, 2020), *aff'd*,
   5 F.4th 560 (5th Cir. 2021) ...................................................60

x

*Stone Creek v. Omnia Italian Design, Inc.*,
  875 F.3d 426 (9th Cir. 2017) ............................................................2, 25, 26, 27

*SunEarth, Inc. v. Sun Earth Solar Power Co.*,
  839 F.3d 1179 (9th Cir. 2016) .............................................................................61

*Synergistic Int'l v. Korman*,
  470 F.3d 162 (4th Cir. 2006) ...............................................................................25

*Tari Labs, LLC v. Lightning Labs, Inc.*,
  2023 WL 2480739 (N.D. Cal. Mar. 13, 2023) ...................................................34

*Tennison v. Circus Circus Enterprises, Inc.*,
  244 F.3d 684 (9th Cir. 2001) .........................................................................38, 39

*Toyota Motor Sales, U.S.A., Inc., v. Tabari*,
  610 F.3d 1171 (9th Cir. 2010) .......................................................................40, 41

*Two Plus Two Pub., LLC v. Boyd*,
  2012 WL 724678 (D. Nev. Mar. 1, 2012), *aff'd*,
  572 F. App'x 466 (9th Cir. 2014)........................................................................60

*Vernor v. Autodesk, Inc*.,
  621 F.3d 1102 (9th Cir. 2010) .............................................................................41

*VIP Prod. LLC v. Jack Daniel's Props.*,
  953 F.3d 1170 (9th Cir. 2020) .............................................................................45

*Yuga Labs, Inc. v. Hickman*,
  No. 2:23-cv-00111-JCM-NJK (D. Nev. Aug. 25, 2023) (Dkt. 30) ...................14

*Yuga Labs, Inc. v. Lehman*,
  No. 1:23-cv-00085-MAD-TWD (N.D.N.Y Feb. 6, 2023) (Dkt. 12).................14

*Yuga Labs v. Hickman*,
  No. 24-1297 (9th Cir.) .........................................................................................70

*Yuga Labs v. Ripps et al.*,
  No. 22-56199 (9th Cir.) .........................................................................18, 42, 70

**STATUTES**

15 U.S.C. § 1117 ........................................................................58, 60

15 U.S.C. § 1125(a) ...................................................................25, 47

15 U.S.C. § 1125(d)(1)(A) ...............................................................53

17 U.S.C. § 512(c)(3) ...............................................................65, 66

17 U.S.C. § 512(f) ....................................................................65, 66

28 U.S.C. § 2111 ...........................................................................38

Lanham Act ..............................................................................49, 59

**RULES**

Federal Rule of Civil Procedure 56(c)(4) ...............................................36

**OTHER AUTHORITIES**

5 McCarthy on Trademarks and Unfair Competition § 25A:1 ...............................47

First Amendment..........................................................................43

## INTRODUCTION

This appeal presents a case of intentional trademark infringement, which Defendants obfuscate by suggesting that trademark law does not afford full protection to new technologies. Yuga created the "Bored Ape Yacht Club" in the emerging market of non-fungible tokens ("NFTs") and built a globally recognized brand. Defendants Ryder Ripps and Jeremy Cahen made counterfeit BAYC NFTs that they advertised and sold to the same customers, in the same markets, using Yuga's BAYC trademarks.[1] Defendants coded Yuga's marks into their NFT collection, naming it "Bored Ape Yacht Club" and "BAYC," which caused verification tools to misidentify them as authentic. Defendants knew their infringement would confuse consumers, yet they pressed forward expecting to generate "passive income" in the "millions." Though Defendants targeted a nascent technology, making it easier to exploit confused consumers, the facts of their infringement are not complicated.

Defendants now challenge nearly every decision of the district court, which they characterize as "riddled with error." Opening Brief ("OB") at 2. But they opposed summary judgment with minimal evidence, relying instead on legal

---

[1] These are "BAYC," "BORED APE," "BORED APE YACHT CLUB," the BAYC logo (5-SER-1195), the BORED APE YACHT CLUB logo (5-SER-1200), and the Ape Skull logo (5-SER-1197).

1

arguments and unsubstantiated disagreement with the record. Moreover, Defendants received a bench trial on the same issues at the remedies phase, and the district court reached the same conclusions after finding facts that are unchallenged on appeal.

Defendants also argue that their infringement was an "art project," "parody," or "protest." The summary judgment record—including Defendants' private communications—belies those narratives. The district court conducted a trial and found that they were merely pretext. But ultimately, the false narratives are irrelevant, because they do not support a legal defense. Defendants' use of Yuga's marks on counterfeit NFTs that appear as Yuga's authentic products is not a "nominative fair use" of the marks that "comments" on Yuga; it is infringement. Nor does the First Amendment immunize that infringement merely because Defendants claim their commercial sales were "art" or intended to "express" disdain for Yuga. Defendants failed to raise a material dispute concerning their infringement or defenses, and thus summary judgment was warranted. While Defendants characterize this result as unusual, that is because cases of clear infringement "hardly ever find their way into the appellate reports" as liability is "open and shut." *Stone Creek v. Omnia Italian Design, Inc.*, 875 F.3d 426, 432 (9th Cir. 2017) (citation omitted).

The district court narrowly tailored its remedies to Defendants' sale and promotion of the counterfeit NFTs—disgorging profits, enjoining further

infringement and ruling the case exceptional and awarding fees—and it properly disposed of Defendants' counterclaims. The Court should affirm.

## STATEMENT OF THE ISSUES

1.      Whether the district court correctly granted summary judgment to Yuga on false designation of origin and cybersquatting, based on determinations that no genuine disputes of material fact existed regarding:

      a.      whether Defendants' use of the BAYC marks to market and sell NFTs in the same markets where Yuga's authentic NFTs appear was likely to cause confusion;

      b.      whether Defendants' commercial use of the BAYC marks should be excused on grounds that: (i) their use of the marks to identify their NFTs constitutes nominative fair use; (ii) the test of *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) bars infringement claims; or (iii) Yuga did not own the BAYC marks; and

      c.      whether Defendants' use of the domain names rrbayc.com and apemarket.com violated the Anticybersquatting Consumer Protection Act ("ACPA").

2.      Whether the district court abused its discretion in awarding remedies:

      a.      enjoining Defendants from using the BAYC marks to "market, advertise, promote, or identify" unauthorized goods;

      b.      disgorging Defendants' profits;

      c.      deeming the case exceptional; and

    d.    awarding statutory damages for cybersquatting above the minimum.

3.    Whether the district court correctly disposed of Defendants' counterclaims by:

    a.    awarding summary judgment on the Digital Millennium Copyright Act ("DMCA") counterclaim that challenged notices asserting trademark infringement rather than copyright infringement; and

    b.    dismissing with prejudice counterclaims seeking declaratory judgment that Yuga did not own certain copyrights.

## CONSTITUTIONAL AND STATUTORY PROVISIONS

Except for the authorities reproduced in the addendum, all applicable statutes, etc., are contained in the addendum of Defendants' opening brief.

## STATEMENT OF THE CASE

## I. YUGA CREATES THE BORED APE YACHT CLUB.[2]

Yuga created one of the most successful NFT collections—the "Bored Ape Yacht Club." 5-SER1413-14; (2-SER-428); 5-SER-1187 (3-SER-610). It consists of 10,000 NFTs with original artwork, each featuring a unique image of an ape:



5-SER-1221 (3-SER-618). Yuga created BAYC NFTs through a "smart contract" deployed to the Ethereum blockchain. 5-SER-1199 (3-SER-621).[3]

An NFT is a virtual good comprising software code and often some associated good or service—here, a digital image. 1-ER-80. NFTs "should be understood to refer to both the NFT and the digital image with which it is associated." *Hermes*

---

[2] Unless indicated otherwise, citations in the statement of the case are to the summary judgment record, with parallel citations to the trial record in parentheses.

[3] Smart contracts are "programs that write the terms of the agreement between the buyer and seller of tokens directly into the program's code…." *Risley v. Universal Navigation Inc.*, 2023 WL 5609200, at *3 (S.D.N.Y. Aug. 29, 2023).

*Int'l v. Rothschild*, 654 F. Supp. 3d 268, 278 (S.D.N.Y. 2023). "Individuals do not purchase NFTs to own a 'digital deed' divorced from any other asset: they buy them precisely so that they can exclusively own the content associated with the NFT." *Id.*

Consumers valued BAYC NFTs not only as collectibles, but also because they granted owners exclusive additional benefits like access to digital spaces and in-person events. 5-SER-1221-31, 5-SER-1256-57; 5-SER-1286, 5-SER-1306 (3-SER-610-18). Yuga also granted owners a copyright license to use the artwork associated with their NFT. 8-ER-1583. This innovation allowed those owners to use their Bored Ape images on social media, clothing, and other goods. 5-SER-1290-91; 4-SER-1100 (3-SER-610-18). By contrast, Yuga granted no license to its trademarks. 3-SER-861; 8-ER-1583.

BAYC NFTs became so popular that they boosted public interest in NFTs generally. 5-SER-1285; 4-SER-1112-13. Yuga worked with global brands, like adidas, to feature BAYC marks on clothing, consumer goods, and other products. 4-SER-1100 (3-SER-609).



5-SER-1182 (3-SER-608). Celebrities bought BAYC NFTs, including Snoop Dogg and Eminem, who each featured their Bored Apes in a music video. 4-SER-1113; 6-SER-1696.

As NFTs gained popularity, scammers exploited the public's unfamiliarity with blockchain technology to trick users out of their money. 3-ER-596-98 (4-SER-919-20); 5-SER-1406-08. This forced Yuga to invest substantial resources to protect its intellectual property. 4-SER-1113 (2-SER-368-69).

## II.  DEFENDANTS SELL COUNTERFEIT NFTS USING BAYC MARKS.

Defendants sought to profit from the success of BAYC NFTs at the height of the market. On May 13, 2022, Ripps launched a smart contract on the Ethereum blockchain, creating a new NFT collection. 5-SER-1325 (2-SER-561); 5-SER-1377, 1381 (4-SER-886-87, 95); 5-SER-1158 (3-SER-593-97). Using tools offered by the online NFT marketplace, Foundation, that simplify the process, 4-SER-1096-97; 5-SER-1165-76, Ripps designed this collection to be confusingly similar to genuine BAYC NFTs by:

- Entering "Bored Ape Yacht Club" in the **name** field and "BAYC" in the **symbol** field for the contract, ensuring that each infringing NFT that he manufactured would be labeled as a purported "Bored Ape Yacht Club" NFT with the symbol "BAYC"—the same marks that Yuga uses, in the

same way, to identify genuine BAYC NFTs. 4-SER-1096-97 (2-SER-292); 5-SER-1158 (3-SER-596-97); 5-SER-1167-68 (3-SER-594).

- Linking to the same Bored Ape image as its genuine counterpart:



6-SER-1512 (3-SER-632) (BAYC NFT #1058 and Ripps' NFT, as each appeared on the OpenSea marketplace).

- Assigning identification numbers to match the corresponding identification numbers of the genuine BAYC NFTs.[4] 3-ER-591-94 (6-ER-1055-56); 5-SER-1180 (3-SER-592, 3-SER-625). Ripps originally copied image links and typed each Ape ID. 5-SER-1325 (2-SER-561).

