No. 24-879

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

YUGA LABS, INC.,

*Plaintiff-Appellee*,

*v.*

RYDER RIPPS, JEREMY CAHEN,

*Defendants-Appellants*,

*and*

DOES 1–10,

*Defendants.*

On Appeal from the United States District Court
for the Central District of California, No. 2:22-cv-04355 (Walter, J.)

## REPLY BRIEF FOR APPELLANTS
## RYDER RIPPS AND JEREMY CAHEN

THOMAS G. SPRANKLING
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
(650) 858-6062

DEREK A. GOSMA
HENRY M. NIKOGOSYAN
WILMER CUTLER PICKERING
  HALE AND DORR LLP
350 South Grand Avenue
Suite 2400
Los Angeles, CA 90071
(213) 443-5316

LOUIS W. TOMPROS
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6886

NICHOLAS WERLE
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

KYLE T. EDWARDS
WILMER CUTLER PICKERING
  HALE AND DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
(628) 235-1000

June 20, 2024

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................... ii

INTRODUCTION ...................................................................1

ARGUMENT .........................................................................2

I.    THE REMEDIES BENCH TRIAL DOES NOT ERASE THE MANY ERRORS IN THE SUMMARY JUDGMENT LIABILITY DECISION .................................2

II.    THE DISTRICT COURT'S NOMINATIVE FAIR USE, FIRST AMENDMENT, AND TRADEMARK OWNERSHIP ERRORS EACH INDEPENDENTLY REQUIRES REVERSAL .........................................................4

    A.    Nominative Fair Use ........................................................4

    B.    First Amendment..............................................................9

    C.    Ownership .....................................................................14

    D.    Reversal On Nominative Fair Use, *Rogers*, Or Ownership Precludes Summary Judgment On Cybersquatting.............................17

III.    THE DISTRICT COURT MADE MULTIPLE ERRORS IN APPLYING THE *SLEEKCRAFT*/LIKELIHOOD OF CONFUSION ANALYSIS...................................18

IV.    AT MINIMUM, SUMMARY JUDGMENT SHOULD NOT HAVE BEEN GRANTED ON THE LANHAM ACT CLAIM .........................................22

    A.    Yuga Failed To Identify Protectable "Goods" ....................................22

    B.    Whether Yuga Lawfully Used The Marks Is Disputed.......................24

V.    THE DISTRICT COURT ERRONEOUSLY REJECTED APPELLANTS' COUNTERCLAIMS ...............................................................25

VI.    THE REMEDIES AWARDED WERE IMPROPER...................................26

    A.    The Permanent Injunction Unconstitutionally Burdens Speech .........26

    B.    Precedent Prohibited Yuga From Dismissing Its Legal Claims To Avoid A Jury.....................................................................27

    C.    A Jury Trial Was Required On Cybersquatting Damages .................29

    D.    This Is Not An "Exceptional" Case Warranting $7 Million In Fees......30

CONCLUSION .....................................................................31

STATEMENT OF RELATED CASES ..............................................33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Anheuser-Busch, Inc. v. Balducci Publications*, 28 F.3d 769 (8th Cir. 1994) ...................................................................................27

*Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884 (9th Cir. 2019) ..................................................................................... 6

*Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062 (9th Cir. 2006) ....................................................................22

*C.A.R. Transportation Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474 (9th Cir. 2000) ............................................................7

*Cairns v. Franklin Mint Co.*, 292 F.3d 1139 (9th Cir. 2002) ................................5, 6

*Connecticut General Life Insurance Co. v. New Images of Beverly Hills*, 321 F.3d 878 (9th Cir. 2003) ..............................................27

*CreAgri, Inc. v. USANA Health Sciences, Inc.*, 474 F.3d 626 (9th Cir. 2007) ...................................................................................25

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003)...................................................................................22

*Dr. Seuss Enterprises, LP v. ComicMix LLC*, 983 F.3d 443 (9th Cir. 2020) ..................................................................................14

*Dr. Seuss Enterprises, LP v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997) ..................................................................26

*DSPT International, Inc. v. Nahum*, 624 F.3d 1213 (9th Cir. 2010) ......................17

*E.&J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280 (9th Cir. 1992) ...................................................................................22

*Entrepeneur Media, Inc. v. Smith*, 279 F.3d 1335 (9th Cir. 2002)...................20, 21

*Experience Hendrix LLC v. Hendrixlicensing.com Ltd.*, 762 F.3d 829 (9th Cir. 2014) ................................................................... 6

*Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340 (1998) ......................29

*Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992).........................29

*FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509 (9th Cir. 2010) .................................................................................................14, 15

*GoPets Ltd. v. Hise*, 657 F.3d 1024 (9th Cir. 2011) .........................................18, 29

*Gordon v. Drape Creative, Inc.*, 909 F.3d 257 (9th Cir. 2018)........................12, 13

*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199 (9th Cir. 2000) .....................21

*Guzman v. Polaris Industries Inc.*, 49 F.4th 1308 (9th Cir. 2022) ...................28, 29

*Institute of Cetacean Research v. Sea Shepherd Conservation Society*, 774 F.3d 935 (9th Cir. 2014) ...........................................................27

*Jack Daniel's Properties, Inc. v. VIP Products LLC*, 143 S. Ct. 1578 (2023)........................................................................................9, 10

*Kearney v. Standard Insurance Co.*, 175 F.3d 1084 (9th Cir. 1999) (en banc) ...................................................................................................3

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596 (9th Cir. 2005) .........................................................................18

*Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190 (9th Cir. 2009) ......................................18

*Lenz v. Universal Music Corp.*, 815 F.3d 1145 (9th Cir. 2016) .............................25

*Levi Strauss & Co. v. Shilon* 121 F.3d 1309 (9th Cir. 1997).................................12

*Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002) ...........................8

*Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137 (9th Cir. 2011) ........................................................................19

*New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302 (9th Cir. 1992) ...................................................................................7, 8

*Nordyke v. Santa Clara County*, 110 F.3d 707 (9th Cir. 1997)...............................12

*Playboy Enterprises, Inc. v. Welles*, 279 F.3d 796 (9th Cir. 2002) .........................6

*Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022 (9th Cir. 2024) ............... 9, 10, 11

*Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) .................................................... 10

*Russian River Watershed Protection Committee v. City of Santa Rosa*,
    142 F.3d 1136 (9th Cir. 1998) ................................................................. 24

*Shields v. Zuccarini*, 254 F.3d 476 (3d Cir. 2001) ................................................... 30

*Slep-Tone Entertainment Corp. v. Wired for Sound Karaoke & DJ
    Services, LLC*, 845 F.3d 1246 (9th Cir. 2017) ............................................... 23

*Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) ......................... 28

*Spectrum Association Management of Texas, LLC v. Lifetime HOA
    Management LLC*, 5 F.4th 560 (5th Cir. 2021) ............................................. 30

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171 (9th Cir.
    2010) ...................................................................................................... 4, 6, 8

*Twentieth Century Fox Television v. Empire Distribution, Inc.*,
    875 F.3d 1192 (9th Cir. 2017) ...................................................................... 11

*Two Plus Two Publishing, LLC v. Jacknames.com*, 572 F. App'x 466
    (9th Cir. 2014) ............................................................................................. 30

*United States v. Gadson*, 763 F.3d 1189 (9th Cir. 2014) ......................................... 20

*Vernor v. Autodesk, Inc.*, 621 F.3d 1102 (9th Cir. 2010) .......................................... 7

## STATUTES AND RULES

15 U.S.C.
    § 1117 ....................................................................................................... 28
    § 1125 ....................................................................................................... 17

Federal Rules of Evidence 701 ................................................................................. 20

17 U.S.C. § 512 ........................................................................................................ 25

## OTHER AUTHORITIES

*Black's Law Dictionary* (11th ed. 2019) .................................................................... 5

# INTRODUCTION

Yuga does not dispute that this case raises complex, novel questions regarding the interaction between NFTs, trademark law, and the First Amendment. Nor does Yuga dispute that the district court committed several legal errors in granting summary judgment on every aspect of its liability case, including misallocating the burden of proof on Appellants' dispositive nominative fair use defense.

Yuga instead paints a misleading picture of the procedural posture (claiming the one-day bench trial on remedies cured the errors committed in granting summary judgment on liability) and invites this Court to err by presenting the record in the light most favorable to Yuga. For example, there is a factual dispute over whether the RR/BAYC NFTs are satirical commentary intended to educate the public about the nature of NFTs and criticize Yuga's antisemitic and racist tropes (as Appellants argue) or "counterfeits" of a digital certificate that trade on Yuga's goodwill (as Yuga contends). Yuga's brief reads as though this disputed question has been settled in its favor—even though the facts must be viewed in the light most favorable to Appellants. Finally, rather than confront head-on Appellants' leading legal arguments regarding nominative fair use, the First Amendment *Rogers* test, and trademark ownership—any one of which would require reversal—Yuga buries its cursory responses deep in its brief.

Yuga's "nothing-to-see-here" approach cannot be squared with the law, the facts, or even its own attorneys' boasts that this was the "[f]irst-[e]ver [s]ummary [j]udgment for [a] [p]laintiff in [a] [g]roundbreaking NFT [t]rademark [c]ase." *See* C.A. Dkt. 17.1 at 8 & n.4. Appellants respectfully submit that reversal is warranted so these complex and novel issues can be decided on the evidence, by a jury.

## ARGUMENT

### I.  THE REMEDIES BENCH TRIAL DOES NOT ERASE THE MANY ERRORS IN THE SUMMARY JUDGMENT LIABILITY DECISION

Yuga asserts that the one-day remedies bench trial renders unnecessary review of the summary judgment rulings on liability. *See, e.g.*, RB2, 19-20, 22, 37-39.[1] Yuga's unsupported argument misrepresents the record and is legally erroneous.

*First*, Yuga is wrong that after the bench trial the district court reconsidered the "topics in the summary judgment order[] and… reached the same conclusions." RB39. The district court expressly *declined* to revisit any liability issue decided at summary judgment and noted that "the *only* issues that remained for the court trial were the equitable remedies to be awarded to Yuga." *See* 1-ER-56 & n.8 (noting that while the court was not "barr[ed]… from reconsidering pretrial rulings" on liability, it would not do so and would instead "apply the law of the case doctrine"

---

[1] "OB" refers to Appellants' Opening Brief.  "RB" refer to Yuga's Response Brief.

on those issues).[2]  The post-trial remedies opinion mentioned the liability rulings in the "Procedural History" section and, even then, only block-quoted what "the Court concluded" *previously*—adding no new findings or analysis.  1-ER-48-55.[3]

*Second*, Yuga identifies no case adopting its novel theory (RB39) that summary judgment errors are harmless if a later bench trial would "reach the same result."  To the contrary, this Court held *en banc* that "there [*is* a] point in remanding for such a trial" because "a bench trial on the record… sometimes leads a judge to a different conclusion" even when considering the same evidence.  *Kearney v. Standard Insurance Co.*, 175 F.3d 1084, 1094 (9th Cir. 1999) (*en banc*).  That argument is even stronger here, where summary judgment depended on legal errors, as there is no reason the district judge would reach the same conclusions when properly applying the law.  Regardless, Yuga's assertion that the trial court would reach the same result on remand is a red herring since at summary judgment the case was headed for a jury trial, not a bench trial.  *See* OB59-61; *infra* pp.27-29.[4]

---

[2] Quotations and citations omitted, and emphasis added unless noted.

[3] Yuga misleads when it implies (RB38) that Appellants were "allowed" to relitigate liability at the remedies trial.  Appellants presented evidence relevant to remedies, though some would also have been relevant to liability (*e.g.*, evidence concerning their intent to criticize Yuga).

[4] This distinguishes Yuga's meager authority, which deals with situations where (1) a ***jury*** had made a ***liability*** finding supporting summary judgment on a near-identical liability claim (*Tennison* and *Gareis*) or (2) the district court made a second ***summary judgment*** ruling supporting a prior summary judgment ruling (*Payne*).

II. **THE DISTRICT COURT'S NOMINATIVE FAIR USE, FIRST AMENDMENT, AND TRADEMARK OWNERSHIP ERRORS EACH INDEPENDENTLY REQUIRES REVERSAL**

A. **Nominative Fair Use**

Ripps and Cahen used the asserted marks because they were "'necessary' to describe their [endeavor]"—criticism of Yuga's Bored Ape NFTs. *See Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1180 (9th Cir. 2010); OB20-25. The district court only granted Yuga summary judgment on nominative fair use by (1) erroneously holding that the defense was unavailable because Appellants "are not using the BAYC Marks to sell Yuga's BAYC NFTs," 1-ER-90; (2) wrongly shifting the burden of proof to Appellants; and (3) failing to correctly apply this Court's three-factor nominative fair use framework from *New Kids*. *See* OB21-22.

Yuga does not dispute: (1) that the court erred by placing the burden of proof on Appellants to prove the three *New Kids* factors,[5] (2) that the court failed to consider the first factor and misstated the second factor, or (3) that Yuga should not have prevailed on the first or second factor whoever bore the burden. *See generally* RB40-42.