By Ripps' design, then, each NFT in the counterfeit collection had the same collection name, token symbol, image, and Ape ID as a legitimate BAYC NFT. Nothing in these counterfeit NFTs or the underlying smart contract referred

---

[4] Each BAYC NFT bears a number ("Ape ID") based on the order in which it was "minted" (created) on the smart contract.

consumers to any disclaimer identifying them as fakes or to any commentary about Yuga or BAYC.

By naming his NFT collection "Bored Ape Yacht Club" and "BAYC" in the smart contract, Ripps caused others reading the blockchain to misrepresent his collection as genuine. Etherscan is a leading tool that consumers consult to verify the authenticity of NFTs. OB12; 8-ER-1504; 4-SER-1096 (6-ER-1129-30); 6-SER-1606-07 (3-SER-665-66). Ripps' actions caused Etherscan to identify his NFTs with Yuga's marks:



5-SER-1160 (2-SER-578).[5] That same code also tricked bots into misreporting counterfeit NFT sales as BAYC NFT sales. 6-SER-1554-69 (3-SER-641; 3-SER-841-59).

---

[5] Only after Yuga filed suit did Ripps' name appear on the Etherscan page. 5-SER-1162 (2-SER-574).

Ripps also linked one of his fake NFTs to his Twitter profile, suggesting that he was a verified BAYC owner and posted a promotion for a Foundation sales page using BAYC marks:



5-SER-1430 (3-SER-627); 6-SER-1571-74 (3-SER-651-52). Because he named the collection "Bored Ape Yacht Club" and "BAYC," his NFTs appeared on Foundation under those marks. 5-SER-1375-76; 5-SER-1427-30 (3-SER-626-27). And he used an identical copy of the Ape Skull logo on that page:



5-SER-1428 (3-SER-626).

Holders of the counterfeit NFTs began reselling them, including on marketplaces like OpenSea that offer BAYC NFTs. 5-SER-1444; 5-SER-1448 (2-SER-571; 3-SER-862; 3-SER-586). Defendants promoted these secondary sales and made over $100,000 in profit on them. 7-SER-1772 (3-SER-769); 5-SER-1430 (3-SER-627); 6-SER-1501-04 (3-SER-628); 5-SER-1377. Then, after they began calling their collection "Bored Ape Yacht Club V3" and "BAYC V3," (6-SER-1517-20 (3-SER-633-34)), Bloomberg News reported on "Bored Ape Yacht Club V3" in a televised segment, without mentioning Defendants or any distinction from the authentic Bored Ape Yacht Club. 6-SER-1547 (3-SER-640).

13

Yuga contacted marketplaces to remove the fakes as violations of trademark law, 4-SER-1093, but Defendants circumvented the removals by re-listing their collection. 3-ER-649; 6-SER-1502; 5-SER-1431 (2-SER-580).

Defendant Jeremy Cahen helped Ripps promote and sell the counterfeits. 5-SER-1391; 6-SER-1501-10. He also recruited two software developers, Ryan Hickman and Thomas Lehman, to develop websites and software for the "business venture" of counterfeit NFTs. 5-SER-1324-26 (2-SER-560-62).[6]

Defendants also promoted the rrbayc.com website, where users could "reserve" a counterfeit NFT by entering the Ape ID of the genuine one that they wanted. 2-ER-283; 3-ER-591-94. Defendants rely on a purported disclaimer (OB12) on rrbayc.com to argue that users would not have confused their NFTs as genuine. But no one purchasing NFTs on the secondary market, or even directly through Foundation, would necessarily have seen this website or the disclaimer. 5-SER-1328 (2-SER-564).

Defendants also began developing "ApeMarket," a project that would allow them to capitalize on secondary market sales even after their counterfeit collection sold out. 5-SER-1326 (2-SER-562).

---

[6] Other courts have now held Lehman and Hickman liable for their participation in the infringement. *See Yuga Labs, Inc. v. Hickman*, No. 2:23-cv-00111-JCM-NJK (D. Nev. Aug. 25, 2023) (Dkt. 30); *Yuga Labs, Inc. v. Lehman*, No. 1:23-cv-00085-MAD-TWD (N.D.N.Y Feb. 6, 2023) (Dkt. 12).



6-SER-1534 (3-SER-635). Defendants designed ApeMarket to offer counterfeit NFTs and genuine BAYC NFTs side-by-side at apemarket.com. 5-SER-1392 (4-SER-985); 5-SER-1326 (2-SER-562). Cahen said the "Goal" of ApeMarket was to "mint out" (i.e., sell out) the counterfeit NFTs and "incentivize people" to trade both authentic and counterfeit NFTs. 3-ER-609 (3-SER-781); 5-SER-1329 (2-SER-565). Defendants teased ApeMarket on social media and addressed advertisements to the "Yuga Community." 5-SER-1391 (4-SER-984-85); 6-SER-1539 (3-SER-639, 2-SER-570).

Defendants sold out their NFTs and were ready to launch ApeMarket when Yuga filed suit in June 2022. (2-SER-293); 5-SER-1326 (2-SER-562); 6-SER-1534 (3-SER-635). The lawsuit averted the launch but did not stop the infringement. Defendants still directed consumers to websites where the counterfeit NFTs

remained for sale, even after the district court ruled that they were infringing. 1-ER-59-60.

## III. DEFENDANTS KNOWINGLY CONFUSED CONSUMERS AND INTENDED TO PROFIT FROM THE INFRINGEMENT.

Defendants knew their infringement would confuse consumers, who Cahen called "too unsophisticated by far." 5-SER-1335 (3-SER-781). They ignored concerns their own partner expressed. Lehman warned—and Cahen *agreed*—that using their modified Ape Skull logo alongside Yuga's on ApeMarket would be "too confusing to the 'average joe'" and that "we should not underestimate how confusing it is." 5-SER-1337 (2-SER-576).

Lehman also cautioned that "a normal person could be like 'I could see where Yuga is coming from, it's confusing how close your logo is to theirs.'" 5-SER-1343 (3-SER-624). In contrast to Defendants' claims about the purported sophistication of NFT consumers, Lehman referred to their buyers as "SHEEPLE" who "will not read the [smart] contract." 5-SER-1338 (2-SER-577).

Defendants' conduct had its intended effect of sowing confusion. Their developer Hickman mistook their infringing sales page as the page for authentic BAYC NFTs. 3-ER-595 (4-SER-948-49).[7] When social media accounts reported the counterfeit NFT sales, onlookers expressed surprise that once-valuable BAYC

---

[7] Hickman denied at trial that he was confused (6-ER-1212-13), but the district court found his testimony "self-serving" and not credible. 1-ER-58 n.10; 1-ER-61.

NFTs had sold for low prices. 6-SER-1554-67 (3-SER-641). Defendants even fooled Bloomberg News. 6-SER-1547 (3-SER-640).

Unrebutted expert survey evidence also showed that Defendants confused consumers. Yuga's expert concluded that consumers viewing the counterfeit NFTs for sale on Foundation would have experienced a 40.4% net confusion rate, even with the modified Ape Skull logo. 4-SER-1125 (2-SER-385); *id.* (6-ER-1140-41) (20% net confusion on from "RR/BAYC" NFTs on OpenSea).

Defendants profited substantially from their infringement. The profits from sales of counterfeit NFTs were all fruit of that infringement, because every such NFT bore the "Bored Ape Yacht Club" and "BAYC" marks. 5-SER-1325 (2-SER-561); 4-SER-1096-97 (2-SER-292). Review of blockchain transactions showed that Defendants profited over $1.36 million in primary sales and over $100,000 from secondary market sales. 4-SER-1147 (3-SER-765-66).[8]

Defendants fixated on profit and causing commercial harm to Yuga. Publicly, they claimed their infringement was an art project as part of their effort "to look really sympathetic to everyone" in case they got sued. 5-SER-1342 (3-SER-822). But Cahen directed the team to "generat[e] more royalties and users" and to set royalty rates low "to bring in users… but not so low that we dont make anything."

---

[8] This figure was reduced after trial based on payments to Lehman and Hickman. 1-ER-61.

17

(3-SER-782.) They wanted to generate "considerable passive income" and thus focused on the "prospect for recurring revenue." (3-SER-782-83.) Cahen told Ripps "Ur gonna make so much on this shit LMFAO" and "It will sell out within 48 hours I think [] You'll make like a million dollars [] Straight up." (3-SER-863). Hickman at one point, referring to secondary market sales, claimed that "'[w]e're closing in on *$10 million impact to yuga." 5-SER-1327 (3-SER-785). Ripps commented he did not "want to get sued personally." (4-SER-908.)

## IV. DEFENDANTS' DEFAMATION OF YUGA IS NOT AT ISSUE.

Defendants attempt to connect their infringement to defamatory statements on social media about Yuga. The statements include a range of false and offensive accusations. 2-ER-247. Ripps allegedly began this campaign in late 2021; yet he did not manufacture his counterfeit NFT collection until May 2022. 5-SER-1311-12; OB9-11. Yuga did not take legal action against Defendants for this commentary and brought only narrow claims directed at Defendants' trademark infringement. Thus, in Defendants' earlier appeal, this Court ruled that Yuga's state law claims "did not arise from acts Ripps took in furtherance of his right of free speech" as "the alleged conduct underlying Yuga's state-law causes of action is Ripps's appropriation of Yuga's Bored Ape Yacht Club trademarks to sell Ripps's infringing non-fungible tokens." *Yuga Labs v. Ripps et al.*, No. 22-56199 (9th Cir.) at 3.

18

## V.    PROCEDURAL HISTORY

### A.    The district court granted summary judgment on liability.

Yuga filed suit on June 24, 2022, 4-ER-804-847, and Defendants counterclaimed.  4-ER-730-784.  Relevant here, the district court dismissed with prejudice two counterclaims seeking declaratory judgment that Yuga did not own copyrights in the ape images.  4-ER-693-95.  The district court held at summary judgment that Defendants were liable for false designation of origin.  1-ER-77-85. The BAYC marks were valid and protectible, 1-ER-78-82, and the court "easily" concluded that "Defendants' use of Yuga's BAYC Marks was likely to cause confusion" under the factors from *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979).    1-ER-85.    The undisputed record also showed that Defendants cybersquatted on the domains rrbayc.com and apemarket.com.  1-ER-85-87.  None of the affirmative defenses had merit, 1-ER-87-91, nor could Defendants maintain a DMCA claim.  1-ER-91-93.

### B.    The district court ruled for Yuga on liability and remedies after a bench trial.

After summary judgment, Yuga withdrew its prayer for legal remedies, 2-ER-102, and the district court set a bench trial on remedies.  4-SER-1046.  Defendants used the trial to reargue liability issues resolved at summary judgment.  They maintained that because disgorgement requires proof of profits "attributable to the infringement," Yuga could recover only for sales *to confused consumers*.  Thus,

Defendants re-argued infringement, asserting their trademark use was not likely to cause confusion. 1-SER-275-77; 1-SER-88; 2-SER-475; 2-SER-485; 2-SER-521; 2-SER-531. They asserted the defenses they lost at summary judgment, claiming they were "not intentional infringers" (1-SER-62-63), the counterfeit NFTs were "artistic" and a form of "protest" (i.e., fair use/First Amendment, 1-SER-61-65), the "evidence at trial showed that Yuga does not own the alleged BAYC Marks," and "Yuga gave away all intellectual property rights associated with the Bored Ape Yacht Club" (i.e., ownership/abandonment, 1-SER-77).