Yuga doubles down on the district court's assertion that nominative fair use is categorically unavailable because Appellants used the marks "to sell their own

---

[5] Nor does Yuga dispute that this burden-shifting error derived from its proposed order. *See* OB22 n.12.

- 4 -

competing RR/BAYC NFTs." RB41 (citing 1-ER-90). This Court rejected Yuga's argument in *Cairns v. Franklin Mint Co.*, which held that nominative fair use is available "where a defendant has used the plaintiff's mark to describe the plaintiff's product, *even if the defendant's ultimate goal is to describe his own product*." 292 F.3d 1139, 1151 (9th Cir. 2002) (emphasis in original).

Unable to circumvent *Cairns* (which Appellants cited prominently, OB2, 21), Yuga ignores it. Instead, Yuga proposes a new rule: that nominative fair use does not apply when marks are used "to misidentify a counterfeit product as authentic." RB40-41. Yuga's proposal is doubly flawed.

*First*, this rule would be inapplicable, because it is factually disputed whether the RR/BAYC NFTs are "counterfeit[s]"—a loaded term that appears over five dozen times in Yuga's brief. By definition, a "counterfeit" is something "made to look genuine… with an intent to defraud." "Counterfeit," *Black's Law Dictionary* 441 (11th ed. 2019). But the record shows (particularly when read in Appellants' favor) that Ripps' and Cahen's expressly stated intent was not to "defraud" by trading on Yuga's reputation but to undermine Yuga by "us[ing] satire and appropriation to protest and educate people." OB41; *see also* OB9-10, 13. Even if Yuga's rule were legally sound, whether it applies would be a jury question, unresolvable on summary judgment.

Regardless, Yuga's proposed rule is legally unsound.  It cannot be squared with *Cairns*, which granted the *defendant* summary judgment of nominative fair use for non-licensed products that claimed to be "authentic" and were sold with a "Certificate of Authenticity."  292 F.3d at 1155.  And to the extent that Yuga's (amorphous) "counterfeit" argument turns on whether the defendant sold a product similar to the markowner's or is using the asserted mark in the name of the defendant's product, this Court has applied nominative fair use in both scenarios. *See Playboy Enterprises Inc. v. Welles*, 279 F.3d 796, 799, 802-803 (9th Cir. 2002) (defendant used the trademarked phrase "Playmate of the Year" to sell defendants' photos from defendant's website); *Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 893 (9th Cir. 2019) (defendant sold a seminar critical of the plaintiff's product and used two of the plaintiff's marks in the seminar's title); *Toyota*, 610 F.3d at 1177 (reversing injunction against using website addresses including the "Lexus" mark).  The only case Yuga cites that addresses the requirement that the mark refer to the plaintiff's product, *Experience Hendrix LLC v. Hendrixlicensing.com Ltd.*, is inapposite, as that defendant "*d[id]  not argue* that his domain name refer[ed] to [the markowner's] Experience Hendrix's products," but rather to Jimi Hendrix, the person.  762 F.3d 829, 839 (9th Cir. 2014).[6]

---

[6] Yuga's brief cites *New Kids* (RB40), but that decision says nothing about "counterfeit" products.  Instead, Yuga seems to be relying on a footnote that

Yuga's remaining arguments fare no better. *First*, Yuga admits that the district court misallocated the burden of proof on the *New Kids* factors but tries to excuse that error as "irrelevant" because the court supposedly resolved nominative fair use "as a matter of law" (apparently referring to the fact that nominative fair use was decided at summary judgment). RB41-42; *see* OB41. Not so. If the district court had properly applied the *Toyota* standard, **Yuga** would have been required to prove that no reasonable jury could find nominative fair use to win summary judgment. *See C.A.R. Transportation Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) ("When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence that would entitle it to a directed verdict[.]'"). The district court did not (and could not) find the evidence so one-sided. The court held only that "**Defendants** have failed to establish all the elements of the nominative fair use defense," 1-ER-90, not that Yuga had met its Rule 56 burden.[7]

*Second*, Yuga asserts (without record citation) that the court held that Appellants failed to meet their threshold *Toyota* burden to show that they used the

---

discusses the scenario when a competitor uses "more than was necessary" of a mark, *New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302, 308 n.7 (9th Cir. 1992)—a point that Yuga has not argued.

[7] Yuga's reliance (RB41) on *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1107 n.7 (9th Cir. 2010), is misplaced. *Vernor* stated it need not resolve a burden issue where "the facts… **are undisputed**." *Id.*

marks to refer to the Bored Ape NFTs. RB41-42. But the only reason the district court gave for stating that the RR/BAYC NFTs "'refer[red] to something other than the plaintiff's product'" was that "Defendants are not using the BAYC marks to sell Yuga's BAYC NFTs." 1-ER-90 (quoting *New Kids*, 971 F.2d at 308). Requiring Appellants to show that they were trying "to sell Yuga's NFTs" to invoke nominative fair use was legal error. *See supra* pp.4-6. At a minimum, whether Appellants' use referred to Yuga's product was genuinely disputed. The RR/BAYC Project's purpose was to criticize Yuga's Bored Ape NFTs; without identifying the Bored Ape NFTs, Appellant's criticism would have been meaningless. *See* OB24-25. Nominative fair use protects such "artistic work [that] targets the original." *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 901 (9th Cir. 2002).

*Third*, Yuga asks this Court to hold as a matter of law (and in the first instance) that the RR/BAYC NFTs "obviously" suggest Yuga's endorsement/sponsorship. RB42. But *Toyota* requires that Appellants' use of the marks be examined in "context," 610 F.3d at 1178 n.5, and whether the RR/BAYC NFTs were satirical criticism or "counterfeits" trading on Yuga's goodwill is a chief factual dispute, *see supra* pp.5. Yuga has no direct response to any evidence rebutting an inference of sponsorship—including the "RR" prefix connoting Ripps' incessant criticism of Yuga or Ripps' voluminous writings about Yuga's exploitation of the NFT craze and its propagation of racist tropes. OB24-25. Yuga asserts in passing (RB42 n.21)

- 8 -

that Appellants' criticism of Yuga should be separated from Appellants' use of the mark, but there is at least a genuine dispute as to whether the two are inextricably intertwined. *See* OB27-30; *infra* pp.10-12.

### B. First Amendment

Ample evidence establishes that Ripps and Cahen's sale of RR/BAYC NFTs was one component of their expressive project to criticize Yuga, and that the marks' use was artistically relevant and not explicitly misleading—particularly when the record is viewed in their favor. OB27-33. If *Rogers* applies, there is no need to reach likelihood-of-confusion. *See Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022, 1028 (9th Cir. 2024). Yuga's contrary arguments fail.