The district court found that Yuga owns the BAYC marks and used them since approximately April 2021. 1-ER-46. It found that Defendants and Hickman did not offer credible testimony (1-ER-58 n.10; 1-ER-64) and that their infringement was intentional and in bad faith (1-ER-58-59; 1-ER-61-64; 1-ER-69). The court ruled that the evidence at trial provided no basis to revise the summary judgment ruling on liability, 1-ER-56 n.8, and it awarded disgorgement of profits, statutory damages for cybersquatting, and an injunction against future trademark infringement. 1-ER-57-67.[9]

A special master recommended an award of $6,983,432.62 in fees and $317,295.04 in costs, 1-ER-11, from more than $13 million that Yuga incurred. 1-

---

[9] Ripps destroyed the private keys required to use his Ethereum wallet in December 2023, making compliance with the injunction impossible. 1-SER-3.

SER-17.  The district court entered final judgment for Yuga, including disgorgement, the permanent injunction, and fees and costs.  1-ER-2.  Defendants did not seek post-judgment relief, stay of enforcement, or clarification of the injunction.

## SUMMARY OF ARGUMENT

The Court should affirm summary judgment for Yuga on false designation of origin because the undisputed record showed that Defendants' use of the BAYC marks was likely to cause consumer confusion. Defendants failed to raise a genuine dispute of material fact that the *Sleekcraft* factors could be balanced in their favor, and the district court correctly ruled likelihood of confusion established as a matter of law based on their appropriation of the BAYC marks to sell copies of Yuga's products in the same marketplaces. Moreover, Defendants tried this issue to the district court during the bench trial on remedies, to the same result.

Similarly, the summary judgment record established that Defendants used the BAYC marks to misidentify their NFTs. That is not nominative fair use. It also precludes a First Amendment defense. This Court held in a prior appeal that the infringing activities on which Yuga sought to impose trademark infringement liability were not protected First Amendment expression. That holding has only strengthened since the Supreme Court's decision in *Jack Daniels*: Defendants used the marks *as trademarks*, i.e., to identify the source of goods, disposing of any First Amendment defense. Because their use was likely to cause confusion, Defendants are liable for infringement. Lastly, there was no dispute that Yuga owned the BAYC marks and that the Lanham Act protected them.

The Court should affirm summary judgment for Yuga on cybersquatting under the less-rigorous test for confusion. Moreover, Defendants concede that Yuga proved eight of the nine factors showing Defendants' bad-faith intent to profit, which is more than sufficient to affirm.

Similarly, the district court did not abuse its discretion in imposing its choice of remedies. It had authority to enjoin Defendants from using Yuga's trademarks to sell their inauthentic goods. It was permitted to disgorge Defendants' profits regardless of whether Yuga also sought actual damages. It was authorized to award statutory damages for cybersquatting absent a jury trial. And it did not abuse its discretion in concluding Yuga's strong case and Defendants' litigation misconduct warranted an exceptional case determination and fee award.

The Court should also affirm the judgment on Defendants' counterclaims. Defendants lack a legal basis for their theory that requests to remove alleged trademark-infringing material are actionable under the DMCA. And the district court correctly dismissed the declaratory judgment claims with prejudice where Defendants could not establish an actionable case or controversy for the exercise of subject matter jurisdiction, and that deficiency could not be cured.

## STANDARD OF REVIEW

The Court reviews de novo an order granting partial summary judgment. *King Jewelry, Inc. v. Fed. Express Corp.*, 316 F.3d 961, 963 (9th Cir. 2003). It reviews for abuse of discretion the grant of a permanent injunction, *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1296 (9th Cir. 1992), an order disgorging profits, *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1212 n.5 (9th Cir. 2023), and an attorney fees award for an exceptional case, *id.* at 1212. The Court reviews underlying fact findings for clear error. *See id.*; *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-In-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1253 (9th Cir. 2020).

## ARGUMENT

## I.   THE COURT SHOULD AFFIRM SUMMARY JUDGMENT.

### A.   The district court may resolve infringement at summary judgment.

The district court properly held that Defendants' counterfeit NFT sales infringed the BAYC marks.  Infringement is established where unauthorized use of a mark is "likely to cause confusion" about its "affiliation, connection, or association" with the plaintiff, or as to "the origin, sponsorship, or approval" of the defendant's "goods, services, or commercial activities" by the plaintiff.  15 U.S.C. § 1125(a).  The district court assesses likelihood of confusion based on eight non-exclusive factors from *Sleekcraft*, 599 F.2d at 348-49.

These *Sleekcraft* factors are "not a rote checklist," *Network Automation, Inc. v. Advanced Sys. Concepts,* 638 F.3d 1137, 1145 (9th Cir. 2011); the court does not have to "count beans or tally points."  *Stone Creek*, 875 F.3d at 431.  Instead, where there is a "virtual identity of marks" that are "used with identical products or services," then "likelihood of confusion would follow as a matter of course." *Brookfield Commc'ns., Inc. v. W. Coast Ent. Corp*., 174 F.3d 1036, 1056 (9th Cir. 1999).  In such circumstances, likelihood of confusion is established as a matter of law.  *Stone Creek*, 875 F.3d at 431; *see also Synergistic Int'l v. Korman*, 470 F.3d 162, 175 (4th Cir. 2006) (affirming summary judgment).

In *Stone Creek*, for example, the plaintiff alleged that its contract manufacturer infringed by selling the same leather furniture using the plaintiff's mark. 875 F.3d at 430. After a bench trial, the district court held that the defendant did not infringe because there was no likelihood of confusion. *Id.* at 431. The Court reversed. It noted that the "slam-dunk evidence of a conceptually strong mark together with the use of identical marks on identical goods" made confusion likely as a matter of law. *Id.* at 436.

In *Lindy Pen Co. v. Bic Pen Corp.*, 796 F.2d 254 (9th Cir. 1986), plaintiff alleged that defendant infringed its "Auditor's" mark by engraving "Auditor's fine point" on pens and selling them in the same telephone order market as plaintiff did its pens. *Id.* at 255. After trial, the district court found no likelihood of confusion. *Id.* at 256-57. The Court reversed. The similarity of the marks and the parties' direct competition established likelihood of confusion and overcame all contrary *Sleekcraft* factors. *Id.* The Court found likelihood of confusion established because the defendant sold the same products under "virtually identical" marks through the same marketing channel.

## B. Defendants' use of the BAYC marks to identify counterfeit NFTs was a clear infringement.

As in the precedent discussed above, the undisputed facts here show likely consumer confusion from Defendants' appropriation of the conceptually strong BAYC marks to sell the same goods in the same markets. But beyond that, virtually

26

every difference between this case and those shows that confusion was *more* likely here, and thus the district court should be affirmed.

*First*, Defendants sold the same products—not just the same *type* of product, *Lindy Pen*, 796 F.2d at 255, or even manufacturing overstock, *Stone Creek*, 875 F.3d at 430; they specifically designed their counterfeit NFTs to match BAYC NFTs such that they would be visually indistinguishable. This required Ripps to enter Yuga's marks as the collection name and token symbol in his smart contract, and, before automating the process, to *manually* link to the image and copy the Ape ID from each legitimate BAYC NFT.

*Second*, Defendants "used the BAYC marks in their RR/BAYC NFTs," 1-ER-83—i.e., they copied the BAYC marks without modification on each counterfeit NFT they sold. Indeed, every such NFT incorporated the unmodified BAYC marks from the smart contract. OB32. Use of the same mark already means that the court should "presume… that the public will be deceived." *Sleekcraft*, 599 F.2d at 354. But here, copying the marks made the counterfeit NFTs appear under the BAYC marks on NFT marketplaces and caused bots and Etherscan—*the very tool consumers use to verify NFT authenticity*—to misrepresent them as genuine, making deception more likely even for discerning consumers. 5-SER-1381; 5-SER-1386-87; 6-SER-1606-7.

Defendants' copying of the BAYC marks into the smart contract is also significant because the name and symbol designations are immutable, 4-SER-1097; 5-SER-1168 (2-SER-292), and thus they ensured the counterfeit NFTs would *continue* to confuse consumers. Likelihood of confusion is not limited to whether original purchasers are confused. The court must also consider whether resale purchasers or observers in the marketplace could be confused. This is because the "law in the Ninth Circuit is clear that post-purchase confusion, i.e., confusion on the part of someone other than the purchaser who, for example, simply sees the item after it has been purchased, can establish the required likelihood of confusion…." *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.*, 457 F.3d 1062, 1077 (9th Cir. 2006) (cleaned up). Indeed, "'[p]ost-sale' confusion… may be no less injurious to the trademark owner's reputation than confusion on the part of the purchaser at the time of sale." *Karl Storz Endoscopy-Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 854 (9th Cir. 2001). Appropriating the BAYC marks in the smart contract was like branding a counterfeit watch with ROLEX or a counterfeit shoe with NIKE. The counterfeit bears the brand and may confuse not just the initial purchaser, but anyone who sees or purchases it thereafter. Here, that confusion had already begun with the Bloomberg telecast and public confusion over reports of supposed BAYC NFTs selling for low prices, and expert testimony indicated it would continue to occur in the secondary markets. 6-SER-1718; 7-SER-1769-1770.

28

*Third*, Defendants sold their NFTs in the same markets as Yuga's. Again, they did not merely use the same marketing channel, they copied Yuga's exact marks and branding on online marketplace sales pages, making them appear authentic. These facts all take on more significance on the internet, given the ease with which consumers can be deceived. *Internet Specialties West v. Milon-DiGiorgio Enters.*, 559 F.3d 985, 989 (9th Cir. 2009); *Brookfield*, 174 F.3d at 1058.

*Fourth*, this case is unique because Defendants knew of the confusion and exalted at harming Yuga. They discussed expressly that their use of the marks would confuse consumers yet went forward anyway to generate "millions" in "passive income." They celebrated a "$10 million impact to yuga" on the secondary market; they targeted Yuga customers in their advertising; and they planned to expand their business with "ApeMarket" and using even more of Yuga's marks to divert secondary sales to them.

Confusion was inevitable from Defendants' appropriation of the BAYC marks to place them on identical goods—that "follow[s] as a matter of course," *Brookfield*, 174 F.3d at 1056—but these additional factors make the case stand out as clear infringement.

## C. The *Sleekcraft* factors show a likelihood of confusion.

The *Sleekcraft* factors reinforce that Defendants' infringement warranted summary judgment. Defendants did not dispute that the BAYC marks are

conceptually and commercially strong (Factor 1),[10] or that they used those marks to sell the same product (Factor 2).[11]  They admitted that they displayed "unmodified" marks so that their "project" "would be directly tied to Yuga, BAYC, and specific BAYC NFTs" (Factor 3),[12] and their NFTs sold through the same marketplaces as BAYC NFTs (Factor 5).[13]  Additional factors further showed a likelihood of confusion, including instances of *actual* confusion in the market (Factor 4)[14] and Defendants' plan to expand their infringement through "ApeMarket" (Factor 8).[15] Defendants contest just four factors on appeal, but they fail to show a genuine material dispute as to any.

### 1.    Defendants used the identical BAYC marks (Factor 3).

Defendants argue (OB38-39) they sometimes altered the BAYC marks, conceding that, in many instances, they did not alter them, such as on their

---

[10] 1-ER-83; *see also* 4-SER-1112-13; 4-SER-1135-36; 4-SER-1100; 5-SER-1181-84; 5-SER-1187; 5-SER-1352-56; 5-SER-1403; 5-SER-1415; 6-SER-1676 n.3.