### 1. Source Identification. *Jack Daniel's v. VIP Products LLC* expressly

declined to disrupt the rule that *Rogers* protects speech when (as here) a mark is used for protected expression rather than "used as a mark," for "source identification." 143 S. Ct. 1578, 1590-1591 (2023). The Supreme Court held that a mark is "source identifying" when the defendant uses the mark to "'trad[e] on the good will of the trademark owner to market its own goods.'" *Id.* at 1589. This factual distinction is vigorously disputed.

Yuga's only direct response comes in a footnote asserting that (1) *Punchbowl* somehow "rejected" the Supreme Court's definition of source identification, and (2) the **trial record** established that Appellants "attempted to trade on Yuga's good

will." RB44 n.22. *First*, this Court did not purport to overrule the Supreme Court in *Punchbowl*. The page Yuga cites summarizes the state of Ninth Circuit law **before** *Jack Daniel's*; it says nothing about *Jack Daniel's* itself. *Id.* (citing 90 F.4th at 1028). Yuga's only suggestion for what source identification means is that the asserted mark is used in the defendant's product's title or name. RB43-44. But that is impossible: *Jack Daniel's* noted that "titles of 'artistic works' like the works themselves have an 'expressive element' implicating 'First Amendment values.'" 143 S. Ct. at 1587 (quoting *Rogers v. Grimaldi*, 875 F.2d 994, 998 (2d Cir. 1989)). The Supreme Court also approvingly cited both *Mattel* and *Rogers*, noting that each concerned an expressive work that used the asserted mark *in the title* without being "a source identifier." *Id.* at 1587-1588 (*Rogers* concerned "a film… titled 'Ginger and Fred,'" and *Mattel* concerned "the song 'Barbie Girl'"). *Second*, although the remedies-trial record is irrelevant to whether summary judgment was erroneously granted on liability, *see supra* pp.2-3, Yuga mischaracterizes that record. The court concluded only that Appellants did "damage to goodwill," 1-ER-65, not that "Defendants attempted to trade on Yuga's goodwill," RB44 n.22 (citing 1-ER-65).

   **2.    Artistic Expression.** It is factually disputed whether the RR/BAYC NFTs are either (1) a component of the preexisting, expressive RR/BAYC Project (at least auxiliary to that work) or (2) expressive in-and-of-themselves. OB27-31.

*First*, responding to the argument that the NFTs were a component of the RR/BAYC Project, Yuga argues that the "auxiliary" doctrine laid out in *Twentieth Century Fox* was "abrogated" by *Jack Daniel's*. RB46 n.23. But since nothing in *Jack Daniel's* addresses the "auxiliary" doctrine, *Punchbowl* reaffirmed this precedent, 90 F.4th at 1031 ("[P]reexisting Ninth Circuit precedent adopting and applying *Rogers*… remains intact and binding" except for the "narrow point of law that *Rogers* does not apply when a mark is used as a mark."); OB30 n.15. Yuga never explains why a doctrine protecting merchandise like champagne glasses and shirts emblazoned with "Empire" but lacking any other connection to the *Empire* television show, *see Twentieth Century Fox Television v. Empire Distribution, Inc.*, 875 F.3d 1192, 1195-1196 (9th Cir. 2017), would not apply to NFTs produced as part of an expressive project satirizing NFTs and criticizing a prominent NFT collection.

Yuga does not contest that Appellants' broader RR/BAYC Project is an expressive work protected under the First Amendment. Yuga has no substantive response to Ripps and Cahen's expression—the extensive artistic commentary about the nature of NFTs and the pre-commission artistic statement on rrbayc.com, 2-ER-280; the criticism of Yuga's racist memes and business practices on gordongoner.com, 2-ER-247-254; or Ripps' longstanding criticism of Yuga on Twitter, *see* 1-ER-46—other than to factually assert that some "consumers on NFT

- 11 -

marketplaces and Etherscan" might not "necessar[ily]" see it. RB46. Ample evidence proves that Ripps' critical message was well known among NFT collectors. *See, e.g.*, 4-ER-652-680 (emails from NFT collectors). Regardless, the same thing could have been said about the "Empire"-emblazoned champagne glasses and shirts (which could have been encountered without having seen the show) or the promotional materials in *Rogers* (which could have been encountered without having watched the movie). OB28-30.[8]

Regardless, the RR/BAYC NFTs are also expressive in-and-of-themselves. They included the "RR/" prefix and satirically undermine Yuga's claim that their NFTs convey rights in the Bored Ape Images. *See* OB28-30. Yuga's primary response is that the RR/BAYC NFTs cannot be expressive because they are "counterfeit goods." RB45. But the "counterfeit" allegation is factually disputed, unresolvable at summary judgment. *See supra* pp.5. This distinction also disposes of Yuga's cases, which state only that the First Amendment does not protect *prohibited* commercial activities that involve some speech. *See* RB45 (citing *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1312-1313 (9th Cir. 1997) (counterfeit jeans); *Nordyke v. Santa Clara County*, 110 F.3d 707, 710 (9th Cir. 1997) (gun

---

[8] Yuga's reliance (RB45-46) on *Gordon v. Drape Creative, Inc.* is misplaced, as it did not involve the auxiliary doctrine or purport to exhaustively define what constitutes an expressive work. 909 F.3d 257, 268-269 (9th Cir. 2018).

shows)). Yuga argues in circles: Yuga contends that the RR/BAYC NFTs lack *Rogers* protection because they are "counterfeits" in violation of the Lanham Act *and* asserts that the RR/BAYC NFTs violate the Lanham Act because *Rogers* is inapplicable. That cannot justify summary judgment.

**3.** Yuga does not dispute it failed to meet its burden on the artistic relevance prong of *New Kids*. *Compare* OB31-32 *with* RB44-46.