[11] 5-SER-1325; 5-SER-1360; 5-SER-1366-67; 5-SER-1393-94; 6-SER-1511-16; 1-ER-83; 5-SER-1180; 3-ER-591-94; 3-ER-606-08; 5-SER-1426.

[12] 5-SER-1361-63; 7-SER-1841-44; 5-SER-1180; 5-SER-1327; 5-SER-1375-76; 5-SER-1378; 5-SER-1389-90; 5-SER-1427-42; 6-SER-1590-93.

[13] 5-SER-1197; 5-SER-1202; 5-SER-1326-27; 3-ER-613; 5-SER-1444, 6-SER-1453; 6-SER-1504; 6-SER-1508; 6-SER-1521-37; 6-SER-1542-45; OB40 n.24.

[14] 6-SER-1505; 6-SER-1546-51; 6-SER-1715; 3-ER-595; 1-ER-59; 6-SER-1571-76' 6-SER-1582-84; 6-SER-1714; 6-SER-1554-70; 6-SER-1610-14; 6-SER-1712-15; 4-SER-1125.

[15] 5-SER-1326-28; 5-SER-1337; 5-SER-1392; 5-SER-1395; 3-ER-599-604; 6-SER-1534-37; 6-SER-1538-41.

Foundation page, where they initially advertised "Bored Ape Yacht Club" and "BAYC" with an *exact copy* of the Ape Skull logo.

That Defendants *sometimes* altered the marks does not change the fact that they used identical marks to identify every NFT they sold—they used identical BAYC marks to identify the infringing NFTs on the blockchain, causing Etherscan and other trackers to misidentify them as legitimate. 5-SER-1157-64. Defendants thus still caused confusion regardless of any subsequent marketing changes. Defendants' use of identical marks *on the products themselves* to designate their products makes these marketing changes irrelevant.

Moreover, the undisputed evidence showed the changes would not dispel confusion. This Court holds that "similarities are weighed more heavily than differences" and "[q]uibbles over trivial distinctions… are unimpressive." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000). Here, modifications to the Ape Skull logo in their marketing materials, such as adding references to the Nazi SS in small text—

  

5-SER-1428-1440; 6-SER-1618—were subtle, such that Defendants' own business partner Lehman noted "it's confusing how close your logo is to theirs." 5-SER-1343

31

(3-SER-624); 6-SER-1554-69.  And Yuga's expert determined through surveys that adding "RR/BAYC" on sales pages would still result in significant consumer confusion.  4-SER-1125; 5-SER-1181-84; 5-SER-1377; 5-SER-1443-49; 6-SER-1502; 6-SER-1510.  This conclusion is obvious—reasonable NFT consumers would assume co-branding or a new product, just as Yuga had done previously with its "MAYC" and "BAKC" brands.  6-SER-1534.  But that aside, Defendants submitted no competent evidence to rebut this proof—just argument and emails from their supporters and distributors.  OB38-39 (4-ER-652-680).

Defendants seek to avoid this reality with a false comparison to *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135 (9th Cir. 2002).  But there, the addition of "PR" to the end of the mark to create "EntrepreneurPR" did not confuse, because the mark was "weak and descriptive," and others needed "to use the term 'entrepreneur' to describe their goods or services."  *Id.* at 1143.  Taking the word "entrepreneur" and adding a generic abbreviation for "public relations" did not suggest affiliation with *any* mark holder.  279 F.3d at 1146.  Here the opposite is true: adding "RR/" (or "V3") to the strong and arbitrary BAYC marks does suggest affiliation, as shown by Yuga's expert and the Bloomberg news report.  4-SER-1112-13; 4-SER-1118; 4-SER-1135-36; 4-SER-1100.  Regardless, neither appending two letters to a word mark nor subtly changing one logo created any triable issue on confusion, where

32

Defendants sold the same goods in the same markets using the entirety of the BAYC marks.

### 2. Defendants used the same marketing channels (Factor 5).

Defendants raised no genuine dispute about whether they marketed to the same consumers as Yuga. Overlap between the purchasers exposed to the products increases the likelihood of confusion. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1130 (9th Cir. 2014). Here, the district court ruled that Defendants marketed and sold counterfeit NFTs through the same marketing channels as Yuga, through Twitter and secondary marketplaces like OpenSea. 1-ER-84. The undisputed record showed that the parties used these channels, but *also* that Defendants targeted Yuga's customers and sought to recruit them to "ApeMarket" to trade authentic BAYC NFTs directly alongside the counterfeits. 5-SER-1326-27; 5-SER-1391-92; 3-ER-599-604; 5-SER-1430; 6-SER-1525-1641; (2-SER-562-63). Defendants also "intentionally promoted" the counterfeits during Yuga's ApeFest event. 5-SER-1329 (2-SER-565). Ripps even proposed handing out coupon codes at ApeFest.

Neither of Defendants' arguments amounts to error. *First*, Defendants argue that they made most "primary market sales" through rrbayc.com. OB40. Yet whether they *also* marketed on that website does not raise a genuine dispute that they marketed their NFTs in the same places where Yuga marketed the BAYC brand. 1-ER-61. Moreover, Defendants' own reference to "*primary*" sales acknowledges that

such sales would still cause confusion, as purchasers of the counterfeit NFTs resold them on NFT marketplaces, where they would be identified as "Bored Ape Yacht Club" and "BAYC".[16]

*Second*, Defendants admit that they marketed through witter, but claim that is too broad of a marketing channel and thus the district court should not have considered it. OB40-41. Defendants' authorities hold only that "the internet" writ large is too broad a channel. *Id.* (citing *Network Automation*, 638 F.3d at 1151; *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004)). Here, the marketing channel is one social media website—not the entire internet. The district courts that have considered the issue have therefore concluded that common use of Twitter as a marketing channel is the type of convergence that shows confusion likely.[17] Moreover, here Defendants addressed Twitter marketing to the "Yuga community," 6-SER-1539, undercutting any argument that they were targeting a different set of consumers through that website.

---

[16] Defendants' "disclaimer" that appeared only on rrbayc.com did not create a triable issue for the same reason. When exact copying is involved and the disclaimer only accompanies the initial sale, it "do[es] nothing to dispel post-purchase confusion." *Au-Tomotive Gold, Inc.*, 457 F.3d at 1077-78; *E. & J. Gallo Winery*, 967 F.2d at 1292 n.6 (affirming summary judgment notwithstanding a "disclaimer").

[17] *E.g.*, *Tari Labs, LLC v. Lightning Labs, Inc.*, 2023 WL 2480739, at *8 (N.D. Cal. Mar. 13, 2023); *Coachella Music Festival, LLC v. Simms*, 2017 WL 6888716, at *5 (C.D. Cal. Oct. 10, 2017), *as clarified*, 2017 WL 6888499 (C.D. Cal. Dec. 13, 2017).

### 3. A reasonable consumer was likely to be confused (Factor 6).

Defendants raised no genuine material dispute about the "reasonable consumer" and whether such person was likely to be confused. For this factor, the Court evaluates a "reasonably prudent consumer" considering the "nature of the goods" at issue. *Network Automation*, 638 F.3d at 1152; *Goto.com*, 202 F.3d at 1209 (consumer's standard of care "will be equal to that of the least sophisticated consumer."). The district court correctly ruled that authenticating NFTs requires specialized knowledge, and therefore some consumers were likely to be confused. 1-ER-84-85.

Defendants concede that in the "token tracker," which designates a collection's name on Etherscan, they called the counterfeit NFTs "Bored Ape Yacht Club" and assigned them the symbol "BAYC." OB38. The undisputed record thus showed that reasonably prudent consumers of NFTs would be confused by the infringement because Defendants took *deliberate steps* to trick the tools those consumers use to authenticate NFTs.

Moreover, unrebutted expert testimony explained that verifying the origin of NFTs is challenging for consumers. 7-SER-1748-49. Buyers are not always aware of the existence of counterfeit NFTs or how to verify authenticity, instead relying on the name and visual appearance of NFTs in online marketplaces. 6-SER-1681-84. Even sophisticated NFT consumers can be scammed (5-SER-1406-08; 7-SER-

1762), and Yuga's experts all found that typical NFT consumers were likely to be confused (4-SER-1124-26; 4-SER-1133; 4-SER-1139-44; 4-SER-1151-53; 6-SER-1602-03; 6-SER-1712-18; 7-SER-1755-57; 5-SER-1317; 5-SER-1335-38). Indeed, Defendants *themselves* testified to the complexity and sophistication required to navigate the NFT space (5-SER-1386-87; 3-ER-596-98; 3-ER-591-92), and their internal communications show their efforts to exploit this complexity. 8-ER-1615; 8-ER-1618; 5-SER-1335-38; 5-SER-1342-45; 5-SER-1386-87; 5-SER-1395; 3-ER-596-98. Defendants even referred to customers as "SHEEPLE" (5-SER-1338 (2-SER-577))—i.e., easy to mislead.

Defendants offered no evidence to create a material dispute on this factor. Ripps' declaration purporting to describe "NFT consumers" (*see* 8-ER-1523) was an improper expert opinion lacking foundation. Fed. R. Civ. P. 56(c)(4); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1183 (9th Cir. 1988). The fact that Yuga's *expert witness*, equipped with a team of computer experts, could distinguish counterfeit NFTs (8-ER-1522; 7-SER-1761) showed nothing about a "typical consumer." Neither of these examples raised a triable issue about NFT consumers.[18]

---

[18] Defendants claim the district court "overlooked" the typical buyer standard, evaluated this factor from the perspective of a "generic consumer," and held a "view 'that Internet users on the whole exercise a low degree of care.'" OB35-36. Nothing in the district court's ruling supports this argument, and the district court acknowledged that confusion may be likely even for goods sold to "discerning consumers." 1-ER-84 (quoting *Brookfield*, 174 F.3d at 1060).

### 4. Defendants used the BAYC marks intentionally (Factor 7).

The intent factor asks whether the defendant intended to *use the marks*, not whether he wanted to sow confusion. *Sleekcraft*, 599 F.2d at 354. Here, Defendants admitted that they intended to use the BAYC marks (5-SER-1361; OB31), and their copying of Yuga's NFTs and branding corroborated those admissions (5-SER-1309). Moreover, while intent to use the marks "can constitute strong evidence of confusion," its absence "is largely irrelevant in determining if consumers likely will be confused as to source." *Brookfield*, 174 F.3d at 1059 (cleaned up); *see also Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1132 n.12 (9th Cir. 1998). Thus, Defendants' argument they did not *subjectively* intend to *confuse consumers* (OB41-42) is irrelevant (and unsupported) because it does not speak to the *Sleekcraft* factor. Even if a defendant is "innocent as a fawn with no intent to copy or appropriate" the mark, "it would prove nothing…." *GoTo.com*, 202 F.3d at 1208.[19]

### D. Any error at summary judgment is harmless because the district court reached the same outcome after trial.

Defendants failed to raise a genuine material dispute to preclude summary judgment, but even if they had the Court should still affirm. Defendants argued that

---

[19] Defendants also argue that their infringement was "comparative advertising." OB41-42. Defendants never made this argument below and thus waived it, but merely labeling their own NFTs with BAYC marks did not convey a comparative message. *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 725 F.2d 1240, 1248 (9th Cir. 1984).

summary judgment did not bind them and they tried the same liability issues at trial. The district court made fact findings and reaffirmed its rulings after trial. Defendants have not attempted to show clear error in those findings on appeal. A retrial on liability would yield the same result, and thus even if the district court erred at summary judgment, Defendants suffered no prejudice.