**4.** Yuga argues the RR/BAYC NFTs "explicitly mislead[]" because (1) Appellants purportedly used marks similarly to Yuga and (2) Appellants supposedly "suggested [Yuga] sponsorship." RB46-47. But Yuga does not even attempt to argue that it carried its burden as a matter of law on this issue. Nor could it. The very case Yuga cites for the first point denied summary judgment to the *defendant* on those facts—it did not grant summary judgment to the plaintiff. *See Gordon*, 909 F.3d at 271 (noting that defendant had (i) used a "slight variation" of the mark and (ii) printed its website address on the back of the item weighed against a finding of explicitly misleading). As to the second point, Appellants strongly dispute that they ever "suggested" sponsorship, given their repeated, public criticism of Yuga. OB9-14, 20. Regardless, an "*implicit*[] suggest[ion of] endorsement or

sponsorship" does not explicitly mislead. *Dr. Seuss Enterprises, LP v. ComicMix LLC*, 983 F.3d 443, 462 (9th Cir. 2020) (emphasis in original).[9]

### C.    Ownership

Yuga's ownership of the asserted marks is genuinely disputed in at least four ways:

**1. Licensed To Purchasers.**  Yuga's principal response is that its Terms "plainly" license only copyrights, not trademarks.  RB50.  But Yuga identifies nothing in the Terms limiting the license to copyright, *see* RB49-51, and no law requires the Terms to say "trademark" to convey trademark rights.  Yuga's own case (RB51) holds that abandonment can arise from even "an *implied* license," *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 516 (9th Cir. 2010), and any contractual ambiguity is a jury question.  Yuga's analogy to "purchasing a poster from the Coca-Cola Museum" (RB50) is specious.  The Coca-Cola Museum does not publish terms giving poster purchasers an "unlimited, worldwide license to use, copy, and display the purchased Art" and to "create[e] derivative works" for profit. 2-ER-277.  Nor has Coca Cola's CEO publicly stated that it has transferred "[*a*]*ll* IP

---

[9] To address just one of Yuga's accusations, Appellants did not "manipulat[e] Etherscan."  RB47.  While Yuga misleadingly focuses on Etherscan's "name" and "symbol" fields, RB9-10, Etherscan identified RR/BAYC NFTs as Ryder Ripps creations through the "contract address" and "creator" fields, which tied the NFTS to Ripps.  *See, e.g.*, 2-ER-272 (Etherscan displaying "Creator: *ryder-ripps.eth").

rights" in its marks to purchasers, with Coca Cola retaining "none of th[e]" trademark rights. 8-ER-1493-1494-¶163.

**2. Failure To Police Licensees And Non-Licensees.** Yuga's responses (RB51) reduce to the assertion that (1) Yuga had no obligation to monitor its marks' use and, (2) if it did, its minimal efforts suffice. Yuga's assertion that it did not license its trademarks again fails. *See supra* p.14. Yuga also cannot identify any specific quality control measures it has taken regarding Bored Ape NFT holders, whether "express contractual rights to inspect and supervise," "*actual* control over" licensees' products, or "close working relationship[s]" with licensees. *FreecycleSunnyvale*, 626 F.3d at 516-518. While Yuga points to four (unexplained) record cites it claims show Yuga polices its marks (RB51), three are improper, irrelevant citations to trial declarations discussing the DMCA takedowns *at issue here* (4-SER-1093 (Williams), 4-SER-1112-1113 (Muniz)), and the fourth is an irrelevant Twitter thread with collectors discussing an RR/BAYC NFT (3-SER-649). Appellants' substantial counter-evidence of unlicensed uses establishes a genuine factual dispute. OB45-46.

**3. Transfer Via Gift.** It is genuinely disputed whether Yuga's transfer to the ApeCoin DAO of an NFT containing the Ape Skull logo left Yuga without residual ownership of three asserted marks. OB46. Yuga apparently argues the transfer conveyed *no* intellectual property rights. RB50. That is at odds with the record. *See*

FER-4 ("This NFT conveys along with it all rights and privileges of the logo's intellectual property to the ApeCoin DAO.  The ApeCoin DAO will decide how the IP is used."); 8-ER-1494-1495-¶¶164-166.  And the statement that the ApeCoin NFT image (left) is "not one of the BAYC marks" is obviously wrong:

 

FER-4; 4-ER-821.

**4.  Abandonment of "APE" claims.**  Yuga concedes that any claim related to the APE mark is "dismissed or abandoned."  RB51 n.28.  That dooms Yuga's cybersquatting claim for apemarket.com, which Yuga's complaint alleged was "confusingly similar to… [the] APE mark[]."  4-ER-834.   Yuga suggests that the apemarket.com cybersquatting claim can be grounded in the BORED APE mark (RB53), but this is nonsensical because apemarket.com uses only a generic portion of the full BORED APE mark.  If Yuga's theory is that using *part* of a trademark in a domain name (indeed, a word with preexisting meanings among crypto enthusiasts, OB47) violates ACPA, then no website domain could include the term "post" or

"bank" without impinging on Washington Post and Bank of America trademarks. That cannot be right.

### D. Reversal On Nominative Fair Use, *Rogers*, Or Ownership Precludes Summary Judgment On Cybersquatting

ACPA applies only to marks "owned" by the plaintiff and only when the defendant is found to have acted in "bad faith"—a finding that cannot be made when the purported infringer "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." *See* 15 U.S.C. §1125(d)(1)(A)(i), (B)(ii); *see also DSPT International, Inc. v. Nahum*, 624 F.3d 1213, 1220 (9th Cir. 2010). Accordingly, if the district court erred in granting summary judgment on Appellants' nominative fair use, *Rogers*, or ownership arguments for purposes of the Lanham Act, it necessarily erred in granting judgment on the ACPA claim. OB25-26, 33.

Yuga does not contest that ownership dispositive. *See* RB53-55. Yuga's only argument regarding nominative fair use and *Rogers* is that ACPA's "reasonable grounds" safe harbor does not apply because Appellants purportedly acted in bad faith in registering the domain names. But this argument (and Yuga's recitation of the statutory bad faith factors) is irreconcilable with ACPA's text, which provides that "bad faith described [under the statute] ***shall not be found***" if the reasonable grounds safe harbor applies. 15 U.S.C. §1125(d)(1)(B)(ii). Yuga's reading would

- 17 -

make the safe harbor a dead letter: If the statutory factors controlled whether the safe harbor applies, it could never be invoked.

*Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1202 (9th Cir. 2009) and *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1033 (9th Cir. 2011), are not to the contrary. Neither relied on the statutory "bad faith" factors to reject the safe harbor defense. Rather, both sensibly held that a serial cybersquatter's vague assertion that he believed domains were permissibly registered did not trigger the safe harbor when any such belief was indisputably and objectively unreasonable. *Lahoti*, 586 F.3d at 1204 (defendant unreasonably relied on trademark defenses rejected in prior cases); *GoPets*, 657 F.3d at 1033 (defendants relied on unreasonable reading of prior arbitration decision). Yuga does not dispute Appellants' subjective good faith in the lawfulness of registering their domains. And if there is a genuine dispute that either nominative fair use or *Rogers* applies, there is necessarily a genuine dispute whether Appellants' belief was objectively reasonable.

## III.   THE DISTRICT COURT MADE MULTIPLE ERRORS IN APPLYING THE *SLEEKCRAFT* / LIKELIHOOD OF CONFUSION ANALYSIS

Finding a likelihood of confusion at "summary judgment is… disfavored," *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005), and not one of Yuga's cited cases (RB25-26) suggests that affirming summary judgment is appropriate where the district court erred in finding one *Sleekcraft* factor undisputed, let alone (as here) multiple factors.