"Reversal is improper if the district court's error was harmless." *Payne v. Barnhart*, 150 F. App'x 612, 613-14 (9th Cir. 2005) (citing 28 U.S.C. § 2111; *Chapman v. California*, 386 U.S. 18, 22 (1967)). The Court has therefore declined to disturb a summary judgment ruling where a plaintiff prevailed at trial on even a different claim, provided it was "predicated on the same facts and similar legal inquiries." *Tennison v. Circus Circus Enterprises, Inc.*, 244 F.3d 684, 691 (9th Cir. 2001).

Defendants argued at trial that they were not bound by the district court's summary judgment order, 1-ER-56, and thus contested likelihood of confusion (4-SER-1039-40; 1-SER-273-74) and intent (1-SER-271-74). The district court allowed them to do so, as well as to reassert their claims about good faith, artistic intent, and Yuga's alleged abandonment of the marks. *See* 1-SER-85-89 (arguing good faith infringement); 1-SER-63 (arguing artistic intent); 1-SER-68 (arguing no consumer confusion); 1-SER-75-77 (arguing Yuga abandoned the BAYC marks).

With the benefit of a full record and live testimony, the district court considered Defendants' arguments on likelihood of confusion and other topics in the summary judgment order, and it reached the same conclusions. 1-ER-56. The district court ruled that "the evidence and testimony at the trial amply supports" its summary judgment conclusion that "Defendants acted with intent to deceive consumers." 1-ER-58. And based on trial testimony, the district court found "Defendants were not creating a parody or satire of Yuga and its BAYC NFTs. Instead, they were intentionally using the BAYC Marks in an effort to profit off of Yuga's success." 1-ER-61.

Accordingly, any supposed error in the summary judgment order is harmless. The district court conducted a trial on the same claims—not merely a separate claim with similar inquiries. *See Tennison*, 244 F.3d at 691. A remand would require the district court to try the exact same issues again—yet "the district court would engage in precisely the same analysis" and reach the same result. *Payne*, 150 F. App'x at 613-14. Accordingly, "the district court's grant of summary judgment on this claim, 'even if wrong, did no harm.'" *Gareis v. 3M Company*, 9 F.4th 812 (8th Cir. 2021). This Court may therefore affirm the district court's summary judgment order, even without reaching whether it contained error, because any such error would be harmless.

### E.    Defendants' use of the marks to identify counterfeit NFTs as genuine was not nominative fair use.

Defendants used Yuga's marks to misrepresent their counterfeit NFTs as authentic BAYC NFTs.  *E.g.*, 4-ER-797; 8-ER-1401; 8-ER-1405; 8-ER-1441.  This conduct is the core harm against which trademark law is designed to protect—i.e., not a "fair use"—and the district court did not err in rejecting that defense.

Nominative fair use protects truthful discussion about brands and businesses by name.  *Toyota Motor Sales, U.S.A., Inc., v. Tabari*, 610 F.3d 1171, 1177 (9th Cir. 2010).  In raising that defense, a defendant necessarily admits trademark use and must show he is referring to the *plaintiff's* product.  *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).  A defendant's use of a mark to identify its "own product or service… is not protected under the nominative fair use defense[]."  *Experience Hendrix LLC v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 839 (9th Cir. 2014).

Defendants contend that nominative fair use protects a party whose "ultimate goal" is to describe his own products.  OB21.  But fair use never includes using a mark to misidentify a counterfeit product as authentic.  *New Kids*, 971 F.2d at 308.  It is of course true that Pepsi may advertise that it "has less sugar than Coke."  *See id.* at 308 n.7.  A supermarket may advertise that it has Coke available for sale.  *E.g.*, *Tabari*, 610 F.3d at 1175.  A magazine might poll its readers about what they like about Coke.  *E.g.*, *New Kids*, 971 F.2d at 305.  And a natural foods enthusiast may

even advertise for-profit seminars about the detrimental health effects of drinking Coke. *E.g.*, *Applied Underwriters v. Lichtenegger*, 913 F.3d 884, 894 (9th Cir. 2019). These are all examples of nominative fair use, notwithstanding that they involve a party whose "ultimate goal" is to describe its own offerings. But the same parties may not put their own cola in red cans labeled "Coke" and distribute those to stores for sale to unsuspecting consumers. *See New Kids*, 971 F.2d at 308.

*That* is what happened here, and what the district court meant when it observed that "Defendants are not using the BAYC Marks to sell Yuga's BAYC NFTs, but to sell their own competing RR/BAYC NFTs." 1-ER-90. The district court did not "misunderstand" (OB2) nominative fair use; it applied that doctrine correctly.

Defendants also contend that the district court incorrectly required them to bear the burden of proof on nominative fair use. OB21-22. But evidentiary burdens were irrelevant because the court decided the issue as a question of law—that the undisputed facts did not amount to fair use. *See Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1107 n.7 (9th Cir. 2010). Even so, as Defendants acknowledge, it was *their* burden to establish they "used the mark to refer to the trademarked good." *Toyota Motor Sales,* 610 F.3d at 1183. Defendants concede that only then the burden shifts to the plaintiff to show the use was not nominative fair use. As the district court correctly held, Defendants plainly could not clear that threshold: the undisputed

41

record showed that they used BAYC marks to refer to their counterfeit NFTs, and not the BAYC NFTs. Because Defendants' claim to nominative fair use failed as a matter of law, no burden shifted to Yuga to prove more, and thus any alleged misstatement of the burdens was irrelevant.

Nonetheless, should the Court apply *New Kids*, the undisputed facts show Defendants' use did not satisfy it.[20] A defendant claiming nominative fair use must do nothing with the mark that suggests sponsorship or endorsement by the trademark holder. *Id.* at 308. Defendants' labeling their counterfeits as authentic BAYC NFTs is obviously "suggesting sponsorship"—that is the point of a counterfeit and is *never* a fair use. *Brother Recs, Inc. v. Jardine*, 318 F.3d 900, 908 (9th Cir. 2003).[21]

### F. Defendants' use of the marks to identify counterfeit NFTs as genuine was not protected First Amendment expression.

The district court ruled at summary judgment that "the only conduct at issue in this action" was Defendants' sale of a "collection of NFTs that point to the same online digital images as the BAYC collection." 1-ER-88; *Yuga Labs v. Ripps et al.*,

---

[20] The test for nominative fair use does not even make sense as applied to Defendants' counterfeiting. It requires the defendant use no more of the mark than is reasonably necessary to identify the plaintiff's product. *New Kids*, 971 F.2d at 308. But here, using Yuga's marks on counterfeit NFTs was necessary only because a counterfeit must copy the original closely to fool an unsuspecting consumer.

[21] Defendants also attempt to claim nominative fair use by switching focus to the use of the marks in their commentary. OB23-24. But Yuga did not sue Defendants for any of that commentary (*see* 4-ER-800; 4-ER-804-847), all of which remains untouched by the judgment (1-ER-5-6; 5-ER-961).

No. 22-56199 (9th Cir.) (holding same as to state law claims). It found after trial—a finding unchallenged on appeal—that Defendants' claim that this conduct was part of a broader expressive "art project" was pretextual and false. 1-ER-52; 1-ER-69-70. The Court may affirm based on that finding, but it need not even reach that issue. Because Defendants used Yuga's marks to designate the source of their NFTs, their "art" claims do not matter.

### 1. The First Amendment does not immunize a defendant who uses a mark to identify source.

This Court has adopted the test from *Rogers*, 875 F.2d 994, requiring a trademark owner challenging an expressive work to prove additional elements to establish infringement liability. *Gordon v. Draper Creative, Inc.*, 909 F.3d 257, 260-61 (9th Cir. 2018). But in *Jack Daniel's Properties, Inc. v. VIP Prod. LLC*, 599 U.S. 140 (2023), the Supreme Court held that test does not apply where an alleged infringer uses a mark as a trademark—i.e., to identify the source of goods. Instead, the *sole* question for determining liability is whether that trademark use is likely to cause confusion. *Id.* at 143. Thus, in this case, whether Defendants or anyone else viewed their counterfeiting as "performance art" or an expressive work does not matter. Defendants are liable for trademark infringement because their counterfeits were likely to cause confusion.

The facts of *Jack Daniel's* make clear the irrelevance of Defendants' claim that their counterfeits were "expressive works." There, the defendant sold a dog toy

shaped like a Jack Daniel's whiskey bottle and marketed it under the name "Bad Spaniels." 599 U.S. at 153. Both the use of the mark and the goods themselves were expressive—a humorous parody of Jack Daniel's. The Court nonetheless held that because the defendant used the mark to identify its own goods, "the infringement claim [] rises or falls on likelihood of confusion." *Id.* The expressive aspects did not entitle the defendant to invoke the First Amendment. *Id.*; *see also Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022 (9th Cir. 2024) (First Amendment defense unavailable because defendant used "Punchbowl" to identify its own product, notwithstanding the presence of "expressive" elements of that use).[22]

Here, there was no genuine dispute that Defendants used the BAYC marks to identify their own NFTs, notwithstanding their argument that doing so was also expressive or conveyed some implicit message. 2-ER-272; 6-ER-1225-26; 5-SER-1158; 4-ER-820; 6-SER-1518; 6-SER-1520. That is dispositive.

## 2. Defendants' NFT sales are not expressive conduct entitled to First Amendment protection.

Defendants still attempt to argue that the counterfeit NFTs were "expressive in-and-of-themselves," and that in ruling otherwise the district court (and by extension this Court) suffered "technological misunderstandings." OB28. That

---

[22] Defendants ask the Court to limit *Jack Daniels* to cases where a defendant attempted to trade on the goodwill of the plaintiff. OB31. The Court has already rejected that view. *See Punchbowl*, 90 F.4th at 1028. Moreover, the district court found after trial that Defendants attempted to trade on Yuga's goodwill. 1-ER-65.

argument is as wrong as it is condescending. Nothing here turns on the nature of an NFT—software associated with a digital image—but rather that Defendants marketed their NFTs as authentic.

*First*, the district court was correct that such counterfeit NFT sales do "not constitute an expressive artistic work protected by the First Amendment." 1-ER-88. An offer to sell counterfeit goods is not protected First Amendment expression. *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1312-13 (9th Cir. 1997); *see also Nordyke v. Santa Clara Cnty.*, 110 F.3d 707, 710 (9th Cir. 1997). It does not matter that a defendant claims he *intended* his counterfeit sales to express a message, because "[i]t is possible to find some kernel of expression in almost every activity a person undertakes." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989).

Selling counterfeit NFTs is no different than selling other counterfeit goods. A work is expressive only if *the work itself* "evinces an intent to convey a particularized message" *and* the circumstances show that "the likelihood was great that the message would be understood by those who viewed it." *Gordon*, 909 F.3d at 268 (cleaned up); *VIP Prod. LLC v. Jack Daniel's Props.*, 953 F.3d 1170, 1174 (9th Cir. 2020). Here, the only artistic expression at issue was Yuga's art. The counterfeit NFTs are associated with those same Bored Ape images, without any expressive modifications or commentary by Defendants.