1.     Yuga glosses over the district court's most significant *Sleekcraft* error: examining confusion from the perspective of a *generic* consumer, rather than "the *typical buyer*" of NFTs "exercising ordinary caution."  *See* OB35-36 (discussing *Brookfield Communications* and *Network Automation*).  Yuga concedes (RB35) that *Network Automation v. Advanced Systems Concepts, Inc.* controls, yet says nothing about *Network Automation's* express rejection of what the district court did: assume, in reliance on *Brookfield Communications*, that generic consumers "exercise a low degree of care" online and are baffled by digital commerce.  638 F.3d 1137, 1152-1153 (9th Cir. 2011).

It was genuinely disputed whether typical NFT collectors are sophisticated enough to check Etherscan for the "contract address" and "creator" fields before making an irreversible blockchain transaction, steps the district court acknowledged would "authenticate[]" and "verify provenance" of NFTs.  1-ER-84.  Appellants adduced multiple pieces of evidence that these steps are routine and feasible for typical NFT collectors, who must use a high degree of care with all blockchain technologies.  OB35-37.  Yuga criticizes Ripps' declaration as "improper expert opinion" (RB36) but never explains why that is so.  Nor is an explanation apparent.  Ripps was undisputedly enmeshed in the NFT community and competent to testify about steps he and other NFT collectors necessarily take to purchase and view NFTs; those facts form an adequate foundation to draw inferences about collectors'

sophistication and care. To the extent Ripps opined, it was a lay opinion admissible under FRE 701 because it was rationally based on his perception and "out-of-court experiences," helpful, and based on neither scientific nor specialized knowledge. *See U.S. v. Gadson*, 763 F.3d 1189, 1208-1209 (9th Cir. 2014). Regardless, there was other evidence of collectors' capabilities. *See, e.g.*, 3-ER-596-598 (Hickman deposition). The district court erroneously resolved this dispute in Yuga's favor, undermining its analysis of the sixth *Sleekcraft* factor (type of goods and degree of care) and infecting the rest of its *Sleekcraft* analysis.

**2.** Yuga similarly misapplies precedent and presents the record in Yuga's favor when discussing the third *Sleekcraft* factor (similarity of the marks).

*First*, Yuga attempts to distinguish *Entrepreneur Media, Inc. v. Smith*—and its holding that a defendant adding a two-letter abbreviation to a mark "may serve effectively to signal an important distinction from [plaintiff's] use of [the mark]," 279 F.3d 1335, 1146 (9th Cir. 2002)—because Yuga's marks are supposedly stronger and its marketing channels arguments supposedly better. RB32. But that goes to different *Sleekcraft* factors. None of Yuga's arguments distinguishes *Entrepreneur's* reversal of summary judgment *for a plaintiff* because a juror could rely on the "difference in meaning" conveyed by the defendant's two-letter addition to "reasonably find the marks dissimilar." 279 F.3d at 1146.

Yuga argues (RB31) that the differences between Appellants' use of the marks, including the Ape Skull logo, and its own are too minor to alleviate confusion. But its case law holds only that the ultimate *finder of fact* may find logos "similar" despite "distinctions"—not that such differences are meaningless at summary judgment. *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000) (reviewing preliminary injunction). Regardless, Yuga never explains what precludes a reasonable juror from finding the RR/BAYC logo's express accusation of Nazism to be more than a "trivial distinction[]." *Id.*; *see also* RB31 (conceding that Appellants "add[ed] references to the Nazi SS" to Yuga's logo).

Finally, Yuga contends the marks were sometimes used unmodified. RB30-31. But "[s]imilarity" is a "context-specific concept[]." *Entrepreneur*, 279 F.3d at 1147. Even if certain fields on the RR/BAYC NFTs' Etherscan pages sometimes displayed Yuga's marks unmodified, there is a triable question whether the juxtaposition of those unmodified marks with the immediately adjacent line "Creator: *ryder-ripps.eth" mitigates confusion. *See, e.g.*, 2-ER-272, 5-SER-1158.[10] Likewise, the Foundation screenshots Yuga features in its brief show "@ryder_ripps" as the RR/BAYC collection's creator, immediately adjacent to the unmodified marks. *See* RB12-13.

---

[10] Ripps' unique wallet ID was *always* visible on Etherscan. *See* 2-SER-578; *cf.* RB11 n.5.

**3.**     Yuga's argument on the fifth *Sleekcraft* factor (marketing channels) also fails to eliminate dispute.   Yuga concedes that primary-market sales of RR/BAYC NFTs occurred almost entirely through rrbayc.com and person-to-person sales following Twitter interactions, channels where collectors encountered Ripps' artistic statement expressly distinguishing the RR/BAYC NFTs and the Bored Ape NFTs.  *See* RB33-34.[11]  Yuga argues Ripps' statement is irrelevant, RB34 n.16, but neither of Yuga's cited cases is analogous, *see Au-Tomotive Gold, Inc. v. Volkswagen of America, Inc.*, 457 F.3d 1062, 1077 (9th Cir. 2006) (disclaimer was ambiguous and "undercut" by messages on defendant's website); *E.&J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, n.6 (9th Cir. 1992) (holding it was not abuse of discretion to admit survey evidence regarding disclaimer, despite methodological "flaws").

## IV.   AT MINIMUM, SUMMARY JUDGMENT SHOULD NOT HAVE BEEN GRANTED ON THE LANHAM ACT CLAIM

### A.     Yuga Failed To Identify Protectable "Goods"

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), precludes using a "false designation of origin claim" to challenge the "allegedly unauthorized use of the [media] *content*" of a product.  OB48-51.  Accordingly, a

---

[11]  Yuga focuses (at RB33) on Appellants' supposed attempts to launch ApeMarket.com, but any *future* plan to use that channel is irrelevant since ApeMarket.com never operated, OB34 n.16.

Lanham Act plaintiff must identify a "tangible good[]… offered for sale" in order to state a claim for trademark confusion. OB49. As this Court held in *Slep-Tone Entertainment Corp. v. Wired for Sound Karaoke & DJ Services, LLC*, free-floating consumer confusion regarding the content of the good is insufficient—"if there is any confusion, it [must] concern the source of the *goods*." *See* 845 F.3d 1246, 1249 (9th Cir. 2017) (*per curiam*).