Defendants rely on assertions (unsubstantiated at summary judgment) that Ripps *wanted* these sales to form part of some "broader" artistic statement or protest. OB28-30. Ripps' intent is irrelevant to this inquiry. Even so, consumers were distinctly *unlikely* to understand any message from the marks other than designating the counterfeit NFTs as genuine. *See Gordon*, 909 F.3d at 268. The NFTs were named "Bored Ape Yacht Club" and "BAYC" in the smart contract—again, much like a counterfeit watch stamped with the "ROLEX" mark or a counterfeit shoe with "NIKE." Consumers on NFT marketplaces and Etherscan, for example, would have no necessary reason to know that Ripps wrote on his website rrbayc.com that his counterfeiting was a "critique," OB28, or that he defamed Yuga with accusations of Naziism on another website.[23] Defendants' NFT branding was not expressive. *Gordon*, 909 F.3d at 268.

*Second*, a defendant is never entitled to First Amendment protection where he "explicitly misleads as to the source or the content of the work." *Rogers*, 875 F.2d at 999. And an "'explicitly misleading description' of source that *Rogers* condemns" can be inferred where a defendant uses the mark in the same manner as the plaintiff. *Gordon*, 909 F.3d at 270. Here, Defendants' use of the BAYC marks was explicitly

---

[23] Defendants' claim that selling counterfeit NFTs was merely "auxiliary" to some expressive work elsewhere (OB30) fails for similar reasons. Moreover *Jack Daniels* abrogated their cited authority, as Defendants acknowledge in a footnote. OB30 n.15.

misleading.  They used the smart contract to imprint their NFTs with Yuga's marks so that they would be identified to the public as "Bored Ape Yacht Club" and "BAYC."  Moreover, they suggested sponsorship at nearly every opportunity—in the secondary market sales pages, by manipulating Etherscan, and on social media (e.g., advertising their NFTs as "BAYC V3" and "RR/BAYC")—using the marks without any meaningful indication that Yuga did not create, sponsor, or endorse the counterfeits.  4-ER-820; 6-SER-1518; 6-SER-1520.

## G.    Yuga owns the marks.

### 1.    The Lanham Act protects marks associated with digital goods such as NFTs.

Consumers purchase NFTs to own the digital content which it is associated. *Hermes*, 654 F. Supp. 3d at 278.  The Lanham Act applies to NFTs because it prohibits trademark uses that cause confusion regarding "goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1).  It does not exempt objects of commerce—like software and other digital goods—merely because they are *physically* intangible.  Courts have held or assumed that marks denoting such goods are protected.[24]  Treatises note the issue is settled.[25]  The district court thus held that

---

[24] *Brookfield*, 174 F.3d 1036 (website "metatags"); *E.S.S. Entertainment 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095 (9th Cir. 2008) (video games); *Network Automation, Inc.*, 638 F.3d 1137 (internet search engines).

[25] 5 McCarthy on Trademarks and Unfair Competition § 25A:1 ("There is no doubt that trademark law and the Lanham Act are fully operative in cyberspace.").

NFTs are "goods for purposes of the Lanham Act." 1-ER-79. NFTs are a multi-billion-dollar industry for which protection against consumer confusion is no less important than other industries, and the statute reflects no intention to exclude them.

Defendants contend that NFTs are not protected because consumers do not see their underlying computer code. OB50. If that was correct, marks designating any software would lack protection because most consumers never view the underlying source code. Yet, those products and services receive protection. Similarly, consumers see branding when they buy an NFT, and consumers bought BAYC NFTs for their digital images *and* associated license rights *and* digital token establishing ownership *and* associated services and benefits. 1-ER-80; 6-SER-1554-75.

Defendants (OB48-51) misread *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003). *Dastar* concerned a producer who sold videotapes of public domain footage from a TV series without attribution. *Id.* at 25-28. Unable to assert a copyright claim, the series owner alleged that the producer misrepresented the footage as his own work, and thus "made a 'false designation of origin'" in violation of the Lanham Act. *Id.* at 31. The Supreme Court considered whether the creative content in the footage was a protected "good" separate from the videotapes sold to consumers. *Id.* at 37. The Court held it was not. Thus, when the Court announced that the Lanham Act applies only to tangible goods" and not to "the

author of any idea, concept, or communication embodied in those goods," *id*., it was not excluding digital goods from protection. *See Slep-Tone Corp. v. Wired for Sound Karaoke & DJ Servs.*, *LLC*, 845 F.3d 1246, 1249 (9th Cir. 2017); *Phoenix Ent. Partners v. Ramsey*, 829 F.3d 817, 821 (7th Cir. 2016); *Hermes Int'l v. Rothschild*, 590 F. Supp. 3d 647, 654 (S.D.N.Y. 2022).[26]

Because NFTs are offered for sale to consumers, the Lanham Act protects consumers from the confusing use of a trademark associated with those NFTs.

### 2. Yuga did not give away or abandon the marks.

Defendants concede that Yuga first used the BAYC marks in commerce (OB31) but contend that Yuga later gave away or abandoned them. Yuga did neither.

Defendants claim first that Yuga abandoned its trademarks in its BAYC terms of service. OB43. The language of that agreement shows otherwise. 2-ER-277. The terms consist of twenty-five lines of text, the first three of which state that the BAYC NFT holders "own" their art "completely"—i.e., they own the art and may display it, like one can with a paper poster. But the remaining twenty-two lines of text describe the "personal use" and "commercial use" rights of the holder. These

---

[26] In *Slep-Tone* and *Phoenix*, both courts assumed that digital karaoke files *could* count as a "tangible good" for purposes of the Lanham Act but rejected similar attempts "to stuff copyright claims into a trademark container." *Slep-Tone*, 845 F.3d at 1248.

paragraphs grant a copyright license that plainly does not include Yuga's trademarks. Defendants fall back to the argument that because *some* ape images *depict* BAYC marks, transfer of the copyright in the image also conveyed rights to the displayed trademarks. OB44. It did not, for the same reason that purchasing a poster from the Coca-Cola Museum does not confer the right to sell goods under the "Coke" mark.

Similarly, Defendants claim that Yuga abandoned three marks by transferring an NFT that displayed an ape skull image to a third party. OB46. Defendants' screenshots only show that Yuga "gifted" the NFT itself and that, in any event, that NFT is not one of the BAYC marks. 8-ER-1494-1495.

Defendants also contend that an offhand, out-of-context statement made by Yuga's former CEO *months after* Defendants had already been sued for their counterfeit NFTs—that BAYC NFT holders have "[a]ll IP rights"—was a trademark assignment. OB43. But Yuga's terms of service and other documentation pre-dating this interview set forth the actual licenses it granted to BAYC NFT holders. 2-ER-277; 3-SER-861.[27]

Finally, Defendants claim that Yuga abandoned its BAYC marks through failure to exercise quality control or to police unlicensed uses. OB44-46. The

---

[27] At trial Ms. Muniz explained that "IP" rights referred to copyrights. 6-ER-1070; 4-SER-1000.

district court held that these arguments were "unquestionably meritless." 1-ER-82. To abandon a mark in this manner, the mark must either no longer designate what consumers have come to expect, *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515-16 (9th Cir. 2010), or lead to such widespread infringing use that the mark becomes a generic term to consumers rather than an indicator of source. *Freecycle Network, Inc. v. Uey*, 505 F.3d 898, 905 (9th Cir. 2007). Here, Defendants relied on a smattering of screenshots they downloaded from the internet that purport to show uses of BAYC marks. But Yuga never granted trademark licenses to BAYC NFT holders, and thus it had no obligation to exercise quality control over them. 1-ER-81-82; 8-ER-1493-94. Likewise, the record shows that Yuga invested significantly in protecting its brand and taking down unlicensed uses. *See* 4-SER-1093; 3-ER-649; 4-SER-1113; 4-SER-1112. Even if it did not catch all unlicensed uses, the law does not require perfection in trademark policing. *See Eclipse Assocs. Ltd. v. Data Gen. Corp.,* 894 F.2d 1114, 1119 (9th Cir. 1990). Defendants did not show either that the BAYC marks lost association with Yuga's brand or that the public sufficiently appropriated the marks that they no longer identify the BAYC collection.[28]

---

[28] Defendants also contend (OB48) that Yuga lacks rights to the APE mark, but Yuga did not assert this mark at summary judgment or trial, and claims based on it are treated as dismissed or abandoned. 1-ER-74 n.2; *SanDisk Corp. v. Kingston Tech. Co.,* 695 F.3d 1348, 1352-53 (Fed. Cir. 2012).

### 3. Yuga used the BAYC marks lawfully in commerce.

Finally, Defendants argue that Yuga's use of the BAYC marks was *unlawful* and therefore does not confer trademark priority. OB51. Only unlawful conduct that has an "immediate and necessary relation" to a plaintiff's acquisition of its rights can invalidate a prior commercial use. *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 931 (9th Cir. 2014). So, for example, cheating on taxes is conduct "collateral and immaterial" and does not invalidate a trademark use, *id.* at 932, while using a mark to designate an illegal dietary supplement is not a lawful use. *CreAgri, Inc. v. USANA Health Scis., Inc.*, 474 F.3d 626, 630 (9th Cir. 2007).

Defendants do not claim that Yuga's use of the BAYC marks on NFTs, consumer products, or at live events was unlawful. Rather, they claim (OB51-52) that Yuga failed to register BAYC NFTs as securities with the SEC. Such a requirement would be "collateral" to use of the mark, and Defendants have no authority suggesting otherwise. Defendants made no attempt at summary judgment to argue that the governing multifactor test from *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946), required Yuga to register BAYC NFTs as securities. The single case Defendants now cite to support their argument concerned an unrelated NFT project, and the court there explicitly noted that not all NFTs are securities. *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 450 (S.D.N.Y. 2023). Now on appeal, Defendants point to Yuga's product development plans and marketing and

unauthenticated allegations to suggest that there was a triable issue of fact. OB52. There was not.

## H. The Court should affirm summary judgment on cybersquatting.

To establish a cybersquatting claim, a plaintiff must show that (1) the defendant registered, trafficked in, or used a domain name (2) identical or confusingly similar to a protected mark (3) with bad-faith intent to profit from the mark. *See* 15 U.S.C. § 1125(d)(1)(A); *DSPT Int'l v. Nahum*, 624 F.3d 1213, 1218-19 (9th Cir. 2010). Here, the district court (1-ER-87) held Defendants liable for cybersquatting "rrbayc.com" and "apemarket.com," as the undisputed record showed that they registered those domains (5-SER-1347-49) making prominent use of the BAYC and BORED APE marks to profit off them (1-ER-86-87; 3-ER-609-12; 6-SER-1534-37).

Defendants admit their appeal on cybersquatting largely rises and falls with their appeal on false designation of origin. OB25. First, the "confusingly similar" element under the ACPA is simpler than the "likelihood of confusion" analysis for infringement, which is "designed to address a different social harm than the cybersquatting statute." *DSPT Int'l*, 624 F.3d at 1222 n.28. Instead, it is sufficient for cybersquatting that a defendant used some part of a distinctive trademark in the domain. *Id.*; *see also GoPets Ltd. v. Hise*, 657 F.3d 1024, 1032 (9th Cir. 2011) (affirming summary judgment that domain names adding e-, my-, and i- to plaintiff's

marks were confusingly similar); *see also Coca-Cola Co. v. Purdy*, 382 F.3d 774, 783 (8th Cir. 2004) (similar as to "mymcdonalds.com" and "drinkcoke.org"). Defendants' invocation of Lanham Act authorities (OB41) to argue otherwise is irrelevant.