Yuga's complaint identified the purported tangible goods solely as the Bored Ape *NFT collection*, *see* 4-ER-817, and Yuga's brief cites nothing in the record where it alleged or argued its marks identified anything other than those NFTs. At the same time, Yuga has argued (without record citation) that its customers "purchase [an] NFT[] to own the digital content [with] which it is associated," RB47, and that Appellants' conduct was harmful because the (unique) RR/BAYC NFTs "point to the same online digital images as the BAYC collection," RB42. In other words, Yuga's "claim is more accurately conceived of as attacking unauthorized copying" of the linked-to image than mislabeling of the blockchain entry. *Slep-Tone*, 845 F.3d at 1250. *Dastar* and *Slep-Tone* prohibit this claim.

Yuga has no answer whatsoever to the *Slep-Tone/Dastar* argument and thus concedes it. (Yuga's brief attacks a straw man—*i.e.*, the assertion that items that are not "*physically*" tangible are unprotected, RB47—but that is not Appellants' argument.) Yuga's sole amicus attempts to fill Yuga's void, but this Court "do[e]s

- 23 -

not review issues raised only by an *amicus curiae*," *Russian River Watershed Protection Committee v. Santa Rosa*, 142 F.3d 1136, 1141 (9th Cir. 1998).

Regardless, even the *amicus* apparently concedes that whether particular NFTs qualify as "goods" is a question that "depends on the facts" of each case. INTA.Br.16. And while the *amicus* believes as a policy matter that Bored Ape NFTs together with authenticated images *should* qualify as "goods," *e.g.*, INTA.Br.16-19, it largely ignores the standard of review and Yuga's decision to frame its claim around the NFTs *alone*. The *amicus* also fails to identify sufficient evidence *in the summary judgment record* to establish as a matter of law that the Bored Ape NFTs indisputably meet its proposed factual criteria. *See, e.g.*, INTA.Br.19 (arguing, without referencing the record, the ERC-721 standard incorporates images into trademark identification).

### B. Whether Yuga Lawfully Used The Marks Is Disputed

Yuga does not directly rebut Appellants' evidence that Yuga sold the Bored Apes NFTs as unregistered securities. OB51-53. Rather, Yuga asserts that securities law violations were "'collateral' to [Yuga's] use of the mark." RB52. But Appellants' evidence—if credited—would establish Yuga leveraged the marks to promote its NFTs as unregistered securities. OB51-52. Using the marks to sell a product in violation of federal law establish a "nexus between use of a mark and…

- 24 -

alleged… unlawfulness." *CreAgri, Inc. v. USANA Health Scis., Inc*., 474 F.3d 626, 631 (9th Cir. 2007).

## V.  THE DISTRICT COURT ERRONEOUSLY REJECTED APPELLANTS' COUNTERCLAIMS

1.     The DMCA encourages online platforms to create takedown systems that entities like Yuga can wield as a "sword to suppress publication of embarrassing content rather than as a shield to protect its intellectual property." *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1155 (9th Cir. 2016).   Congress created §512(f) liability to deter abuse by people who would "intentionally target[] files [they] knew [they] had no right to remove" under the DMCA.   *Id.*   Yuga's DMCA agent successfully leveraged DMCA takedown processes provided by NFT marketplaces to have the RR/BAYC NFTs removed.  *See* OB54.  Although Yuga has not asserted any copyright claim in this case, its takedown notices expressly referenced §512(f) and the DMCA.  *See, e.g.*, 3-ER-628-629.   Invoking the DMCA spurred the platforms to remove Appellants' RR/BAYC collection, since, as Yuga concedes, platforms "receive many reports that they must triage on an automated basis."  RB66.

Yuga admits no appellate precedent supports its assertion that fleeting references to trademarks immunize, as a matter of law, abusively invoking the DMCA.  *See* RB66 n.36.  This Court should not introduce such a loophole.

2.     Appellants' counterclaim for a declaratory judgment of no copyright should have been dismissed without prejudice when the district court determined it

lacked subject-matter jurisdiction.  OB56.  Yuga now concedes "that rule" and fails to identify an applicable exception.  RB68.

## VI.  THE REMEDIES AWARDED WERE IMPROPER

### A.  The Permanent Injunction Unconstitutionally Burdens Speech

As Appellants explained (OB56-58), the injunction is an unconstitutionally overbroad prior restraint restricting protected speech.  Yuga's primary response is to assert—for the first time—that the injunction should be read narrowly to restrict only "unfair competition, not mere noncommercial speech."  RB57.  But Yuga's abrupt about-face from its refusal to stipulate that the injunction is so limited (or to otherwise limit the term "identify") only underscores the overbroad restraint's danger.  None of Yuga's three unpublished decisions (RB56) affirming injunctions that used capacious language like "identifying" addressed a First Amendment challenge to the underlying injunction's scope.

That an injunction "against *trademark infringement*" is not *per se* a prior restraint subject to strict scrutiny (RB57 n.29) is irrelevant.  The First Amendment is not offended by enjoining speech or conduct constituting trademark infringement.  *See Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1396 (9th Cir. 1997) (affirming injunction prohibiting publication and distribution of the infringing book).  But even assuming Appellants' use of the marks constitutes trademark infringement (it does not), the injunction sweeps in a substantial amount

- 26 -

of protected, non-infringing speech. "Courts should tread cautiously when considering injunctive relief against future" speech in trademark cases because overly "broad" injunctions may reach expression that "amount[s] to no infringement at all." *Anheuser-Busch, Inc. v. Balducci Publications*, 28 F.3d 769, 778 (8th Cir. 1994). Strict scrutiny is thus the correct standard. And this injunction cannot survive it, especially because the court's previous, narrower injunction illustrates that the current, overbroad injunction is not the least-restrictive means of preventing infringement.

Nor is there merit to Yuga's argument (RB57-58) that, to appeal, Appellants had to petition to clarify or modify the injunction. The district court previously entered a clear injunction, then modified it in the final judgment without explanation (copying overbroad language Yuga proposed). 1-ER-5, 1-ER-65-66. Nothing here requires a motion to clarify "vague and ambiguous" language, *Connecticut General Life Insurance Co. v. New Images of Beverly Hills*, 321 F.3d 878, 883 (9th Cir. 2003), or for "clarification of [Appellants'] obligations," *Institute of Cetacean Research v. Sea Shepherd Conservation Society*, 774 F.3d 935, 954 (9th Cir. 2014). The amended injunction was clear, and clearly unconstitutional.