Further, Defendants contend there was a triable issue on bad-faith intent to profit, because they believed their use of the domains was lawful. OB26. To determine intent to profit, the district court may consider the nine nonexclusive statutory factors. *Lahoti v. VeriCheck*, 586 F.3d 1190, 1202 (9th Cir. 2009) (§ 1125(d)(1)(B)(i)). Defendants did not challenge on appeal the ruling that eight factors showed their bad faith. 1-ER-86-87. That is dispositive, as the Court has affirmed summary judgment based on as few as just two factors, *GoPets*, 657 F.3d at 1032, and both of those—plus many more—exist here. Defendants knew they had no rights in either the BAYC or BORED APE marks and that Yuga had pending applications for them (Factor 1) (1-ER-86; 2-ER-192-93), that the domains do not contain Defendants' legal names (Factor 2), and that Yuga had made prior use of the marks (Factor 3) (8-ER-1382; 8-ER-1399; 8-ER-1437). Defendants intended to profit by selling counterfeit NFTs on rrbayc.com and receiving transaction fees from sales on apemarket.com (Factor 4). 8-ER-1431; 8-ER-1507; 8-ER-1413. Defendants registered domain names with only minor variations of Yuga's marks and then marketed apemarket.com directly to legitimate BAYC NFT holders using

many of Yuga's marks, thus reflecting their intent to divert customers for commercial gain (Factor 5).  8-ER-1414; 8-ER-1422; 8-ER-1413-14.  Defendants used a proxy registration service to hide their identities from the public (Factor 7) (5-SER-1347-49), and registered multiple domains (Factor 8).  The marks at issue are distinctive (Factor 9) (1-ER-83), which Defendants do not contest.

The Court has held the "'reasonable belief' defense" unavailable as a matter of law for a defendant "who acts even partially in bad faith."  *Lahoti*, 586 F.3d at 1203.  Given the failure to challenge the other factors on appeal, the defense is unavailable and Defendants' claim to subjective good faith is irrelevant.  And although Defendants attempt to distinguish *Lahoti* (OB26) on its facts, the Court has since re-affirmed its holding.  *See GoPets*, 657 F.3d at 1033.  Defendants "gambled" on liability, "made [their] cybersquatter bed[,] and now cannot persuasively challenge the district court's conclusion that [they] must lie in it."  *Lahoti*, 586 F.3d at 1203. 8-ER-1438.

## II.    THE COURT SHOULD AFFIRM THE DISTRICT COURT'S REMEDIES.

### A.    The district court did not abuse its discretion by entering an injunction against future trademark infringement.

A permanent injunction against future infringement is the quintessential trademark remedy.  *See Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988).  The district court enjoined Defendants from using Yuga's

marks: "to market, advertise, promote, or identify any good and/or service not produced, offered, or authorized by Yuga,… or to otherwise unfairly compete with Yuga…." 1-ER-5 (emphasis added).

Defendants argue that the term "identify" is so ambiguous that it fails to give them notice of the enjoined acts and restrains lawful First Amendment activity. OB57. The injunction reflects no abuse of discretion and should thus be affirmed.

First, the district court issued an injunction using language that the Court has affirmed previously. The Court has approved broader injunctions that prohibit using marks to "identify" goods, as well as those that restrict defendants from "referencing," "mentioning," "displaying," and "using in any way" the marks at issue. *Intenze Prod., Inc. v. TATLAB Corp.*, 2023 WL 5209729, at *10 (C.D. Cal. Aug. 3, 2023) (prohibiting use of the marks "to identify any goods or services not authorized by Plaintiff"), *aff'd*, 2024 WL 511878 (9th Cir. Feb. 9, 2024); *Desirous Parties Unlimited Inc. v. Right Connection Inc.*, 2022 WL 4110370, at *10 (D. Nev. Sep. 7, 2022) ("[R]eferencing, mentioning and/or using in any way…"), *aff'd*, 2023 WL 4285504 (9th Cir. June 30, 2023); *2Die4Kourt v. Hillair Cap. Mgmt. LLC*, 2016 WL 4487895, at *12 (C.D. Cal. Aug. 23, 2016) ("Using, displaying, mentioning, advertising, or promoting…"), *aff'd*, 692 F. App'x 366 (9th Cir. May 26, 2017). None of this creates a First Amendment problem because such injunctions restrict only unlawful commercial activities.

Moreover, the Court does not reject injunction language for lack of specificity unless it is "so vague" as to have "no reasonably specific meaning." *E. & J. Gallo Winery*, 967 F.2d at 1297.[29] Here, Defendants argue "identify" might prevent them from discussing this lawsuit or announcing they stopped selling NFTs. But "identify" has a specific meaning. Read in context, it refers to a trademark use that furthers a commercial transaction: Defendants cannot use Yuga's marks to "*market, advertise, promote*, or identify [unauthorized goods],… or to *otherwise unfairly compete with Yuga*…." The surrounding language makes clear that the injunction restricts unfair competition, not mere noncommercial speech. Defendants also assert they *never* used the marks to promote NFTs, but rather to "parody" genuine NFTs for "art." The district court had reason to adopt language that would avoid word games and clearly capture the offending commercial activity.

Finally, Defendants' failure to seek clarification or other relief before taking an appeal belies their argument. The district court stated it would *not* impose "any injunction preventing defendants from exercising their first amendment rights to do whatever they want to do." 5-ER-961. It could have addressed any legitimate free speech concern Defendants raised. This Court previously rejected such attempts to

---

[29] Contrary to Defendants' assertions (OB56-57), a permanent injunction against trademark infringement is *not* a prior restraint subject to strict scrutiny. *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1403 n.11 (9th Cir. 1997).

game injunction proceedings to create an appellate issue. *See Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003) ("the proper approach would be for [defendant] to seek a modification or clarification of the injunction in the district court"); *see also Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc.*, 774 F.3d 935, 954 (9th Cir. 2014). It should do the same here.

### B. The district court did not abuse its discretion by ordering disgorgement of profits.

The district court determined that disgorgement was necessary given Defendants' ongoing infringement and active marketing of their NFTs. 1-ER-57-59. Defendants do not challenge that decision as an abuse of discretion, nor do they challenge the district court's calculation of the award. Instead, they argue that equitable remedies are *per se* unavailable because Yuga did not pursue actual damages or prove that actual damages would provide inadequate compensation. They are incorrect.

First, the Lanham Act expressly provides for disgorgement of profits as a remedy independent of damages. 15 U.S.C. § 1117. It imposes no predicate requirement that the plaintiff prove anything with respect to any other remedy to disgorge a defendant's profits. Nor would that make sense considering the statute's purpose to afford district courts "broad discretion" to fashion a remedy, *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 124 (9th Cir. 1968), with a goal of "making any violations of the Lanham Act unprofitable to the

infringing party." *Playboy Enters., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1274 (9th Cir. 1982); *see also Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012) (affirming Lanham Act award of both damages and disgorgement).[30]

Second, Yuga had every right to forego actual damages to streamline the trial. Defendants suggest that *Guzman v. Polaris Indus., Inc.,* 49 F.4th 1308, 1313 (9th Cir. 2022) forecloses equitable relief when a plaintiff does so. But *Guzman* held that "equitable relief must be withheld when an equivalent legal claim would have been available *but for a time bar*." *Id.* at 1312 (emphasis added).[31] In other words, a plaintiff may not circumvent a statute of limitations bar by recharacterizing its relief as equitable. It has no application here. The Court should affirm the disgorgement award.

### C.   Defendants had no right to a jury trial on statutory damages for cybersquatting.

For an ACPA violation, a plaintiff may elect actual damages or statutory damages "in the amount of not less than $1,000 and not more than $100,000 per

---

[30] Even so, Yuga's expert showed that, given potential holdouts, actual damages were difficult to estimate and thus inadequate. *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91, (2011).

[31] Defendants cite *Franklin v. Gwinett County Pub. Sch.*, 503 U.S. 60, 75-76 (1992), holding that relief for a Title IX violation should not be *limited* to equitable remedies. That case is inapplicable.

domain name, as the court considers just." 15 U.S.C. § 1117(d). The statute commits to the district court the discretion to set an award; it does not mention a jury trial. Accordingly, this Court has held that there is no right to such a jury trial, at least when the district court awards the statutory minimum. *See GoPets*, 657 F.3d at 1024. Defendants argue that any award higher than the statutory minimum requires a jury to make a predicate finding. OB60-61.

The Seventh Amendment applies only to common-law causes of action or statutory causes of action more analogous to those tried in 18th-century courts of law than to those tried in equity. *Granfinanciera, S. A. v. Nordberg*, 492 U.S. 33, 42 (1989). Here, the ACPA proscribes "cybersquatting"—a modern technological practice with no common law analogue—and does so in language that expressly invokes equity, granting "the court" discretion to award an amount it deems "just." At least one court has held that there is no right to a jury trial under the ACPA. *Acad. of Motion Picture Arts & Sciences v. GoDaddy, Inc.*, 2015 WL 12697732, at *4 (C.D. Cal. Apr. 10, 2015). Courts of Appeal have also affirmed awards above the minimum without requiring a jury trial. *E.g., Two Plus Two Pub., LLC v. Boyd*, 2012 WL 724678, at *5 (D. Nev. Mar. 1, 2012) ($25,000.00 award), *aff'd,* 572 F. App'x 466 (9th Cir. 2014); *Shields v. Zuccarini*, 254 F.3d 476, 487 (3d Cir. 2001) ($10,000 award); *Spectrum Ass'n Mgmt. of Texas, LLC v. Lifetime HOA Mgmt.,*

60

*LLC*, 2020 WL 3490384, at *4 (W.D. Tex. June 26, 2020), *aff'd*, 5 F.4th 560 (5th Cir. 2021) ($100,000 award).

Defendants argue that the "logic" of *Feltner v. Columbia Pictures Television*, 523 U.S. 340, 355 (1998) requires a jury trial. OB60. But *Feltner* held that the Copyright Act codified a common law cause of action and thus required a jury trial. Here, there is no such analog. Thus, the district court had the discretion to award Yuga full statutory damages.[32]

### D. The district court did not abuse its discretion by finding the case exceptional and awarding fees.

A fee award requires the district court to find the case exceptional under the "totality of the circumstances," meaning the case "stands out from others" either "with respect to the substantive strength of a party's litigating position… or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014); *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1180-81 (9th Cir. 2016). Here, the district court not only observed Defendants throughout the case but made findings after conducting a trial on the exceptional case issue.

---

[32] If the Court concludes a jury trial was required, it may remit the award to the statutory minimum rather than remand. *See Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1310 (9th Cir. 1990).

Defendants fail to show clear error in those findings or abuse of discretion in the decision to award fees. *See Jason Scott*, 68 F.4th at 1212. They ignore the district court's findings, which supported its conclusions that Defendants had committed blatant infringement and presented a weak defense. The district court found the case "dramatically different" from most trademark cases because Defendants were "using the cover of satire and parody to justify their use of Yuga's BAYC Marks without Yuga's consent." 1-ER-70. "Defendants have simply used the BAYC Marks to create a NFT collection that points to the exact same images as the BAYC NFTs," 1-ER-60, and "were intentionally using the BAYC Marks in an effort to profit off of Yuga's success," 1-ER-61. A raft of evidence supported these findings—for example Cahen telling Ripps "'Ur gonna make so much on this shit LMFAO.'" 1-ER-59; 3-SER-863-64. The district court found Defendants' conduct even more egregious because, when confronted with evidence like this that "contradicted their narrative" they dismissed it "as a 'joke' or 'sarcasm.'" 1-ER-69.