## B. Precedent Prohibited Yuga From Dismissing Its Legal Claims To Avoid A Jury

Under "traditional federal equitable principles," "the party pursuing equitable relief [must] establish that it lacks an adequate legal remedy." *Sonner v. Premier*

- 27 -

*Nutrition Corp.*, 971 F.3d 834, 839 (9th Cir. 2020).  Yuga did not and cannot do so because, through summary judgment, Yuga contended that it was entitled to legal damages (which it later valued at $800 million)—claims that (if meritorious) would plainly make Yuga whole without the $1.6 million equitable relief.  Yuga's last-minute, tactical withdrawal of its legal claims highlights that legal relief *was* available—Yuga just preferred to circumvent Appellants' Seventh Amendment right to a jury trial.  But federal courts' equity jurisdiction does not lie when legal remedies are adequate.[12]

Yuga cannot sidestep this conclusion.  Yuga ignores *Sonner*, where this Court rejected the similar "gamesmanship" of a plaintiff who "initially brought" claims for damages and equitable relief "but later strategically dismissed her… damages claim to avoid a jury trial."  *Guzman v. Polaris Industries Inc.*, 49 F.4th 1308, 1312-1313 (9th Cir. 2022) (describing *Sonner*).  Yuga attempts to rely on Section 1117 (RB58), but it permits disgorgement "***subject to the principles of equity,***" including that equitable relief like disgorgement is unavailable when legal remedies would be adequate.  Such principles of equity cannot be sacrificed to "streamline trial"

---

[12]    Yuga asserts without citation that its expert demonstrated that legal remedies were inadequate because actual damages would be difficult to estimate.  But that same expert submitted a report purporting to precisely quantify those damages, and Yuga's counsel represented that its legal damages were "hundreds of millions [of dollars]."  5-ER-870-871; *see also* 2-ER-118 (asserting, in expert's offer of proof, "cost to purchase and destroy… RR/BAYC NFTs" of $797,183,838).

(RB59), as they are rooted in considerations about courts' proper role, not the parties' convenience. While Yuga attempts to distinguish *Guzman* and *Franklin* on their facts (RB59), both support the "axiomatic" rule that equity will not lie unless legal remedies are inadequate, *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 75-76 (1992); *accord Guzman*, 49 F.4th at 1313.

### C. A Jury Trial Was Required On Cybersquatting Damages

Because cybersquatting is analogous to a common-law cause of action, the district court's bench trial award of more than the minimum statutory damages violated the Seventh Amendment. OB60-61. Yuga asserts cybersquatting is "a modern technological practice with no common law analogue," but that merely recycles the argument dismissed in *GoPets*, 657 F.3d at 1034 (While "[c]ybersquatting, of course, was not a common-law action in English courts in the eighteenth century," it "is a form of trademark infringement" and is "therefore likely analogous to a common-law cause of action.").

Yuga's other arguments also fail. Yuga notes that ACPA "invokes equity" in purporting to grant a court discretion to award statutory damages "as the court considers just." RB60. But this logic is circular: the Seventh Amendment bars Congress from stripping the right to a jury trial in statutory actions that are analogous to those tried to a jury at common law, so Congress's language cannot control. *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 348 (1998) (Seventh

- 29 -

Amendment required jury trial on statutory damages under Copyright Act despite Congress's attempt to authorize statutory damages "as the court considers just"). The single-sentence treatment of the Seventh Amendment argument in the unpublished *Two Plus Two* decision rested on the same erroneous logic. *See Two Plus Two Publishing, LLC v. Jacknames.com*, 572 F. App'x 466, 467 (9th Cir. 2014). And neither *Shields v. Zuccarini*, 254 F.3d 476, 486 (3d Cir. 2001), nor *Spectrum Association Management of Texas, LLC v. Lifetime HOA Management LLC*, 5 F.4th 560, 566 (5th Cir. 2021), addresses a Seventh Amendment argument.

### D.    This Is Not An "Exceptional" Case Warranting $7 Million In Fees

The district court abused its discretion by awarding $7 million in attorney's fees against two individuals who had reasonable and meritorious legal defenses. *See* OB61-64.

Yuga rests its defense of the district court on the legal view that Appellants' defense was "weak." RB62; *see* 1-ER-70. For all the reasons discussed above, Yuga and the district court are wrong on the merits. *See supra* pp.4-29. Yuga does not dispute that if the Court agrees with any of Appellants' merits arguments, the fee award must be vacated. *See* OB61-62. At minimum, Appellants' arguments were reasonable—particularly because this suit involves numerous areas of unsettled law applied to novel technology.

None of Yuga's other points rehabilitates the exceptional case conclusion. While Yuga parrots the district court's statement that Appellants improperly relitigated issues, RB61-62, Yuga does not contest that litigants commonly reassert at summary judgment a position rejected in a motion-to-dismiss decision (due to intervening record developments and for appellate preservation). Yuga instead focuses solely on Appellants' purported "refusal to accept the summary judgment order as binding" at trial (RB62)—but this mischaracterizes the record. *See supra* pp.2-3.

Yuga also selectively quotes (RB63) from the special master's decision, but that passage deals with the fee award's *size*—not the predicate exceptional case determination. As the special master noted, Appellants' allegations regarding antisemitism and racism were matters "integral to [Appellants'] defense" (1-ER-22; *see* OB7-9). Nor does Yuga explain how Appellants' Twitter posts are at all alike the credible threats that culminated in the *TE-TA-MA* litigant's conviction for attempted murder of the presiding judge. *See* OB63-64. And while Yuga attempts to buttress the district court's vague and unsupported assertion that Appellants were "obstructive and evasive," none of their unexplained record cites fills the gap.

## CONCLUSION

Appellants respectfully request that the district court's remedies award be vacated and the liability decision be reversed, with the case remanded for a jury trial.

June 20, 2024

Respectfully submitted,

/s/ *Louis W. Tompros*
_____

THOMAS G. SPRANKLING
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2600 El Camino Real
Suite 400
Palo Alto, CA 94306
(650) 858-6062

DEREK GOSMA
HENRY M. NIKOGOSYAN
WILMER CUTLER PICKERING
   HALE AND DORR LLP
350 South Grand Avenue
Suite 2400
Los Angeles, CA 90071
(213) 443-5316

LOUIS W. TOMPROS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6886

NICHOLAS WERLE
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

KYLE T. EDWARDS
WILMER CUTLER PICKERING
   HALE AND DORR LLP
One Front Street, Suite 3500
San Francisco, CA 94111
(628) 235-1000

## STATEMENT OF RELATED CASES

*Yuga Labs v. Hickman*, No. 24-1297 (9th Cir.) is a related appeal because it arises from the same events at issue here.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 24-879

I am the attorney or self-represented party.

**This brief contains** | 6,992 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

  [ ] it is a joint brief submitted by separately represented parties.

  [ ] a party or parties are filing a single brief in response to multiple briefs.

  [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [          ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Louis W. Tompros | **Date** | June 20, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of June, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Louis W. Tompros*
LOUIS W. TOMPROS