Yet another factor that supported the exceptional case finding was the unreasonable way Defendants litigated. *See Octane Fitness*, 572 U.S. at 554. That included "Defendants' repeated attempts to re-litigate issues already addressed and rejected by the Court," which "unnecessarily complicated this litigation." 1-ER-70. Defendants' refusal to accept the summary judgment order as binding forced the district court to spend resources on issues that it had already resolved. Defendants

downplay this as a "commonplace" reassertion of an issue "to preserve it for appeal." OB63 n.32. But, in fact, Defendants "argue[d] repeatedly that the law of the case doctrine does not apply to pretrial rulings such as motions for summary judgment" and that they were thus free to re-argue every issue on which they had lost. 1-ER-56.

Before this Court, Defendants refuse to engage with the other findings that supported the fee award, including their insistence on pressing false allegations of Nazism, racism and pedophilia after promising the court that they would not do so at trial.[33] As the special master concluded, "the fact that defendants repeatedly raised allegations of Nazism and racism" required Yuga to "spend time preparing its witnesses to respond to such claims," consumed "unnecessary time at depositions and trial," and thus "unnecessarily increased the fees that were incurred litigating the case." 1-ER-22. Defendants also "were obstructive and evasive throughout their depositions and during their trial testimony." 1-ER-70. Defendants argue that the "district court cites no specific examples" of this conduct (OB63), but the record brims with them. *See* 1-SER-45-48; 6-ER-1229; 6-ER-1231-32; 6-ER-1234; 6-ER-1237-38; 1-SER-177-83; 1-SER-192-96.

---

[33] *E.g.*, 1-SER-45-48; 4-SER-1029 ("pedophilia"); 4-SER-1049-50 ("the words 'Nazi' or 'Hitler'"); 5-ER-908-09.

Finally, this case stands out because of Defendants' "disgraceful and slanderous statements" about Yuga's employees and counsel *during the litigation*. 1-ER-70; 8-ER-1450; 8-ER-1452; 8-ER-1456-57. Defendants attempt to minimize this conduct as "a few coarse statements on Twitter." OB63.[34] But Defendants cannot show that the district court committed clear error in finding their conduct "egregious" and "far exceed[ing] the bounds of acceptable conduct" (1-ER-70) merely by stating their own self-serving assessment. The district court did not abuse its discretion in awarding fees.

## III. THE COURT SHOULD AFFIRM THE DISPOSITION OF THE COUNTERCLAIMS.

### A. The Court should affirm summary judgment on the DMCA counterclaim.

Before filing suit, Yuga tried to stop sales of counterfeit NFTs by reaching out to marketplaces where Defendants listed them. 3-ER-614-619; 3-ER-622-649. Yuga's agent sent several successful notices requesting removal of the listings. 3-ER-649; 4-SER-1093. The district court ruled that Defendants could not premise DMCA claims on three successful takedown notices that alleged *trademark* infringement.

---

[34] These included Cahen posting a picture of his avatar holding the decapitated head of a Bored Ape owned by Yuga co-founder Greg Solano. 5-SER-1422-23.

The DMCA provides a safe harbor from copyright liability for online services that host user-generated content if, *inter alia*, they take appropriate measures in response to notices under 17 U.S.C. § 512(c)(3). It also creates a cause of action against a party who materially misrepresents in a notice that hosted content infringes a copyright. 17 U.S.C. § 512(f). The plaintiff must show (a) that a misrepresentation in the notice led the service provider to remove the content, and (b) that the defendant had "some actual knowledge of misrepresentation." *Id.*; *Rossi v. Motion Picture Ass'n of Am.*, 391 F.3d 1000, 1005 (9th Cir. 2004).

Defendants rest their § 512(f) argument on three communications that accurately asserted trademark infringement. OB55; 4-SER-1093.[35] All three takedown requests at issue alleged that Yuga "is the owner of multiple trademarks relevant to this complaint," and asserted the "[u]nauthorized use of Yuga trademarks." 3-ER-626; 3-ER-628-629; 3-ER-632. Two notices (to Foundation and x2y2) show that service providers removed the offending NFTs for that reason, not because of any misrepresentation about copyright infringement. 3-ER-634, 639. The third notice (OpenSea) answered OpenSea's form to "[d]escribe why you are

---

[35] Defendants do not appeal as to the other notices, which either did not result in removal of material (1-ER-92) or asserted an accurate claim of copyright infringement (1-ER-93).

reporting this content" with "[t]his content uses my business's trademarked name or logo" (3-ER-626).

The district court ruled correctly that Defendants cannot premise DMCA liability on a trademark notice.  The statute imposes liability not for any correspondence with an internet service provider, but only for material misrepresentations in a notice of claimed copyright infringement "*under this section*."  17 U.S.C. § 512(f).  Such a notice is "a written communication" that includes an "[i]dentification of the copyrighted work claimed to have been infringed" and a statement that use of the material is "not authorized by the copyright owner."  17 U.S.C. § 512(c)(3).  A communication not meeting these requirements has no legal effect under the DMCA.  *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1112 (9th Cir. 2007).[36]  This makes sense not just based on the statutory language, but because service providers receive many reports (3-ER-638) that they must triage on an automated basis.

---

[36] *CCBill* considered service provider liability for ignoring a deficient notice, but other courts have extended that holding to § 512(f) claims.  *See Rock River Commc'ns v. Universal Music Grp*., 2011 WL 1598916, at *13, *16 (C.D. Cal. Apr. 27, 2011); *ISE Ent. Corp. v. Longarzo*, 2018 WL 11346736, at *8 (C.D. Cal. Dec. 11, 2018); *Mandala v. Tire Stickers, LLC*, 829 F. App'x 869, 902 (11th Cir. 2020).  *CrossFit, Inc. v. Alvies*, 2014 WL 251760 (N.D. Cal. Jan. 22, 2014), cited by Defendants, concerned a motion to dismiss where the court stressed that it would credit plaintiffs' allegations about improper DMCA notices without evaluating defendant's arguments.  *Id.* at *2.

Defendants mix and match from *other* takedown requests and cite form language in the three notices (3-ER-641) that contain incidental "references to the DMCA, copyright, and § 512(f)." OB54. But the district court correctly concluded that *other* requests do not show that *these three* requests asserted copyright infringement. 1-ER-93. Moreover, the online services' form language does not turn these trademark assertions into DMCA notices without identification of a copyrighted work, which was not present. Yuga did not misrepresent "that material or activity is infringing" (§ 512(f)(1)) because it correctly identified that the material infringed its trademarks, and Defendants experienced no injury when the infringing NFT listings were removed for that reason.

## B.   The Court should affirm the dismissal of the declaratory judgment counterclaims.

A party seeking a declaratory judgment must satisfy the "case or controversy" requirement, by showing a dispute "of sufficient immediacy and reality" to warrant relief. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 (9th Cir. 1990). Defendants concede that Yuga held no copyright registration and could not file an infringement suit against them. Thus, no "impending litigation" could exist, and there was no copyright dispute of sufficient immediacy to create a justiciable controversy. 4-ER-693-94. The district court ruled correctly that it lacked subject matter jurisdiction.

Defendants argue that courts should dismiss claims for lack of subject matter jurisdiction without prejudice, but that rule exists to allow the plaintiff to re-file in a competent court. *See Freeman v. Oakland Unified Sch. Dist.*, 179 F.3d 846, 847 (9th Cir. 1999); *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017). Here, Defendants could not have pled facts that would sustain their claim in any court. Instead, the underlying facts would need to change. And if Yuga *did* register a copyright and threaten suit, the "with prejudice" label would not bar Defendants from raising the claim again. *See Ruiz v. Snohomish Cnty. Pub. Utility Dist. No. 1*, 824 F.3d 1161, 1168 (9th. Cir. 2016). Thus, the district court did not err—dismissing with prejudice made no practical difference beyond its salutary effect of preventing Defendants from attempting to amend.

## CONCLUSION

Defendants' shotgun appeal typifies their approach to this case: say anything to avoid taking responsibility for their unlawful actions.  They failed to present any basis to reverse or vacate the judgment, let alone support their extravagant claims (OB64) that the district judge abdicated his responsibility to decide the issues impartially.  Yuga asks the Court to affirm.

May 30, 2024

Respectfully submitted,

FENWICK & WEST LLP

By: */s/ Todd R. Gregorian*
    Todd R. Gregorian

*Attorneys for Plaintiff-Appellee*
*Yuga Labs, Inc.*

## STATEMENT OF RELATED CASES

*Yuga Labs v. Ripps et al.*, No. 22-56199 (9th Cir.), is a related appeal. The panel, consisting of Circuit Judges Bea, Christen, and Johnstone, issued its memorandum opinion on October 30, 2023.

*Yuga Labs v. Hickman*, No. 24-1297 (9th Cir.) is a related appeal because it involves the same events at issue in this appeal.


May 30, 2024                           Respectfully submitted,

                                       FENWICK & WEST LLP


                                       By: */s/ Todd R. Gregorian*
                                              Todd R. Gregorian

                                       *Attorneys for Plaintiff-Appellee*
                                       *Yuga Labs, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**    24-879

I am the attorney or self-represented party.

**This brief contains**  13,993  **words,** including  174  words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [            ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  s/Todd R. Gregorian   **Date**  May 30, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                    *Rev. 12/01/22*

71

# ADDENDUM
# OF PERTINENT STATUTORY PROVISIONS

# ADDENDUM
# TABLE OF CONTENTS

17 U.S.C. § 512(c), (f) ............................................................... A-1

**17 U.S.C. § 512. Limitations on liability relating to material online**

(c)    **Information residing on systems or networks at direction of users.--**

    **(1)**    **In general.--**A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—

        **(A)**    **(i)**    does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

                **(ii)**    in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

                **(iii)**    upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

        **(B)**    does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

        **(C)**    upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to,

the material that is claimed to be infringing or to be the subject of infringing activity.

**(2)    Designated agent.**--The limitations on liability established in this subsection apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement described in paragraph (3), by making available through its service, including on its website in a location accessible to the public, and by providing to the Copyright Office, substantially the following information:

**(A)**    the name, address, phone number, and electronic mail address of the agent.

**(B)**    other contact information which the Register of Copyrights may deem appropriate.

The Register of Copyrights shall maintain a current directory of agents available to the public for inspection, including through the Internet, and may require payment of a fee by service providers to cover the costs of maintaining the directory.

**(3)    Elements of notification.--**

**(A)**    To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the

designated agent of a service provider that includes substantially the following:

**(i)** A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

**(ii)** Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

**(iii)** Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

**(iv)** Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

**(v)**     A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

**(vi)**     A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

**(B)**   **(i)**     Subject to clause (ii), a notification from a copyright owner or from a person authorized to act on behalf of the copyright owner that fails to comply substantially with the provisions of subparagraph (A) shall not be considered under paragraph (1)(A) in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent.

**(ii)**     In a case in which the notification that is provided to the service provider's designated agent fails to comply substantially with all the provisions of subparagraph (A) but substantially complies with clauses (ii), (iii), and (iv) of subparagraph (A), clause (i) of this subparagraph applies only if the service provider promptly attempts to contact the person making the notification

A-4

> > or takes other reasonable steps to assist in the receipt of notification that substantially complies with all the provisions of subparagraph (A).

* * *

**(f)     Misrepresentations.**--Any person who knowingly materially misrepresents under this section--

> **(1)**     that material or activity is infringing, or

> **(2)**     that material or activity was removed or disabled by mistake or misidentification,

shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